# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **TRACI ST. CLAIRE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | |
| | ) | |
| **DITECH FINANCIAL LLC,** | ) | |
| **f/k/a GREEN TREE** | ) | |
| **SERVICING, LLC** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Defendant.** | ) | |
| | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW, the Plaintiff Traci St. Claire, by and through counsel, and brings this Complaint for Damages and shows the Court the following:

1.

Plaintiff is resident of the state of Georgia.

2.

Ditech Financial LLC ("Ditech"), formerly known as Green Tree Servicing LLC ("Green Tree") is a foreign corporation doing business in Georgia with its Registered Agent for service of process being C.T. Corporation System, 1201 Peachtree Street NE, Fulton, Atlanta, Georgia 30361

3.

Jurisdiction is proper under 28 U.S.C. § 1331 in that one of the counts within this complaint involves a federal question.

4.

Venue is proper in this district under 28 U.S.C. § 1391(a)(2) and 28 U.S.C. § 1391(6)(2) in that all of the events and omissions giving rise to these claims occurred in this district.

## OPERATIVE FACTS RELEVANT TO DEFENDANT'S HOMEOWNER'S PROTECTION ACT VIOLATIONS

5.

Plaintiff refinanced her home through Countrywide Financial in 2007.

6.

To memorialize the mortgage loan, Plaintiff signed a Note and Deed of Trust. This mortgage loan transaction is a "residential mortgage transaction" under 12 U.S.C. § 4901(15).

7.

The loan was originally a fixed rate mortgage as defined in 12 U.S.C. § 4901(3).

8.

The terms of this residential mortgage transaction required that the Plaintiff pay for Private Mortgage Insurance ("PMI"), which must be administered in accordance with the Homeowner's Protection Act. 12 U.S.C. §§ 4901 *et seq.*

9.

When the residential mortgage transaction was consummated in June 2007, the automatic termination date for PMI was listed on the PMI disclosure document provided at the real estate settlement closing as June 1, 2016.

10.

June 1, 2016 was the original automatic termination date because that was the date on which the remaining unpaid principal balance was scheduled to automatically fall below 78% of the original value of the loan. 12 U.S.C. § 4901(18)(A).

11.

The "original value" of a residential mortgage transaction is the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated. 12 U.S.C. § 4901(12).

12.

The appraised value at the time of the purchase was $166,000.  See the home appraisal dated May 7, 2007 attached hereto as Exhibit A.  In the case of a refinance, the statute requires use of the *appraised value* as the original value.

13.

Seventy-eight percent (78%) of $166,000 is $129,480.

14.

Bank of America Corporation purchased Countrywide Financial in July of 2008.

15.

In May 2010, Bank of America ("BOA") agreed to modify the terms of the original loan.

16.

Under the Homeowner's Protection Act, whenever a lender and borrower agree to a modification, then the "termination date . . . shall be recalculated to reflect the modified terms and conditions of such loan."  12 U.S.C. § 4902(d) ("Termination of private mortgage insurance:  Treatment of loan modifications").

17.

The modified terms and conditions of the residential mortgage transaction included that the loan was no longer a fixed rate, but instead became an adjustable rate loan, pursuant to the definition of adjustable rate found in the Homeowner's Protection Act. 12 U.S.C. § 4901(1) ("a residential mortgage that has an interest rate that is subject to change.")

18.

Under the Homeowner's Protection Act, when a loan is an adjustable rate loan, the automatic termination date is determined by the "amortization schedule then in effect." 12 U.S.C. § 4901(18)(B).

19.

In particular, PMI shall automatically terminate for adjustable rate loans on "the date on which the principal balance of the mortgage *based solely on the amortization schedule then in effect for that mortgage*, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the *original value* of the property securing the loan." 12 U.S.C. § 4901(18)(B) (emphasis added).

20.

Also, under the Homeowner's Protection Act, "The term 'original value', with respect to a residential mortgage transaction, means the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated.    In the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, *such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction.*"  12 U.S.C. § 4901(12) (emphasis added).

21.

The term "amortization schedule then in effect" means, with respect to an adjustable rate mortgage, a schedule established at the time at which the residential mortgage transaction is consummated or, if such schedule has been changed or recalculated, is the most recent schedule under the terms of the note or mortgage. 12 U.S.C. § 4901(6).

22.

On or around July 2013, Green Tree purchased the servicing rights of the loan.

23.

On or about December 30, 2013, Defendant Green Tree provided an amortization schedule which showed that the principal balance of the Plaintiff's mortgage was scheduled to fall below the 78% threshold – $129,280 – with the September, 1 2015 payment.  Attached as Exhibit B is a copy of the December 30, 2013 Amortization Schedule.

24.

On April 1, 2015, the interest rate on the loan stepped up from 3.75000% to 4.75000% thus creating a new amortization schedule.  Attached as Exhibit C is a copy of the Home Affordable Modification Agreement showing the effective dates of the step rate change at Section 3. C.  Also see Exhibit A.

25.

Thus, pursuant to the new terms and conditions of the modified loan and the dictates of the Homeowner's Protection Act, the requirement that Plaintiff pay PMI every month was required to automatically terminate on October 1, 2015.

26.

Despite the automatic termination date, Defendant Green Tree continued to collect PMI premiums through May 1, 2016.

## COUNT 1 – VIOLATION OF THE HOMEOWNER'S PROTECTION ACT

27.

Defendant had a duty to cancel Plaintiff PMI following her September 1, 2015 mortgage payment.

