IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TRACI ST. CLAIRE,

               Plaintiff,

    v.

DITECH FINANCIAL LLC
formerly known as GREEN TREE
SERVICING, LLC,

            Defendant.

CIVIL ACTION FILE NO.

1:17-CV-03370-AT-JFK

**NON-FINAL REPORT AND RECOMMENDATION**

The above-styled case is before the court on a motion [Doc. 10] to dismiss filed by Defendant Ditech Financial LLC ("Ditech") pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendant Ditech argues that Plaintiff Traci St. Claire's complaint [Doc. 1] should be dismissed for failure to state a claim upon which relief can be granted. Plaintiff St. Claire has asserted claims based on alleged violations of the Homeowner's Protection Act, 12 U.S.C. § 4901, *et seq.*, (Count I), and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*, (Count II). [Id.].

I. **Facts**

The facts are drawn from the complaint and the exhibits properly before the court on Defendant Ditech's motion to dismiss. The factual allegations in the

complaint are assumed true and construed in the light most favorable to Plaintiff. Hardy v. Regions Mortg., Inc., 449 F.3d 1357, 1359 (11th Cir. 2006); M.T.V. v. DeKalb County School Dist., 446 F.3d 1153, 1156 (11th Cir. 2006). "However, conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1188 (11th Cir. 2002) (citations omitted).

If "matters outside the pleadings are presented to and not excluded by the court, [a Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d) (as amended 2009). However, "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002)). "'Undisputed' in this context means that the authenticity of the document is not challenged." Horsley, 304 F.3d at 1134 (citation omitted). "[A] document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, [the court] may consider such a document provided it meets the centrality requirement imposed in Horsley." Day, 400 F.3d at

2

1276 (citations omitted).  In the present case, the court has considered the documents attached to Defendant's motion to dismiss and Plaintiff's response because they are undisputed and central to Plaintiff's claims.  [Doc. 10, Exs. A-N; Doc. 17, Exs. A, B].

On or around June 22, 2007, Plaintiff Traci St. Claire obtained a mortgage loan in the amount of $147,500.00 (the "Loan") from Countrywide Home Loans, Inc. d/b/a America's Wholesale Lender ("Countrywide") to re-finance her home located at 8390 Emerald Point Lane, Gainesville, Georgia 30506 (the "Property").[1]  [Doc. 1 ¶ 5; Doc. 10 at 2-3, Exs. A, B].  Plaintiff executed a Note in favor of Countrywide promising to make payments as and when due under the Loan.  [Doc. 1 ¶ 6; Doc. 10, Ex. A]. Plaintiff also executed a Security Deed, wherein Plaintiff granted Countrywide and its successors and assigns a first-priority security interest in the Property.  [Doc. 1 ¶ 6; Doc. 10, Ex. B].  In 2008, Countrywide was acquired by BAC Home Loans Servicing, LP ("BAC"), which then became the servicer for the Loan.  [Doc. 1 ¶ 14; Doc. 10 at 3].  On April 26, 2010, Plaintiff entered into a "Home Affordable Modification Agreement" (the "Modification Agreement") with BAC.  [Doc. 1 ¶ 15; Doc. 10, Ex.

---

[1]In support of its motion to dismiss, Defendant Ditech offered numerous statements regarding the factual background relevant to Plaintiff's claims.  [Doc. 10 at 2-6].  Plaintiff has stated that she has no dispute with Defendant's representation of the facts.  [Doc. 17 at 3].

3

C].  On or around June 1, 2013, servicing of the Loan was transferred to Green Tree Servicing, LLC ("Green Tree").  [Doc. 1 ¶ 22; Doc. 10 at 3].  Effective August 31, 2015, Green Tree became known as Ditech, which continues to service the Loan. [Doc. 1 ¶ 2; Doc. 10 at 3].

Plaintiff alleges that Defendant Ditech had a duty to cancel the Private Mortgage Insurance ("PMI") premium following her September 1, 2015, mortgage payment. [Doc. 1 ¶ 27].  In a letter dated August 29, 2015, Plaintiff informed Green Tree that her PMI should be terminated effective September 1, 2015.  [Doc. 10, Ex. M].  In a letter dated September 3, 2015, Ditech responded to Plaintiff's letter and informed her that her PMI would not be cancelled.  [Doc. 10, Ex. N].  Plaintiff continued to pay the PMI premium of $50.40 each month from October 1, 2015, through May 1, 2016.  [Id. ¶ 28].  Plaintiff alleges that she paid a total of $403.20 in unearned PMI premiums.  [Id. ¶ 29].

Plaintiff's claims are based on four letters that she wrote to Defendant Ditech in 2016, each of which was designated as a Qualified Written Request and/or Notice of Error.  Plaintiff's first letter to Ditech was dated June 16, 2016.  [Doc. 1 ¶ 47; Doc. 10, Ex. D].  Plaintiff stated in the June 16, 2016, letter that she was responding to a letter from Ditech dated May 19, 2016.  [Doc. 10, Exs. D, K].  In a letter dated July 21,

4

2016, Ditech wrote a response to Plaintiff's June 16, 2016, letter.  [Doc. 1 ¶ 48; Doc. 10, Ex. E].  Plaintiff's second letter to Ditech was dated August 10, 2016.  [Doc. 1 ¶ 61].  Ditech wrote a response to this letter on October 10, 2016.  [Doc. 1 ¶ 64; Doc. 10, Ex. F].  Plaintiff's third letter to Ditech was dated October 20, 2016.  [Doc. 1 ¶ 67; Doc. 10, Ex. G].  Ditech wrote a response on November 9, 2016.  [Doc. 1 ¶ 72; Doc. 10, Ex. H].  Plaintiff wrote her fourth letter to Ditech on November 8, 2016.  [Doc. 1 ¶ 88; Doc. 10, Ex. I].  In a letter dated December 19, 2016, Ditech responded to Plaintiff's November 8, 2016, letter.  [Doc. 1 ¶ 89; Doc. 10, Ex. J].

Additional facts will be set forth below as they become necessary for discussion of Plaintiffs' claims.

## II.    Standard of Review

The Federal Rules of Civil Procedure include no requirement that a plaintiff detail the facts upon which the plaintiff bases a claim.  Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (as amended 2007).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

5

elements of a cause of action will not do[.]"  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted); accord Financial Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (recognizing that "while notice pleading may not require that the pleader allege a specific fact to cover every element or allege with precision each element of a claim, it is still necessary that a complaint contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory") (citations and internal quotation marks omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level," i.e., they must do more than merely create a "'suspicion [of] a legally cognizable right of action,' on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Twombly, 127 S. Ct. at 1965 (citations omitted) (emphasis omitted).  "Stated differently, the factual allegations in a complaint must 'possess enough heft' to set forth 'a plausible entitlement to relief[.]'"  Stephens, 500 F.3d at 1282 (quoting Twombly, 127 S. Ct. at 1966-67).  A plaintiff's complaint will be dismissed if it does not contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citation

6

omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.

The court's inquiry at this stage of the proceedings focuses on whether the challenged pleadings "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (citations and internal quotation marks omitted).  And, a court reviewing a motion to dismiss must keep in mind that a "motion to dismiss for failure to state a claim upon which relief can be granted merely tests the sufficiency of the complaint; it does not decide the merits of the case."  Wein v. American Huts, Inc., 313 F. Supp. 2d 1356, 1359 (S.D. Fla. 2004) (citing Milburn v. United States, 734 F.2d 762, 765 (11th Cir. 1984)).  "Regardless of the alleged facts, however, a court may dismiss a complaint on a dispositive issue of law."  Bernard v. Calejo, 17 F. Supp. 2d 1311, 1314 (S.D. Fla. 1998) (citing Marshall County Bd. of Educ. v. Marshall County Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993) ("[T]he court may dismiss a complaint . . . when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action.")); see also Glover v. Liggett Group, Inc., 459 F.3d 1304, 1308 (11th Cir. 2006) (same); Aque v. Home Depot U.S.A., Inc., 629 F. Supp. 2d 1336, 1350 (N.D. Ga. 2009).

The court will apply these standards in ruling on Defendant Ditech's motion [Doc. 10] to dismiss the complaint.

## III.   Discussion

### A.   RESPA and Regulation X Claims

The Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*, "is a consumer protection statute that regulates the real estate settlement process." Hardy, 449 F.3d at 1359 (citing 12 U.S.C. § 2601(a)). "Under RESPA, the Consumer Financial Protection Bureau (the 'CFPB' or the 'Bureau') is tasked with prescribing rules and regulations, as well as interpretations, 'as may be necessary to achieve' RESPA's purpose." Lage v. Ocwen Loan Servicing LLC, 145 F. Supp. 3d 1172, 1182 (S.D. Fla. 2015) (quoting 12 U.S.C. § 2617(a)), aff'd, 839 F.3d 1003 (11th Cir. 2016). "These rules are codified at 12 C.F.R. pt. 1024 and collectively known as 'Regulation X.' In 2013, the CFPB amended Regulation X to implement new rules governing mortgage servicing." Joussett v. Bank of America, N.A., 2016 WL 5848845, at *1 (E.D. Pa. October 6, 2016).

"RESPA–as implemented by Regulation X, 12 C.F.R. § 1024 (2015)–allows borrowers to notify mortgage servicers of possible account errors." Nunez v. J.P. Morgan Chase Bank, N.A., 648 Fed. Appx. 905, 907 (11th Cir. 2016) (citing 12 C.F.R.

8

§ 1024.35).  RESPA provides that the servicer of a federally related mortgage loan must respond in particular ways if the servicer is sent a "qualified written request" ("QWR") from a borrower relating to the servicing of the loan.  <u>See</u> 12 U.S.C. § 2605(e).  RESPA defines a QWR as:

> a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that – (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B).  A QWR may come in the form of a Notice of Error or a Request for Information.  <u>See Walker v. Branch Banking and Trust Co.</u>, 237 F. Supp. 3d 1326, 1331 (S.D. Fla. 2017); <u>Miranda v. Ocwen Loan Servicing, LLC</u>, 148 F. Supp. 3d 1349, 1354 (S.D. Fla. 2015); 12 U.S.C. § 2605(e)(1)(B); 12 C.F.R. § 1024.35(a) ("A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements applicable to a notice of error with respect to such qualified written request."); 12 C.F.R. § 1024.36(a) ("A qualified written request that requests information relating to the servicing of the mortgage loan is a request for information for purposes of this section, and a servicer must comply with all

9

requirements applicable to a request for information with respect to such qualified written request.").

Under RESPA, the loan servicer is only required to respond to a Notice of Error or a Request for Information from a borrower if, *inter alia*, the notice or request constitutes a QWR.[2]  See 12 U.S.C. § 2605(e)(1).  Under Regulation X, however, a servicer is required to respond to Notices of Error and Requests for Information regardless of whether they qualify as QWRs.  See 12 C.F.R. § 1024.35(a) ("A servicer shall comply with the requirements of this section for *any written notice from the borrower* that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred.") (emphasis added); 12 C.F.R. § 1024.36(a) ("A servicer shall comply with the requirements of this section for *any written request for information from a borrower* that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan.") (emphasis added).  "While there is significant overlap between QWRs and

---

[2]The QWR must also relate to the servicing of the loan.  See 12 U.S.C. § 2605(e)(1).

notices of errors and requests for information, the terms are not synonymous.  The CFPB has made this clear in its official interpretation of the regulations: 'A qualified written request is just one form that a written notice of error or information request may take.  Thus, the error resolution and information request requirements in §§ 1024.35 and 1024.36 apply as set forth in those sections irrespective of whether the servicer receives a qualified written request.'" <u>Messina v. Green Tree Servicing, LLC</u>, 210 F. Supp. 3d 992, 1007 (N.D. Ill. 2016) (quoting 12 C.F.R. § 1024, Supp. I (official CFPB interpretations)).

The language of Regulation X indicates that if the borrower sends the servicer a Notice of Error ("NOE"), the servicer is only required to comply with 12 C.F.R. § 1024.35 if, *inter alia*, the asserted error relates to the servicing of a loan.  12 C.F.R. § 1024.35(b) ("For purposes of this section, the term 'error' refers to the following categories of covered errors . . . *Any other error relating to the servicing of a borrower's mortgage loan.*") (emphasis added).  But Regulation X appears to provide that if the borrower sends the servicer a Request for Information ("RFI"), the servicer is required to comply with 12 C.F.R. § 1024.36 even if the request does not relate to the servicing of a loan.  12 C.F.R. § 1024.36(a) ("A servicer shall comply with the requirements of this section for any written request for information from a borrower.

11

. . .").  This is why numerous courts which have analyzed the new rules implemented by Regulation X have held that the scope of 12 C.F.R. § 1024.36(a) "is not limited to requests for information relating to the *servicing* of a loan."[3]  Joussett, 2016 WL 5848845, at *3 (emphasis in original); accord Pollack v. Seterus, Inc., 2017 WL 6343676, at **3-4 (S.D. Fla. December 11, 2017); Cole v. JPMorgan Chase Bank, N.A., 2016 WL 4491731, at *8 (S.D. Ohio August 25, 2016).  The information requested, however, does have to be directly related to the borrower's mortgage loan account.  12 C.F.R. § 1024.36(f)(1).

Regulation X "delineates separate procedures for responding to a borrower's Notice of Error and a borrower's Request for Information." Hernandez v. J.P. Morgan Chase Bank N.A., 2016 WL 3982496, at *4 (S.D. Fla. July 22, 2016).  When a borrower sends a mortgage servicer an NOE, the servicer is required under RESPA and Regulation X to respond in a reasonable manner.  See Renfroe v. Nationstar Mortg.,

---

[3]Although the RFI does not have to relate to the servicing of the loan, Regulation X provides that the servicer which receives an RFI is not required to comply with the response requirements of 12 C.F.R. § 1024.36(c) and (d) "if the servicer reasonably determines" that: the "information requested is substantially the same as information previously requested by the borrower for which the servicer has previously complied with its obligation to respond"; the "information requested is confidential, proprietary or privileged"; the "information requested is not directly related to the borrower's mortgage loan account"; the "information request is overbroad or unduly burdensome"; or the information request is untimely.  12 C.F.R. § 1024.36(f)(1).

AO 72A
(Rev.8/82)

LLC, 822 F.3d 1241, 1244 (11th Cir. 2016) ("RESPA requires mortgage servicers like Nationstar to reasonably respond to notices of error like the one Mrs. Renfroe sent."). The relevant provision of Regulation X specifies that once the servicer has been properly notified of the possible account error, the servicer must respond to the NOE in one of two ways–by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i); accord Nunez, 648 Fed. Appx. at 907 (citing 12 C.F.R. § 1024.35(e)(1)(i)).  In other words, the "servicer must respond [to the NOE] by fixing the error, crediting the borrower's account, and notifying the borrower; or by concluding that there is no error based on an investigation and then explaining that conclusion in writing to the borrower." Renfroe, 822 F.3d at 1244 (citing 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i)).

13

The response requirements for a servicer that receives an RFI are similar. Regulation X provides that after the servicer receives the borrower's RFI, the servicer must respond by either:

> (i) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

> (ii) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.36(d)(1); see also 12 U.S.C. § 2605(e)(2)(C) (providing that the servicer must "after conducting an investigation, provide the borrower with a written explanation or clarification that includes – (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower").

Because RESPA is "a remedial consumer-protection statute, [it] should be construed liberally in order to best serve Congress's intent." Renfroe, 822 F.3d at

14

1244.  However, as one court has explained, "[G]ood faith – not borrower satisfaction – is the relevant standard for loan servicers to meet the substance of RESPA.  Congress could not have intended for § 2605(e)(2) to operate in hindsight as a 'gotcha' – essentially enabling borrowers to tie the hands of loan servicers 'by inundating a lender with qualified written requests until they receive a single unsatisfying response.'" Russell v. Nationstar Mortg., LLC, 2015 WL 5819663, at *8 (S.D. Fla. October 6, 2015) (quoting Banayan v. OneWest Bank F.S.B., 2012 WL 896206, at *6-7 (S.D. Cal. March 14, 2012)).

Plaintiff alleges in Count II of her complaint that Defendant Ditech failed to respond to her various NOEs and RFIs in accordance with RESPA and Regulation X. [Doc. 1 ¶¶ 94-154].  Plaintiff asserts that she wrote four letters to Defendant Ditech in 2016, each of which requested information and/or notified Ditech of errors.  These letters were dated June 16, August 10, October 20, and November 8.  [Doc. 1 ¶¶ 47, 61, 67, 88].  Plaintiff asserts that Defendant's responses violated 12 U.S.C. § 2605(e) and 12 C.F.R. §§ 1024.35, 1024.36, and 1024.38.  [Id. ¶¶ 96-101].  Plaintiff seeks actual and statutory damages, as well as costs and attorney's fees pursuant to 12 U.S.C. § 2605(f).  [Id. ¶¶ 152-54].  Defendant Ditech argues that dismissal is warranted

15

because Plaintiff's complaint fails to state a claim upon which relief can be granted. [Doc. 10 at 7-27].

### 1.   Plaintiff's Letter Dated June 16, 2016

Plaintiff's first letter to Ditech which forms the basis of the present action was dated June 16, 2016, and was labeled as a QWR/NOE.  [Doc. 1 ¶ 47; Doc. 10, Ex. D]. Plaintiff stated in the letter that she was responding to correspondence from Ditech dated May 19, 2016, and she alleged numerous errors and made a number of requests. [Doc. 10, Exs. D, K].  The first error alleged by Plaintiff was that the "recast letter [she] received was late."  [Doc. 10, Ex. D].  Plaintiff wrote: "I should have received it in November of 2015.  Please explain why this offer did not get mailed until March 30, 2016 and what you will do to correct this error."  [Id.].  Defendant Ditech responded by stating, *inter alia*, that pursuant to an agreement with Plaintiff under the Home Affordable Modification Program ("HAMP"), Plaintiff was paid six annual incentive payments from 2011 through 2016, with the last one being "in the amount of $5,000 on February 3, 2016."  [Doc. 10, Ex. E].  Ditech wrote, "This is the reason why the Recast Offer Letter was mailed on March 30, 2016."  [Id.].  Ditech also stated that Plaintiff's "HAMP trial offer was effective February 1, 2010."  [Id.].  Plaintiff alleges that the information provided by Ditech was "erroneous and misleading"

because "the date of the sixth incentive paid by Fannie Mae" is not tied to when the recast letter should have been received, and because "Plaintiff's HAMP trial offer was effective January 1, 2010, not February 1, 2010." [Doc. 1 ¶¶ 50-53, 102-06].

The undersigned finds that Plaintiff fails to state a RESPA or Regulation X claim based on this portion of her letter dated June 16, 2016. Twelve C.F.R. § 1024.35(a) requires the borrower to provide to the servicer written notice of "the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a). Plaintiff asserted in the letter that "the recast offer letter [she] received was late" because she "should have received it in November 2015." [Doc. 10, Ex. D]. However, Plaintiff acknowledges in her complaint that this assertion was incorrect. Plaintiff now claims that she should have received the recast letter between January 2, 2016, and March 2, 2016, not in November 2015 as she stated in the letter. [Doc. 1 ¶¶ 45-47].

RESPA states that the servicer is required to conduct an investigation and then "provide the borrower with a written explanation or clarification that includes . . . a statement of the reasons for which the *servicer believes* the account of the borrower is correct as *determined by the servicer*[.]" 12 U.S.C. § 2605(e)(2)(B)(i) (emphasis added); accord 12 C.F.R. § 1024.35(e)(1)(i). In Ditech's letter dated July 21, 2016, the company responded by stating that it researched Plaintiff's inquiry. Ditech also

17

offered a detailed explanation about "why the Recast Offer Letter was mailed on March 30, 2016." [Doc. 10, Ex. E]. Thus, Ditech fulfilled its obligations under RESPA and Regulation X "by concluding that there is no error based on an investigation and then explaining that conclusion in writing to the borrower." Renfroe, 822 F.3d at 1244 (citing 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i)).

Moreover, even if Plaintiff had alleged facts indicating that Ditech's response was not reasonable, the court would find that Plaintiff has failed to state a claim under RESPA or Regulation X. Plaintiff's arguments about when the HAMP trial offer was effective and when she should have received a recast letter are based on HAMP. [Doc. 17 at 12-13]. In other words, Plaintiff seeks to use RESPA to assert a claim based on alleged violations of HAMP. However, the Eleventh Circuit has held that HAMP does not provide a private right of action. See Miller v. Chase Home Finance, LLC, 677 F.3d 1113, 1116-17 (11th Cir. 2012); see also Okim v. Bank of America, 2012 WL 5930613, at *5 (N.D. Ga. October 25, 2012) (noting that "the Eleventh Circuit has held that no implied private right of action exists under HAMP"), report and recommendation adopted by 2012 WL 5930267 (N.D. Ga. November 26, 2012). Plaintiff has not cited to any caselaw, and the undersigned has found none, holding that a borrower may bring a claim based on alleged HAMP violations through RESPA or

18

Regulation X.  For all these reasons, the court finds that dismissal is warranted on this aspect of Plaintiff's claim.

Plaintiff asserted in the letter to Ditech dated June 16, 2016, that the "recast offer letter had an estimated principle [sic] balance listed that [was] incorrect and/or was not associated with this loan.  Because this was incorrect, the payment amounts and interest calculations were incorrect."  [Doc. 10, Ex. D].  Plaintiff alleges in the complaint that the recast letter from Ditech dated March 30, 2016, reflects an unpaid principal balance of $114,837.67.  [Doc. 1 ¶¶ 54-58, 108-15, Ex. E].  However, Plaintiff asserts that the balance should have been approximately $120,177.56.  [Id.]. In the June 16, 2016, letter, Plaintiff stated that the recast offer listed two separate payment amounts each with the same term length.  She also asked for an explanation and asked what would be done to correct the erroneous estimated balance and "payment amounts and interest calculations" in the recast letter.  [Doc. 10, Ex. D]. When Ditech sent its response to Plaintiff on July 21, 2016, the only statement that could be interpreted as relevant to Plaintiff's NOE on this issue was the following sentence: "Please note that the Recast Offer Letter only reflect [sic] preliminary information and do [sic] not reflect the final amortization of the loan."  [Doc. 10, Ex. E].

19

The court finds that Plaintiff has stated a RESPA and Regulation X claim based on these allegations.  Plaintiff alleged in the June 16, 2016, NOE that the "estimated principle [sic] balance" and corresponding payment amounts were incorrect as listed by Ditech in the recast letter dated March 30, 2016.  [Doc. 1 ¶¶ 54-58, 108-15, Ex. E; Doc. 10, Ex. D].  Because Plaintiff notified Ditech of the possible account errors, Ditech was required by RESPA and Regulation X to either correct the error and notify Plaintiff of the correction or conduct a reasonable investigation and notify Plaintiff that there was no error and provide a reason for this determination.  See 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i).  However, the response from Ditech dated July 21, 2016, would permit a reasonable inference that Ditech did not comply with these requirements.  Ditech argues that "no error regarding the estimated principal balance was present in the July 21, 2016 Response" and stresses that Ditech stated in the response that "the Recast Offer Letter only reflect [sic] preliminary information and do [sic] not reflect the final amortization of the loan." [Doc. 10, Ex. E].  However, it does not appear in the July 21, 2016, response that Ditech, after being informed of the possible errors in the principal balance and payment amounts, corrected the error and notified Plaintiff of the correction, or, after conducting an investigation, notified Plaintiff that there was no error and provided a reason for this determination.  [Id.].

20

The complaint's allegations and the attached documents would allow the court to reasonably infer that Ditech did not comply with RESPA and Regulation X. Therefore, the undersigned finds that dismissal is not warranted on this aspect of Plaintiff's claim. See Iqbal, 129 S. Ct. at 1949.

Plaintiff asked Ditech in the June 16, 2016, letter to provide a "complete breakdown of each payment" that she had made. [Doc. 10, Ex. D]. Plaintiff explained that she wanted every payment listed because she "need[ed] to know if these payments were applied correctly." [Id.]. Ditech responded to Plaintiff's request by attaching a 14-page payment history to its response dated July 21, 2016. [Doc. 10, Ex. E]. Ditech also provided the name and telephone number of a customer service representative employed by the company who could provide assistance to Plaintiff. [Id.]. While Plaintiff asserts in her complaint that the payment history was not accurate, the issue relevant to Plaintiff's RESPA/Regulation X claim is whether Ditech complied with her RFI. As noted *supra*, Regulation X provides that after the servicer receives the borrower's RFI, the servicer may respond by "[p]roviding the borrower with the requested information and contact information[.]" 12 C.F.R. § 1024.36(d)(1)(i). Here, Plaintiff requested a payment history, and Ditech provided the payment history with relevant contact information. Accordingly, the court finds that Plaintiff has failed to

21

state a RESPA/Regulation X claim based on these allegations.  See 12 U.S.C. § 2605(e)(2)(C); 12 C.F.R. § 1024.36(d)(1).

Plaintiff's final request in the June 16, 2016, letter was contained in the last sentence of the correspondence wherein she wrote: "I need a copy of my signed loan modification agreement." [Doc. 10, Ex. D].  Plaintiff had entered into the Modification Agreement with BAC on April 26, 2010.  [Doc. 1 ¶ 15; Doc. 10, Ex. C].  Defendant Ditech acknowledges that it did not send a copy of the Modification Agreement in its response on July 21, 2016.  [Doc. 10 at 17, Ex. E].  However, Defendant argues that Plaintiff cannot state a claim based on this incident for two reasons.  Defendant contends that Plaintiff's request for the Modification Agreement does not relate to the servicing of the Loan and that Plaintiff did not sustain any damages.  [Doc. 10 at 17].

Defendant is correct that RESPA only requires a servicer to respond to a borrower's RFI if it relates to the servicing of a loan.  See 12 U.S.C. § 2605(e)(1). And the court agrees with Defendant that Plaintiff's request for the Modification Agreement does not relate to the Loan's servicing, and therefore, Plaintiff is unable to bring a RESPA claim based on this RFI.  See Hudgins v. Seterus, Inc., 192 F. Supp. 3d 1343, 1348-51 (S.D. Fla. 2016) (discussing cases holding that inquiries related to loan modification do not relate to loan servicing within the meaning of 12 U.S.C. §

22

2605 of RESPA).  However, Plaintiff may bring a claim pursuant to Regulation X based on her request for the Modification Agreement because, as discussed *supra*, 12 C.F.R. § 1024.36 requires the servicer to respond to the borrower's RFI even if the request does not relate to the servicing of a loan.  <u>See</u> 12 C.F.R. § 1024.36(a) ("A servicer shall comply with the requirements of this section for any written request for information from a borrower. . . .");  <u>see also</u> <u>Pollack</u>, 2017 WL 6343676, at **3-4; <u>Joussett</u>, 2016 WL 5848845, at *3; <u>Cole</u>, 2016 WL 4491731, at *8.  In its reply brief, Defendant acknowledges that Plaintiff's "request brought pursuant to Regulation X may include a request for documents that are not specifically related to the servicing of the Loan as argued by Plaintiff."  [Doc. 19 at 11 n.4].  Therefore, dismissal is not warranted on this basis.

Defendant also argues that Plaintiff's claim should be dismissed because she has failed to allege facts demonstrating damages.  [Doc. 10 at 17].  Defendant contends that "Plaintiff did not sustain any damages because the Modification Agreement was already in the Plaintiff's possession, as evidenced by the fact that Plaintiff attached this document as Exhibit C to the Complaint."  [<u>Id.</u>; Doc. 1, Ex. C].  The court finds Defendant's argument on this issue to be unpersuasive.  As previously noted, Defendant acknowledges that it did not send the Modification Agreement despite

23

Plaintiff's request. [Doc. 10 at 17]. The fact that Plaintiff attached a copy of the Modification Agreement to her complaint filed in September 2017 does not establish that she already had a copy in her possession when she wrote her letter to Ditech more than a year earlier in June 2016. Plaintiff asserts in the complaint that she was damaged by Ditech's failure to provide her with the Modification Agreement because she "could not verify the operative dates of the HAMP modification to be able to determine if Defendant Ditech was in compliance with the Fannie Mae requirements set out in the Lender Letter." [Doc. 1 ¶ 117]. The court finds that the complaint's allegations would permit a reasonable inference that Plaintiff suffered damages as a result of Ditech's failure to respond to her request for the Modification Agreement. Accordingly, dismissal is not warranted on this part of Plaintiff's claim brought pursuant to Regulation X. See Iqbal, 129 S. Ct. at 1949.

In sum, the undersigned **RECOMMENDS** that Defendant's motion [Doc. 10] to dismiss be **GRANTED IN PART AND DENIED IN PART** on Plaintiff's RESPA and Regulation X claim based on Plaintiff's June 16, 2016, letter. It is **RECOMMENDED** that Defendant's motion [Doc. 10] to dismiss be **DENIED** on: Plaintiff's RESPA and Regulation X claim based on Ditech's response to her letter dated June 16, 2016, regarding the unpaid principal balance and the monthly payment

24

amounts listed in the recast letter from Ditech dated March 30, 2016 [Doc. 1, Count II ¶¶ 47, 48, 54-58, 60, 108-15]; and Plaintiff's Regulation X claim based on Ditech's response to her request for the Modification Agreement contained in the letter dated June 16, 2016 [Doc. 1 Count II ¶¶ 47, 48, 60, 116-17].   On all other RESPA and Regulation X claims based on the June 16, 2016, letter, it is **RECOMMENDED** that Defendant's motion [Doc. 10] to dismiss be **GRANTED**.

## 2.   Plaintiff's Letter Dated August 10, 2016

Plaintiff's second letter to Ditech was dated August 10, 2016.[4]  [Doc. 1 ¶ 61]. Plaintiff's complaint alleges that in the letter, she told Ditech that "PMI should have automatically terminated when [her] principle [sic] balance reached 78% Loan to Value in March of 2015 when [her] balance was $129,368.06."[5]  [Id.].  Plaintiff stated that she attached "a copy of [her] appraisal highlighting the original value of [her] loan at $166,000. . . .  79% of $166,000 is $129,480."  [Id.].  Plaintiff also wrote:

---

[4]The parties have not attached this letter to any of their filings.  Defendant stated that it is currently unable to locate the letter in its records.  [Doc. 10 at 4 n.7].

[5]Although Plaintiff stated in the letter that her PMI should have terminated automatically in March of 2015, she asserts in the complaint that PMI should have terminated on October 1, 2015, following her mortgage payment on September 1, 2015.  [Doc. 1 ¶¶ 25, 27, 61, 65].

> Please explain in detail why PMI was not automatically terminated in a
> timely fashion and why unearned premiums were not returned in a timely
> fashion in the correct amount including interest.  If Ditech believes that
> they did not err when automatically terminating my PMI, then provide
> any and all documentation supporting any claim to the contrary.

[Id.].  In addition, Plaintiff asked for "a detailed explanation and documentation to

support the check in the amount of $26.71 which Ditech purports is my unearned

premium."  [Id.].

Ditech wrote a response to Plaintiff's August 10, 2016, letter which was dated

October 10, 2016.  [Doc. 1 ¶ 64; Doc. 10, Ex. F].  Ditech wrote the following, in

pertinent part:

> In referenced [sic] to your correspondence related to the a [sic] Private
> Mortgage Insurance (PMI), we provided the following response:
>
> Per the Mortgage Insurance Disclosure signed at the origination of your
> loan on June 21, 2007 and the Annual Private Mortgage Insurance
> Disclosure, last mailed to you on April 7, 2016, "PMI will automatically
> terminate on the Termination Date, which is the date on which the
> principal balance of your mortgage, based solely on the initial
> amortization schedule for your mortgage, is first **scheduled** to reach 78
> percent of the original value of the property securing the mortgage."
>
> A review of your account history indicates that the scheduled date for
> your loan to reach the automatic termination date was June 1, 2016.  The
> last PMI disbursement occurred on April 4, 2016, in the amount of
> $151.20.  PMI is paid in arrears, therefore this amount represents the PMI
> payments for March, April, and May.  PMI was cancelled effective June
> 1, 2016.  On August 4, 2016, a Private Mortgage Insurance (PMI) Notice

> was mailed communicating the cancellation of the required PMI, which
> included a refund from United Guaranty, in the amount of $26.71.  This
> amount was for the unused premium for the last PMI disbursement made,
> in the amount of $50.40.

[Doc. 1 ¶¶ 64, 120; Doc. 10, Ex. F (emphasis in original)].  Plaintiff asserts that the

response from Ditech is "patently false and misleading."  [Doc. 1 ¶¶ 66, 118].

The court finds that Plaintiff has failed to state a claim based on this

correspondence.  As noted, RESPA provides that after receiving an NOE from the

borrower, the servicer is required to either correct the error and notify the borrower of

the correction or conduct an investigation and "provide the borrower with a written

explanation or clarification that includes . . . a statement of the reasons for which the

servicer believes the account of the borrower is correct as determined by the servicer.

. . ." 12 U.S.C. § 2605(e)(2)(A), (B).  Regulation X similarly provides that once the

servicer has been properly notified of the possible account error, the servicer must

respond to the NOE in one of two ways–by either:

> (A) Correcting the error or errors identified by the borrower and
> providing the borrower with a written notification of the correction, the
> effective date of the correction, and contact information, including a
> telephone number, for further assistance; or
>
> (B) Conducting a reasonable investigation and providing the borrower
> with a written notification that includes a statement that the servicer has
> determined that no error occurred, a statement of the reason or reasons for

27

this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i); accord Renfroe, 822 F.3d at 1244 (explaining that the "servicer must respond [to the NOE] by fixing the error, crediting the borrower's account, and notifying the borrower; or by concluding that there is no error based on an investigation and then explaining that conclusion in writing to the borrower") (citing 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i)).  The allegations in Plaintiff's complaint reveal that Defendant Ditech complied with the requirements of RESPA and Regulation X.

Plaintiff alleged in the letter that Ditech erred when it failed to terminate her PMI in March of 2015, and she asked for an explanation about why this did not happen.  [Doc. 1 ¶ 61].  Ditech did not respond with boilerplate language.  Instead, Ditech explained, *inter alia*, that "the Mortgage Insurance Disclosure signed at the origination of [Plaintiff's] loan on June 21, 2007 and the Annual Private Mortgage Insurance Disclosure" indicated that Plaintiff's PMI would be terminated "based solely on the initial amortization schedule for [Plaintiff's] mortgage" and that this occurred on June 1, 2016.  [Doc. 10, Ex. F].  Ditech also wrote that the last PMI disbursement

28

occurred in the amount of $151.20 on April 4, 2016, which represented PMI payments for March, April, and May.  [Id.].  Ditech explained that a PMI notice was mailed on August 4, 2016, notifying Plaintiff of the cancelled PMI effective June 1, 2016, and including a refund of $26.71, which "was for the unused premium for the last PMI disbursement made, in the amount of $50.40."  [Id.].  Ditech also provided Plaintiff with contact information.  [Id.].  These allegations show that Defendant Ditech responded to Plaintiff's August 10, 2016, letter by: investigating her allegations of error, concluding that no error had occurred based on the investigation, and explaining its reasons for the conclusion to Plaintiff in the October 2016 letter.  [Id.].  Thus, Ditech complied with RESPA by providing to Plaintiff "a statement of the reasons for which the *servicer believes* the account of the borrower is correct as *determined by the servicer*[.]" 12 U.S.C. § 2605(e)(2)(B)(i) (emphasis added); <u>accord</u> <u>Bates v. JPMorgan Chase Bank, NA</u>, 768 F.3d 1126, 1134-35 (11th Cir. 2014).  Nothing more was required of Ditech.  <u>See</u> <u>Renfroe</u>, 822 F.3d at 1244; 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i).  RESPA "does not require the servicer to provide the resolution or explanation desired by the borrower; it requires the servicer to provide a statement of its reasons."  <u>Whittaker v. Wells Fargo Bank, N.A.</u>, 2014 WL 5426497, at *8 (M.D. Fla. October 23, 2014).  Because Plaintiff has failed to offer factual allegations that

29

would allow the court to draw the reasonable inference that Ditech failed to comply with RESPA or Regulation X, the undersigned finds that dismissal is warranted on this portion of Plaintiff's claim.  Therefore, it is **RECOMMENDED** that Defendant's motion [Doc. 10] to dismiss be **GRANTED** on Plaintiff's RESPA/Regulation X claim based on her letter to Ditech dated August 10, 2016 [Doc. 1 ¶¶ 61-66, 118-21].

### 3.   Plaintiff's Letter Dated October 20, 2016

Plaintiff's third letter to Defendant Ditech was dated October 20, 2016, and was single-spaced, consisting of three and a half pages.  [Doc. 1 ¶ 67; Doc. 10, Ex. G].  In the letter, Plaintiff repeated her allegations that Ditech had misstated the date of her HAMP trial offer and that the PMI cancellation date was incorrect.  [Doc. 1 ¶¶ 67-70; Doc. 10, Ex. G].  Plaintiff also alleged that she had faxed the Agreement for Modification on October 19, 2016, and that the Agreement contained errors in the balance owed and the monthly payment amount.  [Id.].  In addition, Plaintiff alleged, *inter alia*, that Ditech's recast letter contained errors.  [Id.].

Ditech wrote a response to Plaintiff's October 20, 2016, letter on November 9, 2016.  [Doc. 1 ¶ 72; Doc. 10, Ex. H].  In Ditech's two-page, single-spaced response letter, as acknowledged by Plaintiff in the complaint, Ditech corrected Plaintiff's HAMP trial offer date to accurately reflect the date as January 1, 2010.  [Doc. 1 ¶ 72;

Doc. 10, Ex. H].  Ditech also noted that it had previously responded to similar complaints from Plaintiff on a number of occasions.  [Doc. 10, Ex. H].  This was proper because Regulation X provides that with regard to RFIs, the servicer is not required to comply with the response requirements of 12 C.F.R. § 1024.36(c) and (d) "if the servicer reasonably determines" that the "information requested is substantially the same as information previously requested by the borrower for which the servicer has previously complied with its obligation to respond[.]"  12 C.F.R. § 1024.36(f)(1)(i).  Regulation X also provides that with regard to NOEs, the servicer is not required to comply with the response requirements of 12 C.F.R. § 1024.35(d), (e), and (i) "if the servicer reasonably determines that . . . [t]he asserted error is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied . . . unless the borrower provides new and material information to support the asserted error."  12 C.F.R. § 1024.35(g)(1)(i).

Ditech listed the various incentives that were applied to Plaintiff's account and stated, "Based on the Treasury Department's Pay for Performance program, your loan has been appropriately credited the earned incentives."  [Doc. 10, Ex. H].  Ditech wrote, "It appears that you re-sent the executed Recast Offer Letter July 28, 2016. Please note that a delay in issuing the permanent Recast Offer Agreement was the

31

result of the investor, Fannie Mae, not providing the final approval until September

2016.  Investor approval is required to be received and the time-line for that approval

is outside Ditech's control." [Id.].  Ditech also explained:

> On September 2, 2016, the Recast Agreement was mailed to you for your
> review and acceptance.  The Recast Agreement was due back to Ditech
> no later than October 22, 2016.  Although we have received faxed copies
> of the executed agreement, signed on October 19, 2016, at this time, our
> records do not show that the hard copy executed Recast Agreement, with
> live signature has been received.  Please note upon the receipt of the
> executed Recast Offer Letter, your loan would have been recast or re-
> amortized over the remaining term.  Additionally, a Recast Agreement
> would have been sent for your execution that would have provided the
> actual information based [sic] the current debt owed.  Please be advised
> that we do not have a record of the live signature of the Recast
> Agreement.

[Id.].  Ditech, *inter alia*, provided Plaintiff with the interest rate for her loan, stated that

Plaintiff's request to cancel escrow for her account had been denied, noted that the

monthly payment listed on the March 30, 2016, recast offer was an estimate, and

explained its reasons for concluding that there were no errors in the principal balances

or the PMI cancellation date.  [Id.].

Plaintiff asserts in the complaint that Defendant Ditech's November 9, 2016,

response constituted a violation of RESPA.  Plaintiff alleges that Ditech falsely stated

that "investor approval" was required before the company could recast the loan and

32

that this false statement constituted a violation of RESPA.  [Doc. 1 ¶¶ 74, 122].

Plaintiff cites to Fannie Mae HAMP modification guidelines as evidence in support of

this assertion.  [Id. ¶¶ 75, 76, 123, 124].  Plaintiff alleges that Ditech violated RESPA

by falsely stating that the principal balance was $123,124.24 under the original terms

of the loan when the actual balance was $117,804.65.  [Id. ¶¶ 126, 128].  Plaintiff also

asserts that Ditech violated RESPA by failing to state what original value Ditech used

to determine PMI removal and what documents or formula Ditech used to determine

the original value.  [Id. ¶¶ 129, 131].  Finally, Plaintiff alleges that Ditech violated

RESPA by incorrectly stating that Plaintiff's escrow requirement of her mortgage

cannot be waived, by failing to state whether it considered Plaintiff's loan to be a fixed

rate or a step rate interest loan, and by stating that Plaintiff's loan was a "fixed interest

step rate modification, with an initial interest rate of 3.750% for the first five years, an

interest rate of 4.750% for the sixth year, and a final interest rate of 5.000% for the

remaining loan term."  [Id. ¶¶ 133-39; Doc. 10, Ex. H].

　　　The court finds that Plaintiff has failed to state a RESPA or Regulation X claim

based on Ditech's November 9, 2016, response.  Many of Plaintiff's arguments

regarding the accuracy of Ditech's response amount to claims that Ditech violated

HAMP.  Plaintiff is seeking to bring RESPA claims for violations of HAMP, but, as

33

discussed *supra*, the Eleventh Circuit has held that there is no private right of action under HAMP.  See Miller, 677 F.3d at 1116-17.  Another deficiency with Plaintiff's RESPA claim is that it is based on her contention that Ditech's written response contains inaccuracies and errors.  As previously noted, Plaintiff alleges, for example, that Ditech did not need investor approval for her loan to be recast, that the balance listed by Ditech was erroneous, that Ditech created new terms to describe her rate as "fixed interest step rate," that Ditech should have cancelled her escrow account, and that Ditech used the wrong date, the wrong principal, and the wrong amortization schedule to calculate when her PMI should have been cancelled.  [Doc. 1 ¶¶ 72-87, 122-40; Doc. 17 at 19-26].  But Plaintiff's complaint fails to assert that Ditech's allegedly erroneous responses constituted violations of RESPA.

As discussed *supra*, RESPA requires the servicer to provide to the borrower "a statement of the reasons for which the *servicer believes* the account of the borrower is correct as *determined by the servicer*[.]"  12 U.S.C. § 2605(e)(2)(B)(i) (emphasis added); accord Bates, 768 F.3d at 1134-35.  Plaintiff's allegations indicate that Ditech provided such a statement to Plaintiff in its response dated November 9, 2016.  See Renfroe, 822 F.3d at 1244; 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i).  Ditech fixed Plaintiff's HAMP trial offer date and provided a written statement of the

34

reasons Ditech believed that the other alleged errors raised by Plaintiff were correct as determined by Ditech.  See Renfroe, 822 F.3d at 1244; Whittaker, 2014 WL 5426497, at *8.  Finally, as previously noted, many of Plaintiff's requests were duplicative.  See 12 C.F.R. §§ 1024.35(g)(1)(i), 1024.36(f)(1)(i).  In light of these facts, the undersigned finds that Plaintiff's complaint fails to offer factual allegations which would permit a reasonable inference that Defendant Ditech's response dated November 9, 2016, violated RESPA or Regulation X.   Therefore, it is **RECOMMENDED** that Defendant's motion [Doc. 10] to dismiss be **GRANTED** on Plaintiff's RESPA/Regulation X claim based on her letter to Ditech dated October 20, 2016. [Doc. 1 ¶¶ 67-87, 122-40].

### 4.   Plaintiff's Letter Dated November 8, 2016

Plaintiff wrote her fourth letter to Ditech on November 8, 2016.  [Doc. 1 ¶ 88; Doc. 10, Ex. I].  Plaintiff again alleged that Ditech had misstated the date of her HAMP trial offer and that the company was supposed to re-amortize her loan after she accepted the offer and faxed it in April 2016.  [Doc. 1 ¶¶ 88-93, 141-51; Doc. 10, Ex. I].  Plaintiff also asked Ditech to provide the Fannie Mae servicing guidelines that support Ditech's claim that additional approval was necessary to process a HAMP re-amortization.  [Id.].  In addition, Plaintiff requested that Ditech provide "transcripts

and actual recordings of all telephone conversations between [Plaintiff] and Green Tree and Ditech." [Id.]. Finally, Plaintiff asked for "amortization schedules then effect [sic] or a historical recreation" for February 1, 2015, November 1, 2015, and March 1, 2016. [Id.].

In a letter dated December 19, 2016, Ditech wrote a response to Plaintiff's November 8, 2016, letter. [Doc. 1 ¶ 89; Doc. 10, Ex. J]. Ditech stated that "any information requested outside the scope of RESPA, or which is proprietary, confidential, burdensome or immaterial to the servicing of the account, will not be provided." [Doc. 10, Ex. J]. Ditech stated that many issues had been addressed by Ditech in previous correspondence, and the company specified the dates of letters that had been sent to Plaintiff. [Id.]. Ditech also referred Plaintiff to a website containing Fannie Mae Re-Amortization servicing guidelines. [Id.]. In addition, Ditech wrote:

> It has been determined that an executed Agreement for Modification (Form 181) is required for Re-Amortization of your loan. At this time it appears that Agreement for Modification documentation was sent to you on November 17, 2016 for execution and to be returned to Ditech by December 17, 2016. Our records show that this Agreement for Modification has not been returned to Ditech. To accept the Recast Offer, please sign and return the original Recast Modification Agreement documents, at the address indicated on the cover page of the agreement to Ditech by December 17, 2016.

[Id.].

36

As discussed *supra*, Regulation X provides that the servicer is not required to comply with the response requirements of 12 C.F.R. § 1024.36(c) and (d) "if the servicer reasonably determines" that: the "information requested is substantially the same as information previously requested by the borrower for which the servicer has previously complied with its obligation to respond"; the "information requested is confidential, proprietary or privileged"; the "information requested is not directly related to the borrower's mortgage loan account"; the "information request is overbroad or unduly burdensome"; or the information request is untimely. 12 C.F.R. § 1024.36(f)(1); see also 12 C.F.R. § 1024.35(g). Ditech informed Plaintiff that the company had repeatedly responded to duplicative requests on numerous occasions previously and wrote that "any information requested outside the scope of RESPA, or which is proprietary, confidential, burdensome or immaterial to the servicing of the account, will not be provided." [Doc. 10, Ex. J]. Defendant Ditech argues that on this basis, it was not required to respond to Plaintiff's request for "transcripts and actual recordings of all telephone conversations between [Plaintiff] and Green Tree and Ditech" and her request for "amortization schedules then effect [sic] or a historical recreation" for February 1, 2015, November 1, 2015, and March 1, 2016. [Doc. 10 at 26-27]. Plaintiff made no response in any way to Defendant's arguments on these

37

issues and the court finds them persuasive.[6]  [Doc. 17 at 26].  Plaintiff's complaint fails to offer factual allegations which would allow the court to reasonably infer that Ditech's response dated December 19, 2016, violated RESPA or Regulation X. Therefore, the undersigned **RECOMMENDS** that Defendant's motion [Doc. 10] to dismiss be **GRANTED** on Plaintiff's RESPA/Regulation X claim based on her letter to Ditech dated November 8, 2016 [Doc. 1 ¶¶ 88-93, 141-51].

### B.  Plaintiff's HPA Claim

In Count I of her complaint, Plaintiff asserts a claim based on the Homeowner's Protection Act ("HPA"), 12 U.S.C. § 4901, *et seq.*  [Doc. 1 ¶¶ 27-32].  The HPA governs when homeowners are able to cancel PMI and when PMI must terminate on its own.  The statute provides that a homeowner's obligation to pay PMI ends on the "termination date if, on that date, the mortgagor is current on the payments required by the terms of the residential mortgage transaction[.]" 12 U.S.C. § 4902(b)(1).  The definition of "termination date" under the HPA is provided at 12 U.S.C. § 4901(18)

---

[6]With regard to Ditech's December 19, 2016, letter and the company's argument in support of its motion to dismiss, Plaintiff only offered a two-sentence response to an argument made by Defendant that Plaintiff's RFIs did not relate to the servicing of the loan.  [Doc. 17 at 26].

and depends on whether the mortgage has a fixed rate or an adjustable rate.  The

relevant provision of the Act states that the "termination date" means:

> (A) with respect to a fixed rate mortgage, the date on which the principal balance of the mortgage, based solely on the initial amortization schedule for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan; and

> (B) with respect to an adjustable rate mortgage, the date on which the principal balance of the mortgage, based solely on the amortization schedule then in effect for that mortgage, and irrespective of the outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the original value of the property securing the loan.

12 U.S.C. § 4901(18).  Plaintiff asserts in her complaint that Defendant Ditech had a

duty to cancel Plaintiff's PMI following her mortgage payment on September 1, 2015.

[Doc. 1 ¶ 27].  The complaint alleges that Plaintiff's PMI premium each month was

$50.40, which she paid from October 1, 2015, through May 1, 2016, for a total of

$403.20 in unearned PMI premiums.  [Id. ¶¶ 28, 29].

Defendant argues that Plaintiff's HPA claim should be dismissed because it is

time-barred.  [Doc. 10 at 28].  The HPA provides: "No action may be brought by a

mortgagor . . . later than 2 years after the date of the discovery of the violation that is

the subject of the action."  12 U.S.C. § 4907(b).  Defendant contends that Plaintiff

discovered the HPA violation on or before August 29, 2015, when she sent a letter to

39

Green Tree stating that her PMI should be terminated as of September 1, 2015.  [Doc. 10 at 28, Ex. M].  Plaintiff asked Green Tree to confirm in writing that her PMI would be terminated effective September 1, 2015.  [Id.].  Ditech responded to Plaintiff in a letter dated September 3, 2015, stating that Plaintiff's PMI would not be cancelled.  [Doc. 10, Ex. N].  Defendant contends that because Plaintiff did not file her complaint in this case until September 5, 2017, more than two years after discovering the violation on or before August 29, 2015, Plaintiff's claim is barred by HPA's two-year statute of limitations and must be dismissed.  [Doc. 10 at 28].  The court finds this argument unpersuasive.

Under "the discovery rule," a claim "accrue[s] when the litigant first knows or with due diligence should know facts that will form the basis for an action."  Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784, 1794 (2010) (citations and internal quotation marks omitted) (emphasis deleted).  A court could reasonably infer from Plaintiff's complaint that she did not know the facts that formed the basis for her HPA action and that she could not have discovered those facts with due diligence until after September 5, 2015.  Plaintiff sent a letter to Green Tree on August 29, 2015, but she did not know at that time whether her PMI would be terminated as of September 1, 2015.  [Doc. 10, Ex. M].  The date listed on Defendant's response letter to Plaintiff is September 3,

2015, but one could reasonably infer that Defendant mailed the letter after this date. Furthermore, even if the letter was mailed on September 3, 2015, and assuming an additional three days for mailing, the letter would not have been received by Plaintiff until September 6, 2015. However, September 6 was a Sunday and September 7, 2015, was Labor Day, a Federal holiday when the U.S. Postal Service did not deliver mail. Thus, Plaintiff would not have received Ditech's letter until Tuesday, September 8, 2015. Because Plaintiff filed her complaint in this case on September 5, 2017, less than two years later, the court finds that Defendant has failed to show that Plaintiff's HPA claim is time-barred. Because this is the only argument offered by Defendant regarding this claim, it is **RECOMMENDED** that Defendant's motion [Doc. 10] to dismiss Plaintiff's HPA claim [Doc. 1, Count I] be **DENIED**.

## IV.    Conclusion

Based on the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendant Ditech's Rule 12(b)(6) motion [Doc. 10] to dismiss be **GRANTED IN PART AND DENIED IN PART**. It is **RECOMMENDED** that Defendant's motion [Doc. 10] to dismiss be **DENIED** on:

Plaintiff's HPA claim [Doc. 1, Count I];

41

Plaintiff's RESPA and Regulation X claim based on Ditech's response to her letter dated June 16, 2016, regarding the unpaid principal balance and the monthly payment amounts listed in the recast letter from Ditech dated March 30, 2016 [Doc. 1, Count II ¶¶ 47, 48, 54-58, 60, 108-15]; and

Plaintiff's Regulation X claim based on Ditech's response to her request for the Modification Agreement contained in the letter dated June 16, 2016 [Doc. 1, Count II ¶¶ 47, 48, 60, 116-17].

It is **RECOMMENDED** that Defendant's motion [Doc. 10] to dismiss be **GRANTED** on all other claims asserted by Plaintiff [Doc. 1].

**SO RECOMMENDED**, this 26th day of April, 2018.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

42