IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| TRACI ST. CLAIRE | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| DITECH FINANCIAL, LLC, formerly | : | CIVIL ACTION NO. |
| known as GREEN TREE SERVICING, | : | 1:17-cv-3370-AT-JFK |
| LLC, | : | |
| | : | |
| Defendant. | : | |

## ORDER

This matter filed pursuant to the Homeowner's Protection Act, 12 U.S.C. § 4901, *et seq.*, and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.*, is before the Court on the Magistrate Judge's Report and Recommendation [Doc. 24] ("R&R") that Defendant's Motion to Dismiss [Doc. 10] should be granted in part and denied in part. For the following reasons, the Court **ADOPTS IN PART** and **DECLINES TO ADOPT IN PART** the R&R.

## I. STANDARD

Under 28 U.S.C. § 636(b)(1), the Court reviews the Magistrate Judge's R&R for clear error if no objections are filed to the report. 28 U.S.C. § 636(b)(1). If a party files objections, however, the district court must determine de novo any part of the Magistrate Judge's disposition that is the subject of a proper objection. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b). As Plaintiff filed timely objections to the

Magistrate Judge's R&R, the Court reviews the findings and recommendations contained therein on a de novo basis.

Neither party filed objections to the portions of the R&R denying Defendant's Motion to Dismiss Count I of Plaintiff's Complaint under the Homeowner's Protection Act and denying in part Defendant's Motion to Dismiss select portions of Count II under the Real Estate Settlement Procedures Act.   The Court **ADOPTS** those portions of the R&R to which there are no objections, with the exception of the portion of the R&R discussed in footnote 4 *infra*.   As explained below, the Court disagrees with several significant parts of the R&R's reasoning and findings, and therefore **DECLINES TO ADOPT** those portions.

## II.   SUMMARY FACTUAL BACKGROUND[1]

Plaintiff refinanced her home in 2007 with a fixed rate mortgage.   The terms of the mortgage loan required Plaintiff to pay for Private Mortgage Insurance ("PMI").   The PMI disclosure document provided to Plaintiff at the real estate settlement closing listed the automatic termination date for PMI as June 1, 2016 (the date on which the remaining unpaid principal balance was scheduled to automatically fall below 78% of the original value of the loan).

In May 2010, Plaintiff modified the terms of her loan to an adjustable rate loan under the Home Affordable Modification Program ("HAMP").   Under the

[1] The following summary of facts is taken from Plaintiff's Complaint, the documents attached thereto, and the documents attached to Defendant's Motion to Dismiss as no party disputes their authenticity or centrality to Plaintiff's allegations.   These facts are construed in the light most favorable to Plaintiff but do not represent actual findings of fact.

modified terms and conditions, the automatic termination for PMI was modified to be determined by an amortization schedule in effect at the time of the loan modification.

In July 2013, Defendant purchased the servicing rights of Plaintiff's loan. On December 30, 2013, Defendant provided Plaintiff with an amortization schedule showing that the principal balance of Plaintiff's mortgage was scheduled to fall below the 78% threshold with the September 1, 2015 payment.

On April 1, 2015, the interest rate on the loan increased from 3.75% to 4.75%, thus creating a new amortization schedule. Pursuant to the new terms and conditions of the loan, the automatic termination date for Plaintiff's PMI changed to October 1, 2015. Despite the automatic termination date, Defendant continued to collect PMI premiums through May 1, 2016.

In connection with her HAMP loan modification, Plaintiff was eligible for a "Pay for Performance" Incentive, including a $5,000 principal reduction[2] in her mortgage and the option to recast (or re-amortize) her mortgage based on the reduced balance to lower her monthly mortgage payments for the remainder of the loan. Fannie Mae requires servicing companies like Defendant to provide written notice of the option to re-amortize the unpaid principal balance of the loan at least 60 days (but no more than 120 days) prior to the sixth anniversary of the Fannie Mae HAMP modification effective date.

---

[2] As part of the "Pay for Performance" Incentive, Plaintiff received additional principal reduction payments each year for five years totaling another $5,000. On February 3, 2016, Plaintiff received the sixth and final incentive payment.

Plaintiff's HAMP Trial Period Plan[3] effective date was January 1, 2010 and the HAMP modification effective date was May 1, 2010. Plaintiff's sixth anniversary of her Fannie Mae HAMP modification effective date was May 1, 2016. According to Plaintiff, Defendant was therefore required to provide Plaintiff with her Recast Letter between January 2, 2016 and March 2, 2016.

Plaintiff received a letter dated March 30, 2016 from Defendant Ditech wherein Ditech offered Plaintiff the opportunity to "recast" her unpaid principal balance over the remaining term of the loan (Plaintiff's "Recast Letter").

## III. PLAINTIFF'S CORRESPONDENCE WITH DITECH

Plaintiff's claims against Ditech under the Real Estate Settlement Procedures Act ("RESPA") stem from Ditech's alleged insufficient responses to four letters Plaintiff wrote to Ditech in 2016 complaining of errors and requesting information related to her mortgage loan (referred to as "Plaintiff's Notices of Error" and "Requests for Information").

On June 16, 2016, Plaintiff wrote a letter to Ditech requesting a written explanation of several issues related to her mortgage loan and the timing of the March 30, 2016 Recast Letter. Ditech responded on July 21, 2016.

On August 10, 2016, Plaintiff wrote a letter to Ditech regarding the cancellation of PMI in connection with her mortgage loan. Plaintiff complained

---

[3] Borrowers eligible for HAMP loan modifications are generally placed on a monthly trial plan to allow the borrowers to demonstrate their ability to make timely payments at the new monthly payment level. If borrowers successfully make all required payments during the trial period, the mortgage company will execute an official modification agreement. This is referred to as the HAMP Trial Period Plan.

about Ditech's alleged failure to timely cancel PMI in accordance with the terms of her loan and requested additional information regarding the calculation of the unearned premium refund check sent to her in the amount of $26.71. Ditech responded on October 10, 2016,

On October 20, 2016, Plaintiff wrote a letter to Ditech complaining about Ditech's alleged improper servicing of her loan, including an (1) error regarding Plaintiff's HAMP Trial Period effective date – the applicable date for the payment of the $5,000 principal balance reduction incentive payment, and (2) an error in the amounts reflected in a Re-Amortization Agreement regarding the principal mortgage balance and the amount of her new monthly payments. Ditech responded on November 9, 2016.

Finally, on November 8, 2016, Plaintiff wrote a letter to Ditech requesting the Fannie Mae Servicing Guidelines Ditech relied on as justification for its delay in processing Plaintiff's acceptance of the re-amortization offer on her Fannie Mae mortgage loan (previously modified under HAMP) by claiming that additional approval was required from Fannie Mae to process her Re-Amortization Agreement. Plaintiff also requested that Ditech provide transcripts and actual recordings of all telephone conversations between Plaintiff and Defendant's employees. Ditech responded on December 19, 2016.

Plaintiff alleges that Defendant violated RESPA by failing to properly and adequately respond to each of her Notices of Error and Requests for Information.

## IV.    PLAINTIFF'S OBJECTIONS

Plaintiff objects to the R&R's recommendation that the Court should dismiss several aspects of Plaintiff's RESPA claim relating to the adequacy of Defendant's responses to Plaintiff's Notices of Error and Requests for Information.  Plaintiff's Objections fall into two basic categories.  First, Plaintiff objects to the R&R's conclusion that Plaintiff seeks to use RESPA to assert claims based on HAMP.  Second, Plaintiff objects to the R&R's conclusions that Plaintiff failed to state a claim based on violations of RESPA, finding that Ditech complied with RESPA by providing proper responses to Plaintiff's written complaints and requests.

### A. RESPA and Regulation X

For the most part, the Court adopts the R&R's summary of the legal principles applicable to a claim under RESPA.

RESPA is "a consumer protection statute that regulates the real estate settlement process." *Hardy v. Regions Mortgage, Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006) (citing 12 U.S.C. § 2601(a)). Because RESPA is a "remedial consumer-protection statute, [it] should be construed liberally in order to best serve Congress's intent." *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016).  The Consumer Financial Protection Bureau ("CFPB") is tasked with rulemaking authority under RESPA and has issued mortgage servicing regulations to implement RESPA's statutory provisions. 12 C.F.R. § 1024.1; *e.g.*, *Lage v. Ocwen Loan Servicing LLC*, 145 F. Supp. 3d 1172, 1182 (S.D. Fla. 2015),

6

*aff'd*, 839 F.3d 1003 (11th Cir. 2016) (citing 12 U.S.C. § 2617(a)).  "These rules are codified at 12 C.F.R. pt. 1024 and collectively known as 'Regulation X.'"  *Joussett v. Bank of America, N.A.*, 2016 WL 5848845, at *1 (E.D. Pa. Oct. 6, 2016).  In 2013, the CFPB amended Regulation X to implement new rules governing mortgage servicing that went into effect January 2014.  The new rules addressed servicers' obligations to "provide information about mortgage loss mitigation options to delinquent borrowers," among other things.    Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696 (Feb. 14, 2013).

RESPA – as implemented by Regulation X – allows borrowers to notify mortgage servicers of possible account errors and make requests for information relating to the servicing of a mortgage loan via "qualified written requests."  *See Nunez v. J.P. Morgan Chase Bank, N.A.*, 648 F. App'x 905, 907 (11th Cir. 2016); *see also* 12 U.S.C. § 2605(e); 12 C.F.R. § 1024.35(a) & (b).  A qualified written request (or QWR) may come in the form of a Notice of Error or a Request for Information.  *See* 12 U.S.C. § 2605(e)(1)(B)(ii) (providing that a "qualified written request" is written correspondence that "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower"); 12 C.F.R. § 1024.35(a) ("A qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error for purposes of this section, and a servicer must comply with all requirements

7

applicable to a notice of error with respect to such qualified written request."); 12 C.F.R. § 1024.36(a) ("A qualified written request that requests information relating to the servicing of the mortgage loan is a request for information for purposes of this section, and a servicer must comply with all requirements applicable to a request for information with respect to such qualified written request.").

A servicer[4] of a federally related mortgage loan must respond to a Notice of Error ("NOE") by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance; or

> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

12 C.F.R. § 1024.35(e)(1)(i).  Servicers must provide the borrower with copies of documents and information relied upon by the servicer in making its determination that no error occurred unless the documents relied upon constitute confidential, proprietary or privileged information. *Id.* § 1024.3(e)(4). Similarly, a servicer must respond within 30 days to a borrower's request for

---

[4] RESPA defines "servicer" as "the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)," 12 U.S.C. § 2605(i)(2).

information either by (1) "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing," or (2) "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available." *Id.* § 1024.36(d).

"RESPA requires mortgage servicers like [Ditech] to ***reasonably*** respond to Notices of Error." *Renfroe*, 822 F.3d at 1244 (emphasis added). "Basically, a servicer must respond by fixing the error, crediting the borrower's account, and notifying the borrower; or by concluding that there is no error based on a [reasonable] investigation and then explaining that conclusion in writing to the borrower." *Id.* (citing 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i)). Failure to comply with these regulations is a violation of RESPA, and results in a potential claim for actual damages, statutory damages, and attorney's fees. *Beltz v. CitiMortgage, Inc.*, 1:15-CV-2649-AT, 2015 WL 12964644, at *2 (N.D. Ga. Sept. 11, 2015) (Totenberg, J.) (citing 12 U.S.C. § 2605(f)) ("RESPA . . . is the remedial vehicle for violations of [its implementing] regulations.").

### B. The R&R erroneously concluded that Plaintiff is attempting to use RESPA to assert claims based on HAMP

The R&R recommends dismissing Plaintiff's claims related to a portion of her June 16, 2016 Notice of Error and her October 20, 2016 Notice of Error because "Plaintiff seeks to use RESPA to assert a claim based on alleged

violations of HAMP," under which there is no private right of action.[5]   (R&R at

18, 33.)  In her June 16, 2016 Notice of Error, Plaintiff complained to Ditech of its

delay in notifying her of the option to recast/re-amortize her mortgage.

Specifically, Plaintiff notified Defendant that "[t]he recast offer letter [she]

received was late in accordance with Fannie Mae's servicing guide." (Doc. 10-5 at

2.)  In her Complaint, Plaintiff points to the January 29, 2015 Fannie Mae Lender

Letter LL-2015-01 sent to "All Fannie Mae Single-Family Servicers" entitled

---

[5] The R&R also concludes that Defendant's failure to respond to Plaintiff's request for a copy of her Loan Modification Agreement is not actionable under RESPA because it does not relate to the loan's servicing.  (R&R at 22.)  The R&R did find, however, that Plaintiff could bring a claim pursuant to Regulation X based on her request for the Loan Modification Agreement because 12 C.F.R. § 1024.36 "requires the servicer to respond to the borrower's RFI even if the request does not relate to the servicing of a loan."  (*Id.* at 23.)  Plaintiff does not expressly object to the R&R's finding that requests for information regarding a loan modification do not relate to loan servicing as required to state a claim under RESPA.  But this issue is a kissing cousin of the R&R's conclusion that neither RESPA nor its mortgage servicing regulations encompass claims related to a loan modification or other mortgage loss options available to borrowers under HAMP (a federal loan program designed to reduce delinquent and at-risk borrowers' monthly mortgage payments). The Court therefore addresses it and finds it to be clearly erroneous.  The R&R's conclusion that Plaintiff's request for a copy of her Loan Modification Agreement is not a violation of RESPA, but is a violation of Regulation X, is unnecessarily parsing.  Regulation X was issued by the CFPB to implement RESPA under the authority granted to it by Congress in enacting the statute.  12 U.S.C. § 2617(a) ("The Bureau is authorized to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter."); § 2605(j)(3) ("The Bureau shall establish any requirements necessary to carry out this section"); 12 C.F.R. § 1024.1.  As the Supreme Court held in *Alexander v. Sandoval*, regulations applying a statutory provision are covered by the cause of action to enforce that statute and "[s]uch regulations, if valid and reasonable, authoritatively construe the statute itself, [cits.] and it is therefore meaningless to talk about a separate cause of action to enforce the regulations apart from the statute. A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well."  *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001) (citing *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995) and *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–844 (1984)).  "[S]ection 6 of RESPA does provide for a private right of action . . .  And Congress may explicitly establish a private right of action to enforce regulations made pursuant to a statutory program." *Joussett v. Bank of America, N.A.*, 2016 WL 5848845, *5 (E.D. Penn. Oct. 6, 2016) (internal quotations omitted) (citing 12 U.S.C. § 2605(f) ("Whoever fails to comply with any provision of this section shall be liable to the borrower[.]")).

"Notification of Future Updates to Borrower 'Pay for Performance' Incentives for a Fannie Mae HAMP Modification."  (Compl. ¶¶ 33-46; Doc. 1-4.)  The Lender Letter, issued pursuant to Fannie Mae servicing guidelines, provides a deadline for servicers to provide borrowers with notice of the re-amortization offer based on the effective date of the borrower's HAMP loan modification.

Plaintiff acknowledges that the recast offer letter is a part of HAMP, but asserts that her Notice of Error involves the servicing of her loan – i.e. offering the recast offer on a timely basis as required by Fannie Mae's servicing guidelines.  Plaintiff contends that a loan recast changes the principal and interest payments of the loan and is therefore directly tied to the servicing of the loan.

The R&R concluded that "Plaintiff's arguments about when the HAMP trial offer was effective and when she should have received a recast letter are based on HAMP" for which there is no private right of action.  (R&R 18.)  This conclusion is based on a flawed reading of Plaintiff's claim and the provisions of RESPA, as implemented by Regulation X, and is contrary to the CFPB's official interpretations of RESPA's requirements.

Under RESPA, borrowers may notify mortgage servicers of possible account errors" and account errors are "broadly defined" by § 1024.35(b) to include a residual category for "[a]ny other error relating to the servicing of a borrower's mortgage loan." *Nunez v. JP Morgan Chase Bank, N.A.*, 648 F. App'x at 907 (quoting 12 C.F.R. § 1024.35(b)(11)) (reversing dismissal of complaint

11

alleging violations of RESPA by mortgage servicer for failure to reasonably investigate and respond to notices of error concerning proper implementation of a loan modification agreement).   Although RESPA defines "servicing" as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan," *id.* § 2605(i)(3), the Dodd-Frank Act amended § 2605 of RESPA to broaden its scope with the addition section (k)(1)(c).   Section 2605(k)(1)(c) provides that servicers shall not "fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or ***other standard servicer's duties***," or "fail to comply with ***any other obligation*** found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."  12 U.S.C. §§ 2605(k)(1)(C), (E) (emphasis added); 78 Fed. Reg. at 10739 (Feb. 14, 2013).

As the CFPB explained in issuing the 2013 amendments to RESPA's Mortgage Servicing Rules in Regulation X,

> Section 6(e) of RESPA requires servicers to respond to "qualified written requests" asserting errors or requesting information relating to the servicing of a federally-related mortgage loan. Section 1463(a) of the Dodd-Frank Act amended RESPA to add section 6(k)(1)(C)[6], which states that a servicer shall not "fail to take timely action to respond to a borrower's request to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or ***other standard servicer's duties***." The Bureau believes that standard servicer duties are those

---

[6] Section 6(k)(1)(C) of RESPA is 12 U.S.C. § 2605(k).

typically undertaken by servicers in the ordinary course of business. ***Such duties include not only the obligations that are specifically identified in section 6(k)(1)(C) of RESPA, but also*** those duties that are defined as "servicing" by RESPA, as implemented by this rule, as well as duties customarily undertaken by servicers to investors and consumers in connection with the servicing of a mortgage loan. These standard servicer duties are not limited to duties that constitute "servicing," as defined in this rule, and include, for example, ***duties to comply with investor agreements and servicing program guides***, to advance payments to investors, to process and pursue mortgage insurance claims, to monitor coverage for insurance (e.g., hazard insurance), to monitor tax delinquencies, to respond to borrowers regarding mortgage loan problems, to report data on loan performance to investors and guarantors, and to ***work with investors and borrowers on options to mitigate losses for defaulted mortgage loans***.

78 Fed. Reg. at 10739 (emphasis added).

Regulation X's "notice of error procedure" specifically states that one error a borrower may raise is a servicer's "[f]ailure to provide accurate information to a borrower regarding loss mitigation options and foreclosure, as required by § 1024.39." 12 C.F.R. § 1024.35(b)(7); *McGahey v. Fed. Nat'l Mortgage Ass'n*, 266 F. Supp. 3d 421, 439 (D. Me. 2017) (holding that Regulation X, "specifically enumerates a "[f]ailure to provide accurate information to a borrower regarding loss mitigation options" as a covered error that may be the subject of a Qualified Written Request or Notice of Error"). Much of the remainder of 12 C.F.R. § 1024.35 describes a variety of other payment-related disputes that have traditionally been associated with loan servicing, and it includes a catch-all allowing borrowers to raise "[a]ny other error relating *to* the servicing of a borrower's mortgage loan." 12 C.F.R. § 1024.35(b). The catch-all indicates that

13

the previously identified types of errors – including the error of failing to provide accurate information regarding loss mitigation options – are "related" to servicing.  The CFPB specifically considered loss mitigation "related" to servicing when it promulgated this section.  More, the loss mitigation requirements of Regulation X impose requirements on *servicers* specifically – not loan originators, or loan owners.  In short, how can a request for information regarding loss mitigation measures not be considered "related" to loan servicing when the regulations make plain that servicers have significant obligations to engage borrowers in the loss mitigation and foreclosure avoidance process and when in practice servicers are almost always the primary points of contact for borrowers seeking such assistance?

Plaintiff's claim regarding the recast letter raised in her June 16th NOE is based on Defendant's failure to comply with Fannie Mae's Servicing Guide D2-3.2-07 on "Communicating with a Borrower Regarding Eligibility for the Expanded Borrower 'Pay for Performance' Incentive for a Fannie Mae HAMP Modification."   (Doc. 1-4.) Providing notice of the recast offer, available to Plaintiff in connection with her HAMP loan modification, qualifies as the type of a loss mitigation and/or foreclosure avoidance activity classified under Regulation X as a standard servicer duty.  *See McGahey*, 266 F. Supp. 3d at 439 (finding borrower's communications with his mortgage servicer regarding a HAMP application denial fell under RESPA); *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 805 (E.D. Pa. Sept. 24, 2014) (declining to dismiss RESPA claim

14

regarding communication about alleged HAMP error).  Thus, if a servicer fails to properly investigate a notice of error related to a HAMP modification, that is a violation of RESPA and gives rise to a claim for damages (i.e., the difference between the cost of the loan unmodified vs modified; or cost of the extra interest and fees caused by the delay), assuming the error actually caused damages (i.e., outcome would have been different if your NOE was properly reviewed).

For these reasons, the Court finds that Plaintiff's NOEs regarding Defendant's failure to provide accurate information regarding the recast offer and its failure to follow Fannie Mae servicing guidelines are complaints related to "standard servicer duties" and are thus "related to servicing" of her loan under RESPA.  *See Lage v. Ocwen Loan Servicing LLC,* 145 F. Supp. 3d 1172, 1190 (S.D. Fla. 2015) (discussing notice of error procedures as opposed to qualified written requests and acknowledging that a claim under RESPA for a failure to respond to a loan-modification inquiry is viable but granting summary judgment to servicer because plaintiffs failed to establish genuine issue of fact with respect to damages); *McClain v. CitiMortgage, Inc.*, No. 15-C-6944, 2016 WL 269568, at *5 (N.D. Ill. Jan. 21, 2016) (holding that letters that "properly sought clarification as to the status of [plaintiff's] modification and whether further documentation was needed" were QWRs related to servicing).[7]  Accordingly, the Court **SUSTAINS**

---

[7] The Court recognizes that there is case law that holds that these kinds of claims are not "related to servicing" as defined by RESPA.  Although many of these cases predate the 2014 amendments to Regulation X, some of these decisions were issued after the new provisions went into effect.  *E.g.*, *Bullock v. Ocwen Loan Servicing, LLC*, No. CIV. PJM 14-3836, 2015 WL

Plaintiff's Objection and **DECLINES TO ADOPT** the portion of the R&R concluding that Plaintiff is attempting to assert via RESPA claims under HAMP for errors related to Defendant's untimely notice of Plaintiff's option to recast her loan under Fannie Mae's HAMP servicing guidelines.

### C. The R&R failed to properly construe Plaintiff's allegations as required on a motion to dismiss under Rule 12(b)(6) by accepting Defendant's contentions that Ditech complied with RESPA by providing proper responses to Plaintiff's written complaints and requests

#### 1. June 16, 2016 NOE

Plaintiff also objects to the R&R's conclusion that she failed to state a claim for a violation of RESPA as it relates to the portion of her June 16, 2016 Notice of Error regarding Ditech's failure to timely provide a Recast Letter as required under the Fannie Mae servicing guidelines. (R&R 17-18.) In finding that Plaintiff failed to state a claim and had not "alleged facts indicating that Ditech's response was not reasonable," the R&R provides as follows:

> Twelve C.F.R. § 1024.35(a) requires the borrower to provide to the servicer written notice of "the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a). Plaintiff asserted in the letter that "the recast offer letter [she] received was late" because she "should have received it in November 2015." [Doc. 10, Ex. D]. ***However, Plaintiff acknowledges in her complaint that this***

5008773, at *10 (D. Md. Aug. 20, 2015) ("a request for information about loan modification does not constitute a QWR.") But even the more recent cases that hold that loan modification issues are not related to servicing often rely on authorities that predate the 2014 amendments to Regulation X. *See, e.g., id.* (*citing Van Egmond v. Wells Fargo Home Mortgage,* No. SACV 12-0112 DOC, 2012 WL 1033281, at *1 (C.D. Cal. Mar. 21, 2012). These decisions are difficult to square with the revamped Regulation X. The Court is therefore unconvinced that the distinction between "servicing" and loss mitigation activity is tenable in light of Regulation X's 2014 amendments.

> ***assertion was incorrect. Plaintiff now claims that she*** ***should have received the recast letter between January 2,*** ***2016, and March 2, 2016, not in November 2015 as she*** ***stated in the letter***. [Doc. 1 ¶¶ 45-47].
>
> RESPA states that the servicer is required to conduct an investigation and then "provide the borrower with a written explanation or clarification that includes . . . a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer[.]" 12 U.S.C. § 2605(e)(2)(B)(i) (emphasis added); accord 12 C.F.R. § 1024.35(e)(1)(i). In Ditech's letter dated July 21, 2016, ***the company responded by stating*** that it researched Plaintiff's inquiry. ***Ditech also offered a*** ***detailed explanation*** about "why the Recast Offer Letter was mailed on March 30, 2016." [Doc. 10, Ex. E]. Thus, ***Ditech fulfilled*** ***its obligations under RESPA and Regulation X*** "by concluding that there is no error based on an investigation and then explaining that conclusion in writing to the borrower." Renfroe, 822 F.3d at 1244 (citing 12 U.S.C. § 2605(e)(2); 12 C.F.R. § 1024.35(e)(1)(i)).

(R&R 17-18) (emphasis added).

Here, the error Plaintiff believed had occurred was that "the recast letter [she] received was late." (Doc. 10, Ex. D.) Plaintiff complained she should have received the recast offer letter before March 30, 2016 (the date of letter) and requested an explanation for the error and how it would be corrected. (*Id.*) At the time Plaintiff wrote the June 16 NOE, she believed the offer letter should have been mailed to her in November 2015. As she explained in her Complaint, however, Plaintiff had confused the Trial Period effective date and the HAMP modification effective date as the trigger for the notice.

Despite her mistake in the actual dates, Plaintiff was not mistaken about the existence of an error.[8]   Based on the documents in the record, Plaintiff's contention that the recast letter was late appears entirely accurate.  Under the terms of the Lender Letter, as Plaintiff has clarified in her Complaint, Ditech was required to provide notice to Plaintiff of the option to recast/re-amortize the unpaid principal balance on her loan "at least 60 days, but no more than 120 days, prior to the sixth anniversary of the Fannie Mae HAMP modification effective date" of her loan.  (Compl. ¶ 43; Doc. 1-4.)  Because the effective date of her loan modification was May 1, 2010, Ditech was required to provide the recast letter to Plaintiff between January 2, 2016 and March 2, 2016.  (*See* Compl. ¶¶ 40, 45; *see also* Doc. 1-3.)  Thus, when Defendant sent the letter on March 30, 2016, it was 28 days late.

The purpose of the recast offer is to inform the borrower that her mortgage loan could be re-amortized on or after the sixth anniversary of the Fannie Mae HAMP modification effective date of her existing loan in order to reduce her monthly payments.  (Doc. 1-4.)  Plaintiff alleges she was "damaged by receiving the Recast Offer after the Fannie Mae deadline because Plaintiff was delayed in accepting the Recast Offer and thereby paid additional interest that Plaintiff would not have otherwise had to pay if the Recast had been provided in a timely manner."  (Compl. ¶ 104.)  Had Defendant properly and timely provided Plaintiff

---

[8] As noted above, covered error includes the "[f]ailure to provide accurate information to a borrower regarding loss mitigation option," and "[a]ny other error relating to the servicing of a borrower's mortgage loan."  12 C.F.R. §§ 1024.35(b)(7), (11).

with the recast letter, she would have been able to begin the recast process sooner, thus allowing her to take earlier advantage of lower payments.

The R&R concludes that Ditech complied with its obligations under RESPA because it "responded by stating that it researched Plaintiff's inquiry" and "offered a detailed explanation about 'why the Recast Offer Letter was mailed on March 30, 2016.'" (R&R 17-18.)  But the "detailed explanation" is inaccurate and contrary to Fannie Mae's servicing guidelines as provided in the Lender Letter. According to Defendant's explanation, the Recast Offer Letter was mailed on March 30, 2016 because Plaintiff received her sixth Pay for Performance incentive payment of $5,000 on February 3, 2015.  No further explanation is provided.  The R&R acknowledges, but fails to accept, Plaintiff's allegations that the information provided by Ditech was "erroneous and misleading" because "the date of the sixth incentive paid by Fannie Mae" is not tied to when the recast letter should have been received.  (R&R 16-17 (citing Compl. ¶¶ 49-51).)

These allegations are supported by Defendant's own responses to Plaintiff's NOEs and the Fannie Mae Lender Letter outlining the requirements servicers must comply with in communicating with borrowers on the HAMP Pay for Performance Incentives.  According to the Fannie Mae Lender Letter, the recast offer letter must be sent a specified number of days prior to the sixth anniversary of the borrower's HAMP loan modification effective date.  Nothing in the Lender Letter indicates that the deadline for providing the required Re-Amortization notice is in any way dependent on the date of the payment of the final incentive.

Despite Plaintiff's allegation that this was in error and the lack of any explanation by Ditech tying the incentive payment to the notice, the R&R accepted Defendant's conclusion in its response letter that there was no error based on its investigation.   What is more, Ditech ultimately acknowledged on October 10, 2016 in response to another NOE from Plaintiff that "it is understood that the Recast Offer and Recast Agreement mailed on March 30, 2016 was delayed." (Doc. 10-7.)   However, the R&R contains no reference to Ditech's eventual acknowledgement of the error on which Plaintiff's claim is based.[9]

Rather than accept Plaintiff's allegations and construe them in her favor, as required under Rule 12(b)(6), the R&R was critical of Plaintiff's position and inexplicably lenient in construing the facts in favor of Defendant in the face of clear indications of Defendant's error and its failure to reasonably and properly respond to Plaintiff's June 16th letter.   *See Nunez*, 648 F. App'x at 909-10 (reversing grant of motion to dismiss  RESPA claim because the district court did not properly construe the facts alleged by the plaintiff in accord with the standard under Rule 12(b)(6), construed the defendant's responses to the plaintiff's notices of error as evidence of a reasonable investigation despite plaintiff having attached documents in support of her claims, ignored plaintiff's allegations that defendant

---

[9] Plaintiff also alleged that the information provided by Ditech was "erroneous and misleading" because "Plaintiff's HAMP trial offer was effective January 1, 2010, not February 1, 2010," as stated in Ditech's response.   (Compl. ¶¶ 52-53.)   The R&R acknowledges Defendant's error regarding the effective date of Plaintiff's HAMP Trial Period, noting that in its response to a subsequent NOE letter by Plaintiff on October 20, 2016, "Ditech corrected Plaintiff's HAMP trial offer date to accurately reflect the date as January 1, 2010."  (R&R 30.)

had failed to properly implement her loan, relied on the defendant's versions of the facts that contradict the allegations in the plaintiff's complaint, and improperly drew inferences in the defendant's favor in concluding that the defendant's   responses complied with "the letter and spirit of [RESPA]"); *Renfroe*, 822 F.3d at 1245 (reversing dismissal of plaintiff's RESPA claim, stating "In reviewing Rule 12(b)(6) motions, courts are bound to accept the plaintiff's allegations as true and to construe them in the light most favorable to her. Nationstar asks us to do the opposite. Nationstar suggests we should accept its contrary allegations — that it conducted a reasonable investigation into Mrs. Renfroe's account and found no error — and then to grant its motion to dismiss on that basis. We decline to do that . . . Nationstar's response letter does not contain specific factual details that foreclose Mrs. Renfroe's recovery as a matter of law.").

In doing so, the R&R ignored binding Eleventh Circuit precedent requiring the court to "liberally construe" RESPA as a remedial consumer-protection statute "in order to best serve Congress's intent." *Renfroe*, 822 F.3d at 1244; 12 U.S.C. § 2601(a) ("The Congress finds that significant reforms in the real estate settlement process are needed to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices" in the mortgage industry.)   The dismissal of Plaintiff's claim here would be entirely contrary to an express

purpose of RESPA – to ensure that borrowers be provided with "***greater and more timely information***," regarding the nature and costs of their mortgage loans.

Accordingly, the Court **DECLINES TO ADOPT** the R&R's determination that Plaintiff failed to allege facts indicating that Ditech's response was not reasonable.   Plaintiff specifically alleged that Ditech's response provided completely erroneous and misleading information.   "RESPA requires mortgage servicers like [Ditech] to reasonably respond to Notices of Error." *Renfroe*, 822 F.3d at 1244.   RESPA and Regulation X "require more than merely a substantive response to a claimant's NOE. Instead, the provisions also require a servicer to conduct a reasonable investigation into the alleged error. 12 C.F.R. § 1024.35(e)." *Gil v. Citibank*, 16-cv-1923-LMM, Order on Mot. to Amend, Doc. 24 (Sept. 2, 2016) (May, J.) (allowing amendment to include claims under RESPA despite the defendant's arguments that it sufficiently responded to the plaintiff's NOE because the defendant's "response does not tell the Court one way or the other if Seterus' investigation was reasonable," and in fact, "raises concerns that Seterus did *not* conduct a reasonable investigation").   Whether a response that provides inaccurate information is reasonable is a question of fact that cannot be determined in a defendant's favor on a motion to dismiss under Rule 12(b)(6). The Court **SUSTAINS** Plaintiff's Objections and **DECLINES TO ADOPT** the R&R's recommendation that Plaintiff failed to state a claim with respect to the portion of her June 16th NOE regarding the delayed recast offer letter.

### 2.  August 10, 2016 NOE and RFI

Plaintiff also objects to the R&R's conclusion that Ditech provided an adequate response to her August 10, 2016 Notice of Error and Request for Information regarding Ditech's calculation of the automatic termination date of PMI on her loan.  According to her Complaint, Plaintiff's NOE informed Ditech that she believed it had miscalculated her PMI automatic termination date and the amount of the unearned premium owed to her as a refund.  (Compl. ¶ 61.) She also requested documentation to support its response.  Plaintiff alleges that Defendant's October 10th response that June 1, 2016 was the automatic termination date on her loan was "patently false and misleading." (*Id.* ¶¶ 64-66.)

According to Plaintiff's Complaint, June 1, 2016 was the original automatic termination date for PMI when she refinanced her loan in 2007.  (*Id.* ¶ 10.) However, because Plaintiff entered into a loan modification, her PMI termination date was subject to recalculation to reflect the modified terms and conditions of the loan. (*Id.* ¶ 16.) Under the loan modification, Plaintiff's loan changed from a fixed interest rate to an adjustable interest rate.  (*Id.* ¶¶ 17-18.) As a result, Plaintiff's automatic termination date would have been based not on the date on the "initial amortization schedule" for her original refinancing, but on the "amortization schedule then in effect" at the time of the loan modification.  (*Id.* ¶¶ 18-21.)  The termination date for PMI is the date on which the principal balance of the mortgage, based on the applicable amortization schedule, irrespective of the outstanding balance for that mortgage on that date, is first

23

scheduled to reach 78 percent of the original value of the property securing the loan.  (Id. ¶ 19; 12 U.S.C. § 4901(18)(B).)  According to Plaintiff's Complaint, Plaintiff's PMI was required to automatically terminate on October 1, 2015 pursuant to the terms of her modified loan, following an increase in her interest rate on April 1, 2015, as provided in her loan modification agreement.  (*Id.* ¶¶ 23-25.)  Plaintiff alleges that Ditech's failure to correct her PMI termination date has caused her damage because she has paid additional PMI she did not owe and Defendant continues to refuse to recognize its error.  (*Id.* ¶¶ 120-121.)

The R&R concluded that Plaintiff's allegations reveal that Defendant Ditech complied with the requirements of RESPA and Regulation X because:

> Ditech did not respond with boilerplate language. Instead, Ditech **explained**, inter alia, that . . . "***based solely on the initial amortization schedule*** for [Plaintiff's] mortgage" and that this occurred on June 1, 2016.  Ditech also wrote that the last PMI disbursement occurred in the amount of $151.20 on April 4, 2016, which represented PMI payments for March, April, and May. [Doc. 10, Ex. F]. Ditech explained that a PMI notice was mailed on August 4, 2016, notifying Plaintiff of the cancelled PMI effective June 1, 2016, and including a refund of $26.71, which "was for the unused premium for the last PMI disbursement made, in the amount of $50.40." [*Id.*] . . . . These allegations show that Defendant Ditech responded to Plaintiff's August 10, 2016, letter by: investigating her allegations of error, concluding that no error had occurred based on the investigation, and explaining its reasons for the conclusion to Plaintiff in the October 2016 letter. [*Id.*]. Thus, Ditech complied with RESPA by providing to Plaintiff "a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer[.]" 12 U.S.C. § 2605(e)(2)(B)(i) (emphasis added); *accord Bates v. JPMorgan Chase Bank*, NA, 768 F.3d 1126, 1134-35 (11th Cir. 2014)[10]. ***Nothing more was***

---

[10] The *Bates* decision cited by the Magistrate Judge is distinguishable on this issue.  Bates sent Chase a "qualified written request" about its failure to credit her account with a $3,495 payment.

> ***required of Ditech*** [because] RESPA "does not require the
> servicer to provide the resolution or explanation desired by the
> borrower; it requires the servicer to provide a statement of its
> reasons." *Whittaker v. Wells Fargo Bank, N.A.,* 2014 WL 5426497,
> at *8 (M.D. Fla. October 23, 2014).

(R&R 28-29.)

Ditech does not explain in its response how or why it determined that Plaintiff's PMI automatic termination date was June 1, 2016 based on "the initial amortization schedule."  Ditech purportedly relies on the initial amortization schedule without taking into account the modification of Plaintiff's loan from a fixed rate to an adjustable rate and the resulting impact on the PMI termination date under the Homeowner's Protection Act. Ditech does not provide documentation of the amortization schedule relied on in support of its determination as requested by Plaintiff in her August 10th correspondence.

The R&R gives no credence to Plaintiff's allegations and accepts, without question, Defendant's representations.   Contrary to the R&R's characterization of Ditech's response, the October 10th letter provides conclusions without any explanation or support as to the PMI termination date or how it determined the amount of Plaintiff's refund, and there is no documentation attached to the letter

---

Chase responded, explaining that it had returned the funds from Bates's September and November payments because they were not certified funds and were inadequate to cure default. There is no indication in the decision that the plaintiff had alleged that Chase's straightforward response was erroneous.  Thus, the Eleventh Circuit found that Chase's explanation, "'provided the borrower with a written explanation . . .  of the reasons for which the servicer believes the account of the borrower is correct.' 12 U.S.C. § 2605(e)(2)(B)(i). Although Bates was confused and/or unsatisfied with this answer, the information provided an explanation to Bates as to what happened to her September payment and provided her with contact information for further support." *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1134–35 (11th Cir. 2014).

from which to determine the accuracy of Ditech's representations.  As a result, there is no information from which this Court can judge whether the response is reasonable.  *See Rice v. Green Tree Servicing, LLC*, 2015 U.S. Dist. LEXIS 122566 (N.D. W.V. 2015) (describing in complex detail all the statutory provisions relevant to the determination of the applicable PMI termination date under a variety of circumstances).  According to the R&R, all that RESPA technically requires is a response, and as long as the response does not contain strictly "boilerplate" language, the substance of the response is irrelevant to a claim under § 2605 of RESPA.  The Court rejects this premise as this reading would render RESPA's provisions meaningless and solely a paper game.  The R&R's conclusion that Ditech was not required to provide accurate information in response to Plaintiff's NOE and was not required to provide supporting documentation in response to Plaintiff's RFI cannot stand.

Accordingly, for the reasons stated above in Section IV(C)(1) *supra* at pages 20-22, the Court **SUSTAINS** Plaintiff's Objections and **DECLINES TO ADOPT** the R&R's recommendation that Plaintiff failed to state a claim under RESPA related to her August 10, 2016 NOE and RFI.

### 3.  October 20, 2016 NOE and RFI

Plaintiff objects to the R&R's conclusion that she failed to state a claim with respect to her October 20, 2016 Notice of Error and Request for Information.  Plaintiff's October 20th letter raising numerous complaints that the R&R considered to be duplicative of her prior requests for which the R&R found

that Ditech had already provided sufficient responses and was under no further

duty to respond.   The R&R found that Ditech properly responded that it had

previously responded to Plaintiff's complaints on a number of occasions because

> Regulation X provides that with regard to RFIs, the servicer is not
> required to comply with the response requirements of 12 C.F.R. §
> 1024.36(c) and (d) "if the servicer reasonably determines" that the
> "information requested is substantially the same as information
> previously requested by the borrower for which the servicer has
> previously complied with its obligation to respond[.]" 12 C.F.R. §
> 1024.36(f)(1)(i). Regulation X also provides that with regard to
> NOEs, the servicer is not required to comply with the response
> requirements of 12 C.F.R. § 1024.35(d), (e), and (i) "if the servicer
> reasonably determines that . . . [t]he asserted error is substantially
> the same as an error previously asserted by the borrower for which
> the servicer has previously complied . . . unless the borrower
> provides new and material information to support the asserted
> error." 12 C.F.R. § 1024.35(g)(1)(i).

(R&R at 31, 37.)   Plaintiff asserts in her objections, however, that "[n]ever, not

once, has Ditech explained why its calculations are correct or why Plaintiff's

calculations are incorrect, on the PMI automatic termination dates, the recast

payment amounts, or the PMI premium refund amount."  (Objections at 10.)

More specifically, Plaintiff objects to the R&R's recommendation that

Plaintiff's claim related to her October 20th letter should be dismissed because,

her NOE described in detail multiple errors by Ditech in the Recast Agreement it

forwarded to Plaintiff for her execution. Plaintiff therefore contends that her

October 20th NOE provided "new and material information" not previously

considered and, thus requiring a response from Ditech pursuant to 12 C.F.R. §

1024.35(g)(i).  Indeed, the October 20th letter was the first time Plaintiff had

raised the discrepancies regarding the terms of the Recast Agreement. It does not appear that the Magistrate Judge found that Ditech had previously provided responses regarding these errors.  Rather, it appears that the R&R found that the errors regarding the Recast Agreement were an improper attempt to bring a HAMP claim under RESPA.  For the reasons stated above in Section IV(B) *supra* at pages 11-15, the Court **DECLINES TO ADOPT** this finding of the R&R.

Additionally, it appears that the Magistrate Judge found that Plaintiff's allegations regarding the inaccuracies in Ditech's November 9th response regarding the applicable principle balance of Plaintiff's loan in the Recast Agreement and the additional errors raised by Plaintiff regarding her PMI termination date[11] were insufficient to state a claim because Plaintiff had "fail[ed] to assert that Ditech's allegedly erroneous responses constituted violations of RESPA."  For the reasons stated above in Section IV(C)(1) *supra* at pages 20-22, the Court **DECLINES TO ADOPT** this finding of the R&R.  *See also Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 805 (E.D. Pa. Sept. 24, 2014) ("Defendant … sent [Plaintiff] two letters with contradictory explanations for why her loan could not be modified. She then submitted her requests for information and Notice of Error, the responses to which were contradictory. Given the varying explanations Defendant offered for the treatment of the Loan account, Plaintiff now properly and adequately asserts that no 'reasonable investigation' has

---

[11] In her October 20th NOE, Plaintiff pointed out that on three separate dates, representatives of Ditech had provided her with contradictory information regarding the applicable termination date for her PMI.

occurred with respect to her Notice of Error."). Plaintiff has stated a claim under RESPA and Regulation X related to this portion of her October 20, 2016 NOE.

### 4. November 8, 2016 NOE and RFI

Finally, with respect to her November 8, 2016 Notice of Error and Request for Information, Plaintiff objects to the R&R's conclusions that: (1) Ditech's reference to a website containing Fannie Mae Re-Amortization servicing guidelines was an adequate response under RESPA, and (2) that Ditech was not required to produce copies of transcripts and recordings of all telephone conversations with Plaintiff because such information was either outside the scope of RESPA or was proprietary, confidential, burdensome or immaterial to the servicing of the account. (R&R at 37 (citing Defendant's December 19, 2016 Letter at Doc. 10-1-and 12 C.F.R. § 1024.36(f)(1)).

In both her October 20, 2016 and November 8, 2016 letters to Ditech, Plaintiff complained that Ditech had delayed in processing her acceptance of the Recast Offer Letter. In its November 9, 2016 response, Ditech informed Plaintiff that "a delay in issuing the permanent Recast Offer Agreement was the result of the investor, Fannie Mae, not providing the final approval until September 2016. Investor approval is required to be received and the time-line for that approval is outside of Ditech's control." (Doc. 10-9.) In her November 8, 2016[12] letter, Plaintiff requested that Ditech provide her with the servicing guidelines from

---

[12] The Court wonders whether the November 8th date of this letter is a typo (and whether the letter was actually written on December 9th) as Plaintiff would not yet have received Ditech's November 9th response.

Fannie Mae that support Ditech's claim that additional approval from Fannie Mae was required in order to process a HAMP Re-Amortization.  She further asked Ditech to "circle or underline specifics to make it clear."  (Compl. ¶ 88; Doc. 10-10 at 3.)  In its December 19, 2016 response, Ditech referred Plaintiff to a Fannie Mae web page with information regarding Re-Amortization Processing.

Plaintiff alleges in her Complaint that "Defendant's statement regarding 'investor approval' being required is a complete falsehood."  (Compl. ¶ 74.) She further alleges that according to the Fannie Mae Guidelines for "Communicating with a Borrower Regarding the Re-Amortization Option Related to the Expanded Borrower 'Pay for Performance' Incentive for a Fannie Mae HAMP Modification" Ditech was "was fully authorized to process the Recast Agreement and was not required to seek 'investor approval'."  (*Id.* ¶¶ 75-76.)  The R&R's determination that Ditech's reference to a webpage with these same Guidelines was a complete and adequate response to Plaintiff's request ignores the allegations of Plaintiff's Complaint.  According to Plaintiff, no such investor approval is required under the Fannie Mae Guidelines referenced on the website, and Ditech has not provided any further support for its justification in delay.   Therefore, for the reasons stated above at Section IV(C)(1) at pages 20-22, the Court **SUSTAINS** Plaintiff's Objection and **DECLINE TO ADOPT** this finding of the R&R.

Finally, Plaintiff objects to the R&R's recommended dismissal of her claim related to the transcripts and audio recordings of her telephone calls with Defendant.  The Magistrate Judge found Defendant's argument that it was not

required to respond to such a request persuasive because "Plaintiff made no response in any way to Defendant's arguments."   (R&R at 37.)   However, as Plaintiff points out in her Objections, in response to the Motion to Dismiss, Plaintiff cited *Pollack v. Seterus, Inc.*, which found that "[u]nder Regulation X, a servicer is required to respond, as directed elsewhere in the regulations, to "any written request for information . . . that . . . states the information the borrower is requesting with respect to the borrower's mortgage loan." 2017 U.S. Dist. LEXIS 202827 (S.D. Fla. Dec. 7, 2017) (citing 12 C.F.R. § 1024.36(a)).   More enlightening, however, is the CFPB's official interpretation of Regulation X as providing for borrower requests of copies of telephonic communication with a servicer.      *See*      https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa-interpretations.pdf (last visited September 7, 2018). "The servicer's personnel have access in the ordinary course of business to audio recording files with organized recordings or transcripts of borrower telephone calls and can identify the communication referred to by the borrower through reasonable business efforts. The information requested by the borrower is available to the servicer." *Id.* (citing 12 C.F.R. § 1024.36(d)(1)(ii)).

Accordingly, the Court **SUSTAINS** Plaintiff's Objection and **DECLINES TO ADOPT** the R&R's determination that Defendant was not required to provide a response to Plaintiff's request for transcripts and audio recordings in her November 9th letter.

## V.    CONCLUSION

For the foregoing reasons, the Court **ADOPTS IN PART** and **DENIES IN PART** the R&R as set forth above.  Defendant's Motion to Dismiss Count II under RESPA is therefore **DENIED**.

The Court **ORDERS** the parties to attend mediation to be conducted by a magistrate judge of this Court.  The Clerk is **DIRECTED** to refer this action to the next available magistrate judge for the purpose of conducting the mediation. In light of Ms. St. Claire's current *pro se* status[13], the Court finds that it would be helpful to the mediation process to appoint counsel for Ms. St. Claire solely for the purpose of facilitating the mediation.  Accordingly, the Magistrate Judge assigned to conduct the mediation is **DIRECTED** to identify and appoint pro bono counsel for Ms. St. Claire for this limited purpose. The mediation is to be concluded within 50 days of the appointment by the Magistrate Judge of pro bono counsel, unless otherwise extended by the Magistrate Judge.  If the case is not settled at the mediation, the parties are **DIRECTED** to file a status report with the Court by that date.  All deadlines in this action are **STAYED** and the case is **ADMINISTRATIVELY CLOSED** pending the outcome of the mediation.

---

[13] It has come to the Court's attention that the residence at issue in this litigation (and where Ms. St. Claire currently resides) is located in Gainesville, and now that Ms. St. Claire is proceeding without counsel, she files her pleadings with the Clerk's office in Gainesville.  The Court therefore advises Ms. St. Claire that she may seek to transfer this action to the Gainesville division if she desires, but that the case would then be reassigned to the district judge in Gainesville.  In the event Ms. St. Claire intends to seek a transfer, she is **DIRECTED** to do so within 14 days of the conclusion of the mediation if the case is not settled.

**IT IS SO ORDERED** this 21st day of September, 2018.


AMY TOTENBERG
UNITED STATES DISTRICT JUDGE