28.

Plaintiff's PMI premium each month was $50.40, which she paid each month from October 1, 2015 through May 1, 2016.

29.

In summary, Plaintiff paid a total of $403.20 in total unearned PMI premiums.

30.

Pursuant to 12 U.S.C. § 4907(a)(1), Defendant is liable to Plaintiff for "actual damages sustained by the mortgagor as a result of the violation, including interest (at a rate determined by the court) on the amount of actual damages, accruing from the date on which the violation commences."

31.

Pursuant to 12 U.S.C. § 4907(a)(2)(A), Defendant is liable for statutory damages up to $2,000.00 for its violation of the Act.

32.

Defendant is also liable to Plaintiff for Plaintiff's reasonable costs of this action and attorney's fees to be determined by the Court.  12 U.S.C. § 4907(a)(3) and (4).

## OPERATIVE FACTS RELEVANT TO DEFENDANT'S VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

### A. *Plaintiff's June 16, 2016 NOE*

33.

Pursuant to the Fannie Mae Lender Letter LL-2015-01 entitled "Notification of Future Updates to Borrower 'Pay for Performance' Incentives for a Fannie Mae HAMP Modification" dated January 29, 2015 ("Lender Letter"), Fannie Mae extended the borrower "pay for performance" incentive for one year and added an incentive of $5,000 in connection with the sixth anniversary of the Trial Period Plan effective date.  See Lender Letter attached hereto as Exhibit D.

34.

The Lender Letter states that "This expanded borrower 'pay for performance' incentive will be payable prior to the first payment due after the sixth anniversary of the Fannie Mae HAMP Trial Period Plan effective date for eligible borrowers."  Id.

35.

The eligibility criteria for the "pay for performance" incentive are that the mortgage must:

- Be a first lien conventional mortgage loan that was previously modified under Fannie Mae HAMP modification;

- Be in good standing as defined in *Identifying Loss of Good Standing*[1] in D2-3.2-07 Fannie Mae HAMP Modification on the sixth anniversary of the Trial Period Plan effective date; and

- Not be paid in full.

Id.

36.

Plaintiff's loan was in good standing in accordance with the guidelines provided by Fannie Mae.

37.

Fannie Mae requires that the servicer must "provide written notice of the potential for receipt of the expanded borrower 'pay for performance' incentive to a

---

[1] "If, following a successful Trial Period Plan, a borrower defaults on a HAMP modification (three monthly payments are due and unpaid on the last day of the third month), the mortgage loan is no longer considered to be in 'good standing.' Once lost, good standing cannot be restored even if the borrower subsequently cures the default."
https://www.fanniemae.com/content/guide/servicing/d2/3.2/07.html#Identifying.20Loss.20of.20Good.20Standing (last visited Jan. 11, 2017).

borrower in good standing prior to the fifth anniversary of the Fannie Mae HAMP modification effective date." Id.

38.

If the effective date is prior to April 1, 2015 and before September 1, 2015, then the servicer must "provide at least one written notice on or before June 1, 2015; and  perform at least one follow up communication to the written notice using any acceptable communication methods as described in D2-2-01, Achieving Quality Right Party Contact with a Borrower."[2]   Id.

39.

Plaintiff's Trial Period Plan effective date was January 1, 2010.

40.

Plaintiff's Fannie Mae HAMP Modification effective date was May 1, 2010.

41.

Thus, Plaintiff's fifth year anniversary of the Trial Period Plan effective date was January 1, 2015.

42.

Plaintiff's fifth year anniversary of the Fannie Mae Modification effective date was May 1, 2015.

---

[2] Available at https://www.fanniemae.com/content/guide/svc121615.pdf#page=441 (last visited Jan. 11, 2017)

43.

According the Lender Letter, Defendant was to provide notice of the option to re-amortize the unpaid principal balance.  The written notice must:

- be provided at least 60 days, but no more than 120 days, prior to the sixth anniversary of the Fannie Mae HAMP modification effective date;

- give the borrower at least 30 days, but no more than 180 days, from the date of the notice to respond to the re-amortization offer;

- notify the borrower of any changes to principal and interest payments as required by applicable law;

- specify changes to the payment schedule as a result of the re-amortization and total interest to be paid during the remaining term of the mortgage loan after the sixth anniversary of the Fannie Mae HAMP modification effective date, both with and without the effect of the re-amortization; and

- include the contact information of the servicer and instruct the borrower to contact the servicer if the borrower has questions or concerns about the re-amortize offer.

Id.  The aforementioned written notice is hereinafter referred to as the "Recast Letter".

44.

Plaintiff's sixth anniversary of her Fannie Mae HAMP modification effective date was May 1, 2016.

45.

Plaintiff should have received her Recast Letter between January 2, 2016 and March 2, 2016.

46.

Plaintiff received a letter dated March 30, 2016 from Ditech wherein Ditech offered Plaintiff the opportunity to "recast" her unpaid principal balance over the remaining term of the loan. This "Recast Letter" attached hereto as Exhibit E.

47.

On June 16, 2016, Plaintiff wrote a Qualified Written Request pursuant to the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605(e) to Ditech entitled "QWR/Notice of Error" (hereinafter "June 16, 2015 NOE") and made several inquiries to Ditech, including:

- That the Recast Letter should have been mailed to Plaintiff in November 2015[3] and she was not mailed the Recast Letter until March 30, 2016 and Plaintiff requested an explanation;

- That the Recast Letter contained an incorrect estimated principle balance and Plaintiff requested that the principal balance be corrected

---

[3] Plaintiff had confused the Trial Period Effective Date and the HAMP Modification Effective Date at the time Plaintiff drafted her June 16, 2016 NOE.

or an explanation as to why Ditech states that the balance is different;

- That the Recast Letter listed two separate payments amounts, with the same term length for each.  Plaintiff stated that this was extremely confusing and also incorrect.  Please explain why this was not corrected and addressed and when the error will be corrected;

- That Plaintiff sent in the signed form agreeing to recast my loan and at the time of Plaintiff's letter, the loan had not been recast.  Plaintiff asked for an explanation as to why loan still had not been recast and when it would be recast and asked that it be retroactively adjusted.

- That Plaintiff receive a complete breakdown of each payment Plaintiff had made to Green Tree Servicing and Ditech to include the amount of principle, interest, and escrow amounts and any fees

- That Plaintiff had earlier requested via a demand letter to Cindy Leete, that Plaintiff wanted to cancel her escrow account and requested an explanation for why it had not been done and when it will be done.

48.

Plaintiff received a partial response to her June 16, 2016 NOE from Ditech on July 21, 2016.

49.

The NOE response of July 21, 2016 is erroneous and inaccurate in several key ways.

50.

The July 21, 2016 NOE response stated that Plaintiff "received the 6th incentive, in the amount of $5,000.00 on February 3, 2016. This is the reason that the Recast Offer was mailed on March 30, 2016."

51.

This is completely erroneous and misleading information, as the date of the sixth incentive paid by Fannie Mae in no manner is tied to the date that Plaintiff should have received the Recast Letter.

52.

The July 21, 2016 NOE response also stated that "A review of your loan show that the HAMP trial offer was effective February 1, 2010."

53.

This statement is also completely erroneous and misleading, as Plaintiff's HAMP trial offer was effective January 1, 2010, not February 1, 2010.

54.

As stated in Plaintiff's NOE, the Recast Letter stated an incorrect estimated principal balance, and Plaintiff asked that this be corrected.  Defendant's response did not address this issue at all, and only stated "Please note that the Recast Offer Letter only reflect (sic) preliminary information and do (sic) not reflect the final amortization of the loan."

55.

In fact, the Recast Letter reflects an unpaid principal balance of $114,837.67, when in fact the balance should have reflected approximately $120,177.56 – a difference of approximately $5,000.00.

56.

According to the Payment History attached to Defendant's July 21, 2016 NOE response, Plaintiff's HAMP incentive was credited of $5,000.00 to her mortgage on February 3, 2016, and again on March 29, 2016, then was reversed on March 30, 2016.

57.

Plaintiff pointed out to Defendant that the Recast Letter offered two different payment amounts over the same period of 255 months.  Plaintiff asked that this error be corrected.

58.

In Defendant's July 21, 2016 NOE Response, Defendant did not even attempt to correct the error, but only resubmitted a copy of the original erroneous Recast Letter with its Response.

59.

Plaintiff's inquiry in her June 16, 2016 NOE into why her loan had not been recast went unanswered.  Plaintiff had supplied Defendant with her acceptance of the Recast Offer on April 20. 2016.

60.

Finally, Plaintiff requested a copy of her signed modification agreement from May 1, 2010.  Defendant did not provide a copy of said modification nor even respond to Plaintiff's request.

### B. *Plaintiff's August 10, 2016 NOE.*

61.

Plaintiff sent another NOE to Defendant on August 10, 2016.  Plaintiff's NOE stated, in relevant part:

> I'm in receipt of a PMI cancellation letter as well as an unearned premium refund check which I believe is incorrect.  The letter dated August 4, 2016 states that my PMI was cancelled and the check is for the amount of $26.71.

PMI should have automatically terminated when my principle balance reached 78% Loan to Value in March of 2015 when my balance was $129,368.06. I've attached this statement for your review as well as a copy of page 2 of my appraisal highlighting the original value of my loan at $166,000. I've sent in a copy of the full appraisal so that record should be on file. 78% of $166,000 is $129,480.

Please explain in detail why PMI was not automatically terminated in a timely fashion and why unearned premiums were not returned in a timely fashion in the correct amount including interest. If Ditech believes that they did not err when automatically terminating my PMI, then provide any and all documentation supporting any claim to the contrary.

Please provide a detailed explanation and documentation to support the check in the amount of $26.71 which Ditech purports is my unearned premium.

I've been battling this PMI issue since August 29, of 2015. The failure to correct errors has also caused me emotional distress and caused financial harm.

62.

Plaintiff received document entitled "Agreement for Modification of a Mortgage, Reamortization Only, (HAMP Modification Assistance)" dated September 26, 2016 from Ditech. (Hereinafter "Reamortization Agreement").

63.

Plaintiff executed this Reamortization Agreement and returned it to Ditech on October 19, 2016.

64.

Defendant sent its NOE Response on October 10, 2016 (to Plaintiff's August 10, 2016 NOE), wherein Defendant responded as follows:

> In referenced (sic) to your correspondence related to the a (sic) Private Mortgage Insurance (PMI), we provided the following response:
>
> Per the Mortgage Insurance Disclosure signed at the origination of your loan on June 21, 2007 and the Annual Private Mortgage Insurance Disclosure, last mailed to you on April 7, 2016, "PMI will automatically terminate on the Termination Date, which is the date on which the principal balance of your mortgage, based solely on the initial amortization schedule for your mortgage, is first scheduled to reach 78 percent of the original value of the property securing the mortgage."
>
> A review of your account history indicates that the scheduled date for your loan to reach the automatic termination date was June 1, 2016. The last PMI disbursement occurred on April 4, 2016, in the amount of $151.20. PMI is paid in arrears, therefore this amount represents the PMI payments for March, April, and May. PMI was cancelled effective June 1, 2016. On August 4, 2016, a Private Mortgage Insurance (PMI) Notice was mailed communicating the cancellation of the required PMI, which included a refund from United Guaranty, in the amount of $26.71. This amount was for the unused premium for the last PMI disbursement made, in the amount of $50.40.

65.

As previously stated herein at paragraph 25 *supra*, the requirement that Plaintiff pay PMI terminated on October 1, 2015.

66.

Thus, the NOE Response of Defendant of October 10, 2016 is patently false and misleading.

### C. Plaintiff's October 20, 2016 NOE.

67.

Plaintiff, once again, points out to Defendant that it has mis-stated the date of her HAMP trial offer in their October 10, 2016 NOE response, when Defendant again stated that her HAMP trial offer date was February 1, 2010. Plaintiff went so far as to provide three (3) separate documents proving that the HAMP trial offer date was January 1, 2010.

68.

Plaintiff stated further that:

> [T]he [Recast] letter itself was misleading in regards to the difference in interest and payment amounts with the same term. Ditech omitted the fact that by not recasting the loan, that the term would be shortened, instead showed the term did not change with either payment amount.
>
> . . .

> The plain fact of the matter is that the $5000 incentive payment decreased the total interest due on the loan and by recasting the loan, consumers would not be paying additional interest and by not recasting the loan, they would actually be paying off the loan earlier.  The Ditech Recast Offer Letter led me as a consumer to believe that the recast offer was of no real benefit.  I had to plug the numbers into a spreadsheet to make sense of it.

69.

Plaintiff states in this NOE that her loan has not been serviced in accordance to the Fannie Mae guidelines governing the process for reamortization of HAMP modified loans, and asked for an explanation for this error.

70.

Plaintiff further pointed out again to Defendant Ditech that its Reamortization Agreement dated September 22, 2016 contained several errors including:

- In Paragraph 2 of the Reamortization Agreement incorrectly states the mortgage balance on the first day of the month that the Reamortization Agreement is made.  The Reamortization Agreement states the amount is $123,146.24, when it is actually $117,804.65;

- In Paragraph 5 of the Reamortization Agreement reflects a different monthly payment amount than is reflected in the March 30, 2016 Recast Letter (Exhibit E).  The Reamortization Agreement reflects a

monthly payment amount of $761.60.  The Recast Letter reflects a monthly payment of $732.03;

- Also in Paragraph 5, Plaintiff also challenges Defendant's calculation of the monthly payment, stating that Plaintiff believed the correct monthly payment amount should be $760.22, instead of Defendant's calculated payment of $761.60 (based upon 249 months of payments);

- Plaintiff again challenges Ditech's calculation of the date of PMI automatic termination and points out that Defendant has changed its stated position three separate times as to the proper PMI automatic termination date.

71.

Plaintiff asked for an explanation of how these errors occurred; for the errors to be corrected; or if Defendant believes that these are not errors, explain why Defendant believes them to be correct.

72.

In Ditech's November 9, 2016 response to Plaintiff's October 20, 2016 NOE, Defendant finally corrected Plaintiff's HAMP Trial offer date to reflect January 1, 2010.

73.

Regarding Plaintiff's complaint on why Defendant has delayed applying the reamortization, Defendant stated in its November 9, 2016 response:

> Please note that a delay in issuing the permanent Recast Offer Agreement was the result of the investor, Fannie Mae, not providing the final approval until September 2016. Investor approval is required to be received and the time-line for that approval is outside of Ditech's control.

74.

Defendant's statement regarding "investor approval" being required is a complete falsehood.

75.

The Fannie Mae guidelines for "Communicating with a Borrower Regarding the Re-Amortization Option Related to the Expanded Borrower 'Pay for Performance' Incentive for a Fannie Mae HAMP Modification" is unambiguously clear. The Fannie Mae document states:

> The following table outlines the servicer requirements related to the re-amortization option for a Fannie Mae mortgage loan with a Fannie Mae HAMP modification.
>
> . . .
>
> Apply the same re-amortization conditions to all mortgage loans serviced for Fannie Mae, however, the servicer is authorized to:

- require that the mortgage loan is current at the time of the re-amortization;

- require that the borrower receives the expanded borrower "pay for performance" incentive prior to completing the re-amortization;

- not send a notification to a borrower of the option to re-amortize the UPB if at the time the servicer sends its notifications the borrower is not eligible to receive the expanded borrower "pay for performance" incentive; and

- not to send a notification to an eligible borrower of the option to re-amortize the UPB if the mortgage loan was re-amortized within the previous twelve months.

Provide the re-amortization at no expense to the borrower once the borrower accepts the re-amortization offer.

Perform a follow-up communication to the initial written notice using any acceptable communication methods as described in D2-2-01, Achieving Quality Right Party Contact with a Borrower if the borrower has not responded to the initial written notice.

Provide estimated amortization schedules upon the borrower's request.

Process and document the mortgage loan re-amortization in accordance with *Processing a Re-Amortization After Application of Additional Principal Payments* in C-1.2-01, Processing Additional Principal Payments.

Ensure that the mortgage loan maintains its first lien position and is fully enforceable.

https://www.fanniemae.com/content/guide/servicing/d2/3.2/07.html (last accessed Aug. 31, 2017).

76.

Thus, according to the Fannie Mae guidelines, Defendant was fully authorized to process the Recast Agreement and *was not* required to seek "investor approval.

77.

In addressing Plaintiff's concern regarding the mortgage balance as stated in Paragraph 2 of the Reamortization Agreement, Defendant stated:

> The amount of $123,146.24, referenced is the principal balance under the original loan terms. The agreement was generated in September, therefore under the terms of the HAMP modification, the unpaid principal balance as of the date the agreement was printed was the (sic) $118,246.24. There is no error within the recast offer.

78.

This information is blatantly false and misleading to Plaintiff, as the balance under the original terms of the loan was approximately $117,804.65.

79.

As for Defendant's response to Plaintiff's Notice of Error in Paragraph 5 of the Recast Agreement, Defendant dismisses these discrepancies as merely "estimates" without explaining why these numbers varied between the documents.

80.

Defendant failed and refused to respond to Plaintiff's Notice Of Error regarding the automatic cancellation of her PMI.  To wit:

- Defendant did not respond to the direct inquiry by Plaintiff as to what original value Ditech used to determine PMI removal; and

- Defendant did not respond to the direct inquiry by Plaintiff as to what documents or formula Ditech used to determine the original value used to determine PMI removal.

81.

Further, as to Plaintiff's inquiry into whether Defendant considered her loan to be a fixed rate or a step rate interest loan; Defendant replied:

> Please be advised that your HAMP modification agreement is a fixed interest step rate modification , with an initial interest rate of 3.750% for the first five years, an interest rate of 4.750% for the sixth year, and a final interest rate of 5.000% for the remaining loan term.  The interest rate for your account is 5.000% as stated in the modification agreement.

82.

The information Defendant provided in response to Plaintiff's Notice of Error and Request for Information regarding the Plaintiff's interest rate is incorrect, false, misleading, confusing to Plaintiff (and any other consumer), and

creates new terminology regarding interest rates inconsistent with RESPA and the

Homeowner's Protection Act.

83.

Defendant's terminology of a "fixed interest step rate" is utterly nonsensical.

84.

In Plaintiff's October 20, 2016 NOE, Plaintiff further stated:

> On May 20, 2016, I sent a request to Cindy Leete to cancel my escrow account. The letter was sent via Fed-ex and was received on May 24, 2016. My letter to you dated June 16, 2016 contained the same request. In your letter to me dated July 21, 2016, you stated that "Your request to cancel escrow has been forwarded to our Escrow Department for review. Our Escrow Department is scheduled to review your request within 20 business days. Once they have completed their review, you will be notified of their decision."
>
> I have not received anything regarding my request for cancellation from the Escrow Department and by law, Ditech was required to answer my QWR by July 7, 2016.
>
> Please explain to me why I did not get an answer to my QWR in the time allowed and how Ditech plans to correct this issue.

85.

In Defendant's November 9, 2016 NOE Response, Ditech stated:

> Records indicate that your request to cancel escrow for your account was denied. As a condition of the HAMP agreement, your loan is required to be escrowed.

> Therefore, your account is not eligible to have the escrow requirement waived.  Escrow will remain for the life of the loan.

86.

Contrary to Defendant's statement, the HAMP agreement, at paragraph 4D

in pertinent part, states:

> I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items.  **Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.**  In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.

87.

Thus, Defendant's statement that "[a]s a condition of the HAMP agreement,

your loan is required to be escrowed" is patently false.

### D. *Plaintiff's November 8, 2016 NOE*

88.

Plaintiff states in her November 8, 2016 NOE the following:

Ditech was supposed to re-amortize the loan once I accepted the offer. I accepted the offer and faxed in in on April 20, 2016.[4]

**Please provide to me the servicing guidelines from Fannie Mae that you have to support your claim that Ditech has to have additional approval from Fannie Mae in order to process a HAMP re-amortization of a UPB. Please circle or underline the specifics to make it clear.**

Emphasis in original.

89.

In response to Plaintiff's November 8, 2016 NOE, Defendant Ditech responded on December 19, 2016 and stated the following:

It has been determined that an executed Agreement for Modification (Form 181) is required for Re-Amortization for your loan. At this time it appears that Agreement for Modification documentation was sent to you on November 17, 2016 for execution and to be returned to Ditech by December 17, 2016. Our records show that this Agreement for Modification has not been returned to Ditech. To accept the Recast Offer, please sign and return the original Recast Modification Agreement documents, at the address indicated on the cover page of the agreement to Ditech by December 17, 2016.

---

[4] The April 16, 2016 date is a typographical error made by the Plaintiff. The Modification agreement was actually sent via facsimile on October 19, 2016 to two different facsimile numbers.

90.

This statement is patently false as Plaintiff returned the Modification Agreement *via* facsimile to two different facsimile numbers on October 19, 2016.

91.

Plaintiff further requested in her November 8, 2016 NOE that she be provided with transcripts and actual recordings of all telephone conversation between Plaintiff, Green Tree, and Ditech.

92.

Additionally, Plaintiff requested in her November 8, 2016 NOE that she be provided with "amortization schedules then in effect or a historical recreation of the following dates:  2/1/15, 11/1/15, 3/1/2016.

93.

In response to this request, Defendant responded:  "Please be advised, any information requested outside the scope of RESPA, or which is proprietary, confidential, burdensome or immaterial to the servicing of the account, will not be provided."  No other response was provided to these two requests for information.

**THE REAL ESTATE SETTLEMENT PROCEDURES ACT**

94.

The United States Congress, in enacting RESPA, found:

> The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.

12 U.S.C. § 2601(a).

95.

Further Congress stated the purpose of RESPA:

> It is the purpose of this Act to effect certain changes in the settlement process for residential real estate that will result--
>
> (1)  in more effective advance disclosure to home buyers and sellers of settlement costs;
>
> (2)  in the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services;
>
> (3)  in a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance; and
>
> (4)  in significant reform and modernization of local recordkeeping of land title information.

12 U.S.C. § 2601(b).

96.

RESPA defines a Qualified Written Request ("QWR") as follows:

Qualified written request. For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--

(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605e(1)(B).

97.

RESPA requires that a mortgage servicer respond to a homeowner's QWR in the following manner:

Action with respect to inquiry. Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--

(A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

(B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

(i)  to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

(ii)  the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

(C)    after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

(i)   information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

(ii)  the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2).

98.

Regulations promulgated under RESPA defines a "Notice Of Error":

(a) Notice of error.  A servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred. . . . A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with

all requirements applicable to a notice of error with respect to such qualified written request.

(b) Scope of error resolution. For purposes of this section, the term "error" refers to the following categories of covered errors:

. . .

(2) Failure to apply an accepted payment to principal, interest, escrow, or other charges under the terms of the mortgage loan and applicable law.

. . .

(11) Any other error relating to the servicing of a borrower's mortgage loan.

12 C.F.R. § 1024.35(b).

99.

The mortgage servicer's duties after receiving a Notice Of Error are:

Except as provided in paragraphs (f) and (g) of this section, a servicer must respond to a notice of error by either:

(A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

(B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to

> request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e).

100.

The mortgage servicer's duties after receiving a Request For Information are:

> (d) Response to information request.
>
> (1) Investigation and response requirements. Except as provided in paragraphs (e) and (f) of this section, a servicer must respond to an information request by either:
>
>> (i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or
>>
>> (ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.36.

101.

The mortgage servicer is required under RESPA to maintain reasonable policies and procedures to accomplish the objectives of RESPA's regulations:

> (a) Reasonable policies and procedures. A servicer shall maintain policies and procedures that are reasonably designed to achieve the objectives set forth in paragraph (b) of this section.
>
> (b) Objectives.
>
> (1) Accessing and providing timely and accurate information. The policies and procedures required by paragraph (a) of this section shall be reasonably designed to ensure that the servicer can:
>
>> (i) Provide accurate and timely disclosures to a borrower as required by this subpart or other applicable law;
>>
>> (ii) Investigate, respond to, and, as appropriate, make corrections in response to complaints asserted by a borrower;
>>
>> (iii) Provide a borrower with accurate and timely information and documents in response to the borrower's requests for information with respect to the borrower's mortgage loan;
>
> . . .
>
> (5) Informing borrowers of the written error resolution and information request procedures. The policies and procedures required by paragraph (a) of this section shall be reasonably designed to ensure that the servicer informs borrowers of the procedures for submitting

Page 36 of 51

written notices of error set forth in § 1024.35 and written information requests set forth in § 1024.36.

12 C.F.R. § 1024.38.

## COUNT II – VIOLATIONS OF RESPA

102.

Defendant's July 21, 2016 NOE response violated RESPA by stating the completely erroneous and inaccurate statement that Plaintiff "received the 6th incentive, in the amount of $5,000.00 on February 3, 2016.  This is the reason that the Recast Offer was mailed on March 30, 2016."

103.

As stated *infra*, Plaintiff should have received the Recast Offer, according to the Fannie Mae guidelines, between January 2, 2016 and March 2, 2016.

104.

Plaintiff was damaged by receiving the Recast Offer after the Fannie Mae deadline because Plaintiff was delayed in accepting the Recast Offer and thereby paid additional interest that Plaintiff would not have otherwise had to pay if the Recast had been provided in a timely manner.

105.

Defendant's July 21, 2016 NOE response violated RESPA by making the completely erroneous and inaccurate statement that Plaintiff's "HAMP trial offer was effective February 1, 2010."

106.

Plaintiff's HAMP trial offer was effective January 1, 2010.

107.

Plaintiff was damaged by receiving this inaccurate and misleading information by causing the Plaintiff confusion and anxiety over what are the operative dates of her loan and worry over whether her loan was being serviced properly.

108.

Defendant's July 21, 2016 NOE response violated RESPA by stating the completely erroneous and inaccurate unpaid principal balance of the Plaintiff's loan was $114,837.67.

109.

In reality, Plaintiff's unpaid principal balance was approximately $120.177.56.

110.

Plaintiff was damaged by receiving this inaccurate and misleading information by causing the Plaintiff confusion and anxiety over what her true unpaid principal balance of her loan *actually* was and worry over whether her loan was being serviced properly.

111.

Defendant's July 21, 2016 NOE response violated RESPA by providing the completely erroneous and inaccurate Payment History that showed Plaintiff's loan being credited the $5,000 HAMP incentive on both February 3, 2016 and again on March 29, 2016.

112.

Plaintiff was damaged by receiving this inaccurate and misleading information by causing the Plaintiff confusion and anxiety over what her true unpaid principal balance of her loan *actually* was and worry over whether her loan was being serviced properly.

113.

Defendant's July 21, 2016 NOE response violated RESPA by completely failing to address the error pointed out by Plaintiff that the Recast Offer displayed two different payment amounts over the same 255 month period.

114.

Defendant merely resubmitted a copy of the same erroneous Recast Offer with its July 21, 2016 response.

115.

Plaintiff was damaged by receiving this inaccurate and misleading information by causing the Plaintiff confusion and anxiety whether recasting/re-amortizing her loan would have a positive or negative effect on her mortgage payments and/or interest owed on the loan and worry over whether her loan was being serviced properly.

116.

Defendant's July 21, 2016 NOE response violated RESPA by completely failing to respond to Plaintiff's request for a copy of her May 2010 signed modification agreement.

117.

Plaintiff was damaged by not receiving this information because Plaintiff could not verify the operative dates of the HAMP modification to be able to determine if Defendant Ditech was in compliance with the Fannie Mae requirements set out in the Lender Letter.

118.

Defendant's October 10, 2016 NOE response violated RESPA by providing patently false and misleading information about the automatic cancellation date for Plaintiff's PMI payments.

119.

Plaintiff informed Defendant Ditech in her August 10, 2016 NOE that her PMIJ should have cancelled following her March 2015 payment, when her balance reached $129,368.06.

120.

Defendant erroneously and incorrectly stated in its October 10, 2016 NOE response that Plaintiff's PMI automatic termination date was June 1, 2016.

121.

Plaintiff was damaged by this erroneous information because Plaintiff paid additional PMI that she did not owe, and Defendant continues to refuse to recognize its error.  Plaintiff was further damaged by receiving this inaccurate and misleading information by causing the Plaintiff anger, confusion and anxiety over when her PMI *should have* automatically cancelled on her loan and worry over whether her loan was being serviced properly.

122.

Defendant's November 9, 2016 NOE response violated RESPA by falsely stating that "investor approval" was required before Ditech could recast Plaintiff's mortgage loan.

123.

The Fannie Mae guidelines (available at https://www.fanniemae.com/content/guide/servicing/d2/3.2/07.html) unambiguously state the requirements for re-amortizing Plaintiff's loan, and nowhere within this document is there a requirement for "investor approval."

124.

Defendant was fully authorized to process the Recast Agreement and *was not* required to seek investor approval.

125.

Plaintiff was damaged by the incorrect and erroneous statement because Plaintiff's re-amortization was delayed by Ditech resulting in Plaintiff paying additional interest that she otherwise would not had to pay.  Plaintiff was further damaged by receiving this inaccurate and misleading information by causing the Plaintiff anger, confusion and anxiety over when her loan *should have* been re-amortized and worry over whether her loan was being serviced properly.

126.

Defendant's November 9, 2016 NOE response violated RESPA by falsely stating that the principal balance was $123,124.24 under the original terms of the loan.  127.

The balance under the original terms of the loan was $117,804.65.

128.

Plaintiff was damaged by receiving this inaccurate and misleading information by causing the Plaintiff confusion and anxiety over what her true unpaid principal balance of her loan *actually* was and worry over whether her loan was being serviced properly.

129.

Defendant's November 9, 2016 NOE response violated RESPA by failing and refusing to provide Plaintiff's Request For Information regarding Plaintiff's direct inquiry as to what original value Ditech used to determine PMI removal.

130.

Plaintiff was damaged by this erroneous information because Plaintiff paid additional PMI that she did not owe, and Defendant continues to refuse to recognize its error.  Plaintiff was further damaged by receiving this inaccurate and misleading information by causing the Plaintiff anger, confusion and anxiety over

when her PMI *should have* automatically cancelled on her loan and worry over whether her loan was being serviced properly.

131.

Defendant's November 9, 2016 NOE response violated RESPA by failing and refusing to provide Plaintiff's Request For Information regarding Plaintiff's direct inquiry as to what documents or formula Ditech used to determine the original value used to determine PMI removal.

132.

Plaintiff was damaged by this erroneous information because Plaintiff paid additional PMI that she did not owe, and Defendant continues to refuse to recognize its error. Plaintiff was further damaged by receiving this inaccurate and misleading information by causing the Plaintiff anger, confusion and anxiety over when her PMI *should have* automatically cancelled on her loan and worry over whether her loan was being serviced properly.

133.

Defendant's November 9, 2016 NOE response violated RESPA by failing and refusing to provide Plaintiff's Request For Information regarding whether Defendant considered her loan to be a fixed rate or a step rate interest loan.

134.

Defendant replied:

> Please be advised that your HAMP modification agreement is a fixed interest step rate modification, with an initial interest rate of 3.750% for the first five years, an interest rate of 4.750% for the sixth year, and a final interest rate of 5.000% for the remaining loan term. The interest rate for your account is 5.000% as stated in the modification agreement.

135.

The information Defendant provided in response to Plaintiff's Notice of Error and Request for Information regarding the Plaintiff's interest rate is incorrect, false, misleading, confusing to Plaintiff (and any other consumer), and creates new terminology regarding interest rates inconsistent with RESPA and the Homeowner's Protection Act.

136.

Defendant's terminology of a "fixed interest step rate" is utterly nonsensical.

137.

Plaintiff was damaged by receiving this inaccurate and misleading information by causing the Plaintiff confusion and anxiety over how her loan should be handled in accordance with the Homeowner's Protection Act as either a

fixed rate loan or a or an adjustable rate loan and worry over whether her loan was being serviced properly.

138.

Defendant's November 9, 2016 NOE response violated RESPA by incorrectly stating that Plaintiff's escrow requirement of her mortgage cannot be waived.

139.

In fact, Plaintiff's HAMP Agreement at paragraph 4D, plainly states: "**Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.**"

140.

Plaintiff has been damaged by this violation of RESPA by not being considered for a waiver of her escrow requirement, and thus losing the ability to control her own funds.  Further Plaintiff has been damaged by the confusion, worry and anxiety that Defendant is not properly servicing her mortgage loan.

141.

Defendant's December 19, 2016 NOE response violated RESPA by failing to recognize that Plaintiff had previously provided Ditech with the Agreement for Modification.

142.

Defendant stated that the Agreement for Modification was sent to Plaintiff on November 17, 2016, and had not been returned.

143.

However, Plaintiff had supplied the executed Agreement to Defendant on October 19, 2016 by sending *via* facsimile to two separate facsimile numbers.

144.

Plaintiff was damaged by the incorrect and erroneous statement because Plaintiff's re-amortization was delayed by Ditech resulting in Plaintiff paying additional interest that she otherwise would not had to pay.  Plaintiff was further damaged by receiving this inaccurate and misleading information by causing the Plaintiff anger, confusion and anxiety over when her loan *should have* been re-amortized and worry over whether her loan was being serviced properly.

145.

Defendant's December 19, 2016 NOE response violated RESPA by not providing the transcripts and actual recordings of all telephone conversations between Plaintiff, Green Tree and Ditech.

146.

In response to Plaintiff's Request For Information, Defendant stated, "Please be advised, any information requested outside of the scope of RESPA, or which is proprietary, confidential, burdensome or immaterial to the servicing of the account, will not be provided."

147.

Plaintiff's Request For information in this regard is clearly within the scope of RESPA. 12 C.F.R. § 1024.38(c)(2)(iii) states that a mortgage servicer should, as a standard requirement, retain "[a]ny notes created by servicer personnel reflecting communications with the borrower about the mortgage loan account."

148.

Plaintiff has been damaged by Defendant's failure to respond to this Request For Information by being denied access to evidence showing her efforts to seek Defendant's compliance with RESPA and its regulations. Plaintiff was further damaged by causing the Plaintiff anger, confusion and anxiety over whether her loan was being serviced properly.

149.

Defendant's December 19, 2016 NOE response violated RESPA by failing and refusing to provide amortization schedules then in effect.

150.

In response to Plaintiff's Request For Information, Defendant stated, "Please be advised, any information requested outside of the scope of RESPA, or which is proprietary, confidential, burdensome or immaterial to the servicing of the account, will not be provided."

151.

Plaintiff was damaged by Defendant's refusal to provide the amortization schedules in effect because Plaintiff could not determine which was the proper date for the termination of her PMI without these schedules, and thereby overpaid her PMI.

152.

Defendant, by failing to accurately respond to Plaintiff's Notices Of Error and Requests For Information in accordance with RESPA laws and regulations, is liable to the Plaintiff for actual damages to be proven by competent evidence. 12 U.S.C. § 2605(f)(1)(A).

153.

Defendant, by failing to accurately respond to Plaintiff's Notices Of Error and Requests For Information in accordance with RESPA laws and regulations, has demonstrated a pattern or practice of noncompliance with the requirements of

RESPA, is liable to the Plaintiff for additional damages in an amount not to exceed $2,000.00.  12 U.S.C. § 2605(f)(1)(B).

154.

Defendant, by failing to accurately respond to Plaintiff's Notices Of Error and Requests For Information in accordance with RESPA laws and regulations, is liable to the Plaintiff for the costs of this action, together with any attorney's fees incurred in connection with this action as this Court may determine to be reasonable under the circumstances.  12 U.S.C. § 2605(f)(3).

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a) Assume jurisdiction of this action;

b) Serve Defendant in manner prescribed by law;

c) Award Plaintiff actual damages sustained as a result of the violation of the Homeowner's Protection Act, including interest (at a rate determined by the court) on the amount of actual damages, accruing from the date on which the violation commenced, pursuant to 12 U.S.C. § 4907(a)(1);

d) Award Plaintiff statutory damages up to $2,000.00 for its violation of the Homeowner's Protection Act, pursuant to 12 U.S.C. § 4907(a)(2)(A);

e) Award Plaintiff reasonable costs of this action and attorney's fees to be determined by the Court, pursuant to 12 U.S.C. § 4907(a)(3) and (4).

f)  Award Plaintiff actual damages in an amount to be proven at trial and statutory damages in an amount up to $2,000 for each violation of RESPA committed by Defendant pursuant to 12 U.S.C. § 2605(f)(1)(B);

g)  Award Plaintiff the costs of this action, together with any attorney's fees as the court may determine to be reasonable under the circumstances pursuant to 12 U.S.C. § 2605(f)(3); and

h)  Award such other and further relief as is just and equitable.

Respectfully submitted, this 5th day of August, 2017.

**HURT STOLZ, P.C.**

/s/ *James W. Hurt, Jr.*
By: James W. Hurt, Jr.
Georgia Bar No. 380104

345 West Hancock Avenue
Athens, Georgia 30601
(706) 395-2750
Facsimile: (866) 766-9245
jhurt@hurtstolz.com                    **ATTORNEY FOR PLAINTIFF**

Page 51 of 51