FILED IN CLERK'S OFFICE
U.S.D.C. - Gainesville

OCT - 3 2018

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **TRACI ST. CLAIRE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION NUMBER:** |
| **v.** ) | |
| ) | NO.   1:17-cv-03370-AT-JFK |
| **DITECH FINANCIAL LLC,** ) | |
| **f/k/a GREEN TREE SERVICING,** ) | |
| **LLC,** ) | |
| **FEDERAL NATIONAL** ) | |
| **MORTGAGE ASSOCIATION,** ) | |
| **DOE DEFENDANTS 1-50** ) | |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| **Defendant.** ) | |
| ) | |

## PLANTIFF'S FIRST AMENDED COMPLAINT FOR DAMAGES

COMES NOW, the Plaintiff Traci St. Claire, pro se, and amends her Complaint for Damages by substituting portions, amending portions, and supplementing portions of the original complaint, and for joinder of Additional Defendants, Federal National Mortgage Association ("Fannie Mae'), and shows the Court the following:

## PRELIMINARY STATEMENT

The Real Estate Settlement Procedures Act (Regulation X) ("RESPA") was amended in part to provide consumers protection from the abusive practices rampant within the loan servicing industry. "Given the nature of their activities, servicers can have a *direct and profound impact on borrowers*." See Mortgage Servicing Rules under RESPA (Regulation X), 78 Fed. Reg. 10696, 10699 (Feb. 14, 2013) (codified at 12 C.F.R. pt. 1024) ("Regulation X Amendments").

When a homeowner is forced to file a lawsuit in order to compel a mortgage servicer to comply with its statutory and regulatory duties under RESPA, something is seriously wrong with the system. When a servicer will essentially commit fraud in order to cover up its non-compliance with its statutory, regulatory, and contractual duties because it believes it can, and often does get away with it, the system is inherently broken.

These acts of non-compliance by mortgage servicers are nothing more than a *numbers game*. In this case as in others, put into perspective with the potential outcome, it's obvious that for many servicers, *gambling pays*. Many courts have stated that the law in regards to RESPA is sparse and the expansions under Regulation X are still relatively new. In addition, the proper application of these

statutes can be confusing to plaintiffs and their counsel. As such, plaintiffs may be inadequately represented if they can find representation at all.

I, representing the average borrower and between the dates of December 6, 2013 and June 13, 2016, made no less than *nineteen phone calls, sent two faxes, one letter, six messages through Ditech's website, and contacted no less than five outside agencies including Fannie Mae, for assistance in the attempt to get information, documents and to correct errors on my loan before I realized the potential for relief available to b*orrowers *under RESPA, specifically 12 U.S.C. § 2605(e), 12 U.S.C.§1024.35 and 12 U.S.C.§1024.36.*

Even after the commencement of this action Defendant Ditech continues to violate its contractual, statutory and regulatory obligations and RESPA, revealing its reckless disregard for the statute, consumer rights, and this court.

## **VENUE AND JURISDICTION**

### 1.

Plaintiff is a resident of the state of Georgia.

### 2.

Ditech Financial LLC ("Ditech"), formerly known as Green Tree Servicing LLC ("Green Tree") is a foreign corporation doing business in Georgia with its

Registered Agent for service of process being C.T. Corporation System, 289 S.
Culver Street, Gwinnett County, Lawrenceville, GA, 30046-4805

3.

The Federal Home Mortgage Association (Fannie Mae") is a government-
sponsored enterprise located at 3900 Wisconsin Avenue, NW, Washington, D.C.
20016.

4.

Fannie Mae is and remains the principal over its agent, Ditech, regarding the
servicing of Plaintiff's loan.

5.

Doe Defendant is a Mortgage Insurance Company.

6.

Doe Defendant is a Reinsurance or Insurance Company.

7.

Jurisdiction is proper under 28 U.S.C. § 1331 in that three of the counts within
this complaint involves a federal question.

8.

Venue is proper in this district under 28 U.S.C. § 1391(a)(2) and 28 U.S.C. §
1391(6)(2) in that all of the events and omissions giving rise to these claims occurred

in this district.

## **FACTUAL ALLEGATIONS**

9.

Plaintiff refinanced her home through Countrywide Financial in 2007.

10.

To memorialize the mortgage loan, Plaintiff signed a Note and Deed of Trust. This mortgage loan transaction is a "residential mortgage transaction" under 12 U.S.C. § 4901(15). See the Note and Deed of Trust dated June 22, 2007 attached hereto as Exhibit A.

11.

Included as part of the Note and Deed of Trust is a "Mortgage Insurance Disclosure" which states "If you have a fixed-rate loan, you will receive a disclosure at loan closing showing you when your loan is scheduled to reach 80% and 78% of the original value of the property. If you have an adjustable-rate loan, *the lender will notify you when your loan is scheduled to reach 80% and 78% of the original value* of the property, since these dates will change due to changes in the amortization schedule resulting from interest rate changes on your loan." See Exhibit A page 73. Ditech did not disclose, thereby breaching the terms of the Note and Deed of Trust.

12.

Also included the Note and Deed of Trust is a "Special Reinsurance Disclosure." This form discloses the existence of a reinsurance company owned by or affiliated with lender, provides borrowers with information regarding lender's reinsurance treaties with mortgage insurance companies, and provides the borrower with the option to "opt out" of having their mortgage insurance ("MI") included in any reassurance arrangement. See Exhibit A page 78. Ditech did not disclose this information to me, thereby breaching the terms of Note and Deed of Trust.

13.

The terms of this residential mortgage transaction required that the Plaintiff pay for Private Mortgage Insurance ("PMI"), which must be administered in accordance with the Homeowner's Protection Act ("HPA"). 12 U.S.C. §§ 4901 *et seq*.

14.

When the residential mortgage transaction was consummated in June 2007, the automatic termination date for PMI was listed on the PMI disclosure document provided at the real estate settlement closing as June 1, 2016.

15.

June 1, 2016 was the original automatic termination date because that was the date on which the remaining unpaid principal balance was scheduled to automatically fall below 78% of the original value of the loan. 12 U.S.C. § 4901(18)(A).

16.

The "original value" of a residential mortgage transaction is the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated.  12 U.S.C. § 4901(12).

17.

The appraised value at the time of the purchase was $166,000. In the case of a refinance, the statute requires use of the *appraised value* as the original value.

18.

Seventy-eight percent (78%) of $166,000 is $129,480.

19.

Bank of America Corporation purchased Countrywide Financial in July of 2008.

20.

In May 2010, Bank of America ("BOA") agreed to modify the terms of the original loan, adjusting the principal and interest rate. Attached as Exhibit B is a copy of the Home Affordable Modification Agreement ("HAMP").

21.

In addition to the principal and interest adjustments, the modified terms and conditions of the residential mortgage transaction included that the loan was no longer a fixed rate, but instead became a step rate or adjustable rate loan, pursuant to the definition of adjustable rate found in the HPA 12 U.S.C. § 4901(1) ("a residential mortgage that has an interest rate that is subject to change."). No other terms were modified.

22.

Under the HPA when a loan is an adjustable rate loan, the automatic termination date is determined by the "amortization schedule then in effect." 12 U.S.C. § 4901(18)(B).

23.

In particular, PMI shall automatically terminate for adjustable rate loans on "the date on which the principal balance of the mortgage *based solely on the amortization schedule then in effect for that mortgage*, and irrespective of the

outstanding balance for that mortgage on that date, is first scheduled to reach 78 percent of the *original value* of the property securing the loan." 12 U.S.C. § 4901(18)(B).

24.

12 U.S.C. § 4901(6) defines the term "then in effect" to mean "with respect to an adjustable rate mortgage, a schedule established at the time at which the residential mortgage transaction is consummated or, *if such schedule has been changed or recalculated, is the most recent schedule under the terms of the note or mortgage"* (emphasis added).

25.

Also, under the HPA, "The term 'original value', with respect to a residential mortgage transaction, means the lesser of the sales price of the property securing the mortgage, as reflected in the contract, or the appraised value at the time at which the subject residential mortgage transaction was consummated. In the case of a residential mortgage transaction for refinancing the principal residence of the mortgagor, *such term means only the appraised value relied upon by the mortgagee to approve the refinance transaction.*" 12 U.S.C. § 4901(12) (emphasis added).

26.

On or around July 2013, Green Tree purchased the servicing rights of the loan.

27.

Fannie Mae's Servicing/Selling Guide requires that servicers "comply with, all federal, state, and local laws (e.g., statutes, regulations, ordinances, directives, codes, administrative rules and orders that have the effect of law, and judicial rulings and opinions) that apply to…"  available at:

https://www.fanniemae.com/content/guide/selling/a3/2/01.html

28.

On or around December 2013, I called Green Tree and it declined to provide the date that my loan would reach 78% loan to value ("LTV") and instead told me that I could request an amortization schedule to assist me in figuring this out on my own. Essentially, Green Tree failed to disclose information it was under contract to provide.

29.

On or about December 30, 2013, Green Tree provided an amortization schedule which showed that the principal balance of my mortgage was scheduled to fall below the 78% threshold – $129,280 – with the September 1, 2015 payment.

30.

On January 1, 2015, Green Tree applied a HAMP "Pay for Performance" incentive payment in the amount of $1000 thus changing the amortization "then in

effect."

31.

On April 1, 2015, the interest rate on the loan stepped up from 3.75000% to 4.75000% once again creating a new amortization schedule "then in effect."  See also the HAMP Modification Agreement showing the effective dates of the step rate change at Section 3. C.

32.

Thus, pursuant to the new terms and conditions of the modified loan and the dictates of the Homeowner's Protection Act, the requirement that I pay PMI every month was required to automatically terminate on April 1, 2015.

33.

On or around April 2015, Green Tree Paid $63 million to settle "Federal Trade Commission and Consumer Financial Protection Bureau charges that it harmed homeowners with illegal loan servicing and debt collection practices." https://www.ftc.gov/news-events/press-releases/2015/04/national-mortgage-servicing-company-will-pay-63-million-settle.

34.

Sometime in 2014 or 2015, I became aware of my eligibility to earn an additional $5000 incentive payment and to re-amortize "recast" my loan through

Page 11 of 78

The Making Home Affordable Program in an online article from Housingwire. The article reads "While the housing sector has strengthened in recent years, there are still many homeowners struggling to make their mortgage payments," said Secretary of the Treasury Jacob Lew. The article continues with *"The changes we are announcing today offer meaningful incentives for borrowers to stay current in their modifications, increase their opportunity to build equity in their homes, and provide vital safety nets for those facing greater financial strains."*

Also within the article is "In addition to the additional $5,000 for homeowners, the new HAMP guidelines include offering some homeowners an opportunity to re-amortize the reduced mortgage balance, which *would lower their monthly payment*." (emphasis added).

https://www.housingwire.com/articles/32251-treasury-announces-hamp-changes.

35.

Indeed and pursuant to the MHA HAMP Guidelines, Fannie Mae's Lender Letter LL-2015-01 entitled "Notification of Future Updates to Borrower 'Pay for Performance' Incentives for a Fannie Mae HAMP Modification" dated January 29, 2015 ("Lender Letter"), outlined the extended borrower "pay for performance" incentive for one year and added an incentive of $5,000 in connection with the sixth

anniversary of the Trial Period Plan effective date. Attached as Exhibit C.

36.

Lender Letter LL-2015-01 is part of the Fannie Mae's overall *servicing guide*. (emphasis added). "The policy changes in this Lender Letter will be reflected in the April 2015 update of the *Servicing Guide*" (emphasis added). https://www.fanniemae.com/content/guide/svc121615.pdf

37.

On or around July 22, 2015 I called Green Tree to confirm its receipt of Form 720. See Exhibit C referencing Form 720 requirements.

38.

On August 29, 2015, I sent a letter via fax to then Green Tree and put it on notice that based on the HPA and the amortization schedule provided to me on December 30, 2013, I had determined that my loan was scheduled to reach 78% of the home's original value on September 1, 2015. Attached as Exhibit D is the August 29, 2015 letter with Appraisal.

39.

Effective August 31, 2015, Green Tree merged with Ditech Mortgage Corp. to form Ditech Financial LLC ("Ditech").

40.

On September 1, 2015 and through Ditech's website, I sent this message "I called on 8/28/15 and the customer service representative was rude and condescending. My message is concerning PMI removal. Please update the amount due on my loan immediately as I'm no longer required to pay PMI." Ditech never responded.

41.

On or around September 8, 2015, I received a letter from Ditech's Escrow Department dated September 3, 2015 regarding "FNMA MI Notice of Denial of Cancellation/Termination of Private Mortgage Insurance ("PMI")." This letter stated the reason for the denial was that my actual LTV was 87.12%. No other information as to how that LTV was calculated was provided.

42.

On or around September 8, 2015, I called Ditech to speak to someone about PMI.

43.

On September 9, 2015, I sent letter via fax to Ditech's Escrow Department. This letter advises that Ditech is not using the original value of $166,000 to

determine the automatic termination date at 78% LTV of PMI. Attached as Exhibit E is the September 9, 2015 letter.

44.

On September 15, 2015, in a case that is almost identical to mine, and in response to Ditech's motion for summary judgment, the Honorable Chief Judge Gina M. Groh opined that Ditech had violated the HPA when it used a value other than the original value to determine the automatic termination date at 78% LTV of Plaintiff's modified loan. Judge Groh also advised Ditech that "Plaintiff's *step-rate loan is an adjustable rate mortgage, as it has an interest rate that is subject to change (even if the date of each change is predetermined).* The applicable definition of "termination date" is therefore found in § 4901(18)(B) (emphasis added). See Curt Rice v. Green Tree Servicing, LLC, Civil Action No: 3:14-CV-93.

45.

On September 15, 2015, I again called Defendant Ditech regarding PMI.

46.

On September 15, 2015, I filed a complaint with the Better Business Bureau ("BBB") alleging violations of the HPA for failure to terminate my PMI when my loan reached 78% LTV. Attached as Exhibit F is Plaintiff's BBB complaint.

47.

The complaint is a qualified written request ("QWR") under RESPA 12 U.S.C. § 2605(e).

48.

The BBB, acting as agent to the borrower under 12 C.F.R. § 1024.35(a), sent the complaint to Ditech, who forwarded it to the appropriate department for review.

49.

On September 21, 2015, Ditech responded through the BBB that my LTV was 86.91%, that my original value was $146,292 and that the date PMI would automatically terminate at 78% LTV is 8/1/2020. Ditech followed up its response with a letter also dated September 21, 2015. This letter was sent through the U.S. Mail. See again Exhibit G.

50.

The letter was signed by Shea Anderson, Customer Service Correspondence Supervisor.

51.

Listed on Ditech's September 21, 2015 correspondence as the return address:

> Ditech Financial LLC
> 1400 Turbine Dr.
> PO Box 6172
> Rapid City, South Dakota 57709-6172

Page 16 of 78

52.

Ditech's address for receiving QWRs is at the same location however there is a one digit difference between the PO Box address:

Ditech Financial LLC
1400 Turbine Dr.
PO Box 6176
Rapid City, South Dakota 57709-6176

53.

Ms. Anderson, while under the employ of Ditech, made a false statement of material fact regarding the LTV and automatic termination date of PMI on my loan.

54.

On September 24, 2015, I filed a complaint with Consumer Financial Protection Bureau ("CFPB") alleging violations of the HPA for failure to terminate my PMI when my loan reached 78% LTV.

55.

On September 26, 2015 through the BBB, I attempted to explain to Ditech that the HAMP Modification Agreement didn't modify the original value of the loan. See Exhibit G.

56.

On October 1, 2015, Defendant Ditech responded through the BBB that in other words, that the modification changed the original value from $166,000 to $146,292. Attached to its response was a document referred to as Data Elements and an amortization schedule based on the HAMP Modification Agreement. Ditech followed up its response with a letter also dated October 1, 2015. This letter was sent through the U.S. Mail. See again Exhibit G.

57.

On October 3, 2015, I again attempt to explain to Ditech in other words, that the HAMP Modification Agreement did not change the original value of the loan. I also asked why the amortization schedule sent through the BBB was different than the one sent to me by Green Tree in December of 2013. See again Exhibit G.

58.

On October 9, 2015, Defendant Ditech responded through the BBB among other things, that "We are assuming the amortization schedule that Ms. St. Claire referenced in her letter was the one provided when the loan originated." Ditech followed up its response with a letter also dated October 9, 2015. This letter was sent through the U.S. Mail. See again Exhibit G.

59.

Shea Anderson did not review the documentation provided to her and thereby failed to investigate or correct this error and violated both provisions of 12 C.F.R. §1024.35(e).

60.

On November 13, 2015, Defendant Ditech's legal department responded to the CFPB complaint that "Ditech previously received correspondence from the Better Business Bureau regarding the same issues raised in this complaint filed with the CFPB. It further stated that "Ditech has not received any additional or new information that would alter our prior response." Ditech followed up its response with a letter also dated November 13, 2015. This letter was sent through the U.S. Mail. The CFPB closed the case. Attached as Exhibit G is Ditech's November 13, 2015 Letter.

61.

Ditech's paralegal, Cindy Leete, made a false statement of material fact regarding the LTV and automatic termination date of PMI on my loan and that it had not received any additional or new information.

62.

Despite Rice v. Green Tree, Defendant Ditech continued to violate the HPA and its employees and its own legal department falsely and materially represented that it had not received any information that would change its previous responses.

63.

On December 4, 2015, I called Defendant Ditech to discuss my issue with PMI and requested a payment history. Ditech never sent the payment history.

64.

On December 17, 2015, I called Ditech to inquire about form 720, related to the re-amortization or "recast" of my loan.

65.

On December 18, 2015, I submitted a complaint through Making Home Affordable ("MHA") regarding my incentive payment and PMI removal dates.

66.

The sixth year anniversary of the *Trial Period Plan effective date* was January 1, 2015 and as such, I thought that I should have received the offer to recast my loan.

67.

My loan was in good standing in accordance with the guidelines provided by Fannie Mae.

68.

On January 21, 2016 and through Ditech's website, I sent a message inquiring about the status of my incentive payment. Ditech never responded.

69.

On January 22, 2016, I received a letter from Ditech in response to my Making Home Affordable complaint. In its response, Ditech falsely states that "The $5,000 principal balance reduction payment will be payable the month after the sixth anniversary of the month in which the HAMP trial period plan effective date occurred, or when the payment is received by us from the U.S Treasury (whichever is later)..." Attached as Exhibit H is Ditech's January 22, 2016 letter.

70.

The six year Borrower Pay-For-Performance payment was in fact to be "Paid as principal reduction in the *sixth year anniversary month of the first trial period payment due date...*" (emphasis added). https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mb2.0_compens ation_matrix_04302015.pdf

71.

Defendant Ditech received the incentive payment from the Department of Treasury on February 3, 2016 and back dated that to January 1, 2016.

72.

My Fannie Mae *HAMP Modification effective date* was May 1, 2010.

73.

Thus according to Fannie Mae's Lender Letter, and despite the previous mix up, I should have received the recast offer letter no later than March 2, 2016.

74.

On February 25, 2016 I called Ditech to discuss the recast of my loan and was told *that I did not qualify for a recast* (emphasis added). This comment added to the ongoing confusion and frustration I was experiencing as a result of Ditech's error.

75.

On March 4, 2016, I again called Ditech to inquire about the recast offer.

76.

On March 5, 2015, I filed another complaint with the CFPB in an attempt to force Ditech's compliance with Fannie Mae's Servicing Guides and resolve the issue with the delayed written notice of the option to recast the UPB of my loan.

77.

On March 26, 2016, I once again called Ditech to inquire about the recast offer letter.

78.

On or after March 30, 2016, I received the recast offer letter option to re-amortize the unpaid principal balance of the loan. Attached as Exhibit I is the Recast Offer Letter.

79.

The recast offer letter contained several errors both in wording and in estimated values including two new payment amounts with the same term length, making it *very difficult* to understand and reconcile the estimates.

80.

The recast offer letter listed an "Estimated Unpaid Principal Balance at 6th year anniversary" (January 1, 2016) as $114,837.67 in spite of the fact the 6th anniversary was sixty one (61) days in the past.

81.

The recast offer letter also implied that if I chose to recast, my interest would increase when in reality, the total amount of interest paid over the life of the loan would not change at all.

82.

Had Defendant Ditech chose to use the HAMP model recast notice recommended by MHA and sent the recast timely in accordance with Fannie Mae's

Lender Letter, the recast offer and estimates provided would have made sense. This notice provided that "by making your mortgage payments on time at the scheduled amount, you may pay-off your loan earlier, which will reduce the amount of interest you pay over the life of the loan" and "With a recast (or re-amortization), your scheduled interest rate(s) will not change, but your principal and interest payment will decrease based on the lower unpaid principal balance (after all earned incentives are applied) that will be paid over the remaining term of your loan." See link to Model MHA Recast Notice.

https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/model_mha_rec
ast_notice_060115.pdf

83.

Ditech's recast offer letter did not offer this very important information which would have explained the differences in interest.

84.

Additionally, the recast offer letter provided that I had to sign and return it by May 4, 2016.

85.

Sometime in March or April, I requested a new amortization schedule. I received that schedule on or around April 13, 2016.

86.

Missing from the schedule was the current LTV. The schedule also noted: "The accuracy of these calculators and their applicability to your circumstances are not guaranteed. Projections are calculated with hypothetical figures that are entered by you (the user) with no verification from the system. There is no guarantee that the results given are accurate for your specific situation and can even be achieved."

87.

I again called Ditech in an attempt to understand the interest and terms of the recast letter. This call was made on April 13, 2016.

88.

Becoming increasingly worried that I might not get answers and miss the deadline, I faxed the signed recast offer to Ditech on April 20, 2016 with a note that stated that I accepted the agreement with the exception of paying any additional interest on my loan.

89.

In addition to the fax, I also called Ditech regarding a late fee that was erroneously applied to my account.

90.

On April 27, 2016, I called Ditech and was told that it would take 60 days to recast my loan. This was in contrast to the 30 days to process a recast listed on its website.

91.

If it would take 60 days to recast my principal balance, and my rate was due to increase on May 1, 2016 but yet I didn't get the recast offer letter until March 30, 2016, then the MHA option to re-amortize or recast to offset the pending rate adjustment and subsequent payment increase had failed its intended purpose.

92.

On May 1, 2016, my interest rate adjusted from 4.75% to 5.00%, thereby increasing my monthly payment.

93.

Had Ditech listened to my pleas that they were not following Fannie's Mae's servicing guidelines, specifically the instructions set forth in the Lender Letter, then the payment increase would not have had the same impact. See again Exhibit C.

94.

Out of continued frustration and confusion, I sent yet another message to Ditech through its website complaining again about the terms of the recast offer and that my loan had still not been recast. This was on May 3, 2016.

95.

On May 6, 2016 Cindy Leete again responded to the CFPB complaint that among other things, my PMI was due to terminate on August 1, 2016. This statement is a misrepresentation of material fact. This letter was sent through the U.S. Mail.

96.

On May 13, 2016, I replied to Cindy Leete and asked if she was aware of Rice v. Green Tree. This was among other issues outlined in the CFPB complaint.

97.

On May 17, 2016 I received a letter from Ditech dated May 11, 2016 that PMI had been either cancelled or terminated. This letter if mailed on May 11th, took six days to be delivered, excluding Sunday.

98.

On information and belief the May 11, 2016 was back-dated to avoid prosecution for violations of the HPA upon my mention of Rice v. Green Tree.

99.

On May 20, 2016 I sent a demand letter to Ditech via Fed Ex to the attention

of Cindy Leete, claiming that Ditech had violated the HPA and requested that it send

me unearned premiums, plus interest, and $2000 in statutory damages for a total of

$2796.66. Ditech received the letter on May 24th yet never responded.

100.

I made three more phone calls to Ditech between the dates June 10 and June

13, 2016 in an effort to resolve errors and issues on my loan.

101.

On June 16, 2016, I sent a letter to Ditech. This letter identified four separate

Notices of Error ("NOEs") and seven separate Requests for Information ("RFIs').

102.

Ditech timely acknowledged the receipt of my June 16, 2016 letter.

103.

In Defendant Ditech's July 21, 2016 response, sent through the U.S. Mail,

Jared Abelseth "*offered two full paragraphs of redundant information that I did not

ask for*, provided inaccurate and confusing information about the trial offer effective

date, and false information about why the recast offer was delayed.

104.

Further, Ditech enclosed a payment history in a font so small, that it was practically illegible and incomplete as it didn't include the month in which it was printed.

105.

In addition, receiving inaccurate, misleading and missing information after the many written inquiries, complaints and calls regarding this issue created even more confusion and anxiety. It was difficult to determine whether recasting my loan would have a positive or negative effect on my mortgage payments and/or interest owed on the loan and worry over whether my loan was being serviced properly.

106.

Further and because Ditech did not provide a signed modification agreement, I began to worry that perhaps my modification was not even valid.

107.

Most importantly, had Ditech actually investigated my complaint, it would have likely revealed that I had made a mistake in calculating the timeliness of the recast offer.

108.

Finally Ditech did not provide me with a statement of my "right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents…" And though Ditech did provide me with a phone number, it did not provide me with a contact. Therefore Ditech violated 12 C.F.R. §1024.35(e)(1)(i)(B) and 12 C.F.R. §1024.36(d)(1)(i).

109.

In conclusion, though Ditech's response was not boilerplate and appeared to be substantial, it was in fact exceedingly lacking. Attached as Exhibit J is the June 16, 2016 and July 21, 2016 correspondence with payment history.

110.

On July 28, 2016 I faxed a copy of the signed recast offer to the number on Ditech's response letter and to the attention of Jared Abelseth.

111.

On July 28, 2016 and August 03, 2016 out of desperation and continued frustration, I made two additional phone calls to Ditech.

112.

On August 4, 2016 I received a letter from Ditech stating that effective immediately, Ditech will no longer maintain an escrow account for PMI.  Included

with that letter was a check dated 8/3/16 in the amount of $26.71. See attached as
Exhibit K is a copy of the August 4, 2016 letter and Check.

113.

The amount of the unearned premiums was inaccurate. In addition, it was
untimely as it was provided 63 days after the supposed termination date of June 1,
2016, excluding travel time, rather than the 45 days required under the HPA. See 12
U.S.C 4902(f).

114.

As a result of Ditech's untimely and insufficient response, I continued to pay
unearned PMI premiums I did not owe and was anxious and agitated.

115.

On August 10, 2016 I sent letter to Ditech which identified six NOEs under
five RFIs.

116.

Pending Ditech's response to my August 10, 2016 letter, I received a
document entitled "Agreement for Modification of a Mortgage, Reamortization
Only, (HAMP Modification Assistance)" dated September 26, 2016 from Ditech.
(Hereinafter "Reamortization Agreement").

117.

On October 10, 2016 and after timely acknowledging receipt, Ditech sent its response to my August 10, 2016 letter through the U.S. Mail.

118.

As with the previous letter, Mr. Abelseth provided "While it is that the Recast Offer Letter mailed on March 30, 2016 was delayed, *the delay of the notice did not impact the overall balance due on the account.*" Thus, Ditech created a concern that was not a concern for me at all to make its response appear thoughtful when it was not.

119.

Ditech then reaffirms its previous error that the anniversary date of the HAMP trial offer was effective February 1, 2010, concluding that Ditech did not bother to investigate or correct this error.

120.

Ditech continues to repeat the information it previously provided, information once again that I did not ask for, want or desire.

121.

Ditech misrepresented that the delay was unavoidable after I had put them on notice that something was amiss as early as nine months prior.

122.

Further and in addition to previous misrepresentations, Ditech claims that the date that my loan was first scheduled to reach the automatic termination date was June 1, 2016 when Ditech knew from Rice v. Green Tree that the original PMI termination did not apply as my loan had been modified into a step rate loan.

123.

While Ditech did offer an explanation as to the unearned premium refund check, that explanation did not meet the minimum requirements under RESPA as the check was not from United Guaranty, but from Ditech. No documents were provided even though I had asked for them. 12 U.S.C. § 2605(e)(2)(C)(i).

124.

Because the PMI termination date was in error, and that error has still not been corrected, Ditech could not possibly provide any document to support the error. Thus, Ditech's response letter is patently false, misleading and contradicts earlier statements and documents. These are clear violations of the provisions of RESPA.

125.

Additionally though Ditech *did* provide the name of a contact person on this occasion, that information was also incorrect. Further Ditech did not provide "a statement of the borrower's right to request documents relied upon by the servicer in

reaching its determination, information regarding how the borrower can request such documents…" under C.F.R. §1024.35(e)(1)(i)(B). Attached as Exhibit L is the August 10, 2016 and October 10, 2016 correspondence.

126.

On October 19, 2010, I faxed the signed Reamortization Agreement to Ditech's designated address for receiving QWRs.

127.

On October 20, 2016 I sent a letter to Ditech.

128.

On November 9, 2016 and after timely acknowledging receipt, Ditech sent its partial response to my October 20, 2016 letter sent through the U.S. Mail. This letter was signed by Shea Anderson.

129.

Ms. Anderson's title of Customer Service Correspondence Supervisor had not changed since she had previously replied to my complaint with the BBB.

130.

Ditech states that it has previously responded to similar complaints and lists several dates. While it is true that Ditech responded on those dates, those responses contained false misrepresentations and contradictions and did not correct errors or

provide information or documents that it relied on to prove there were no errors. Therefore those responses were insufficient under RESPA.

131.

Specifically the PMI termination date of August 1, 2020 provided on September 21, 2015 contradicts the August 1, 2016 date in the May 6, 2016 letter, the May 6, 2016 contradicts the PMI termination date of June 1, 2016 in the October 10, 2016 letter while the May 19, 2016 letter, provided in response to a formal complaint with an outside agency, specifically declines to provide an answer to my request for the *PMI termination date* by stating among other things, that I must get an appraisal in order to *cancel* PMI. (emphasis added).

132.

*No explanation whatsoever was provided to explain the many, glaringly obvious contradictions* (emphasis added).

133.

I had never, not once complained that Ditech refused to cancel PMI but that *Ditech failed to terminate PMI when my loan reached 78% LTV and in violation of the HPA* (emphasis added).

134.

As outlined, the July 21, 2016 response was wholly insufficient and also contained inaccurate information.

135.

As such Ditech's statement that it had previously responded was itself nothing more than another false statement.

136.

In the third paragraph of Ditech's response letter, it *finally* corrects itself in regards to the trial period plan and in so doing, revealed that it *did* previously provide false information, and took no action to correct it for over three months, thereby violating RESPA.

137.

Additionally, the third and fourth paragraphs in part, regurgitate the content of previous responses that were not even in dispute.

138.

As such Ditech's statement that it had previously responded was itself nothing more than another false statement.

139.

Regarding my RFI on why Defendant had delayed applying the reamortization, Ditech stated in its November 9, 2016 response that it was the "result of the investor, Fannie Mae, not providing the final approval until September 2016. Investor approval is required to be received and the time-line for that approval is outside of Ditech's control."

140.

This statement is materially false as the reamortization as set forth by both MHA and Fannie Mae, outlined in detail the very process, incorporated that process into their servicing guides for mortgage servicers, far in advance and for the benefit of borrowers. See again Exhibit C dated January 29, 2015.

141.

Ditech further falsifies information that I requested by stating that a "hard copy of the executed Recast Agreement, with a live signature…" was required when in fact, the cover letter for the Reamortization Agreement required only that I sign and return it. Attached as Exhibit M is the Reamortization Agreement Cover Letter.

142.

As for Defendant's response to my Notice of Error in Paragraph 5 of the Recast Agreement, Ditech dismisses these discrepancies as merely "estimates"

without explaining why these numbers varied between the documents. Further Ditech reiterates the same false information it provided regarding the hard copy and live signature requirements in response to NOE number three.

143.

The advisory that my HAMP modification agreement is a "fixed step rate modification…" is without a doubt a clear attempt by Ditech to cover-up its violation of the HPA. The HAMP modification Agreement is utterly and completely devoid of the term of "fixed step rate" as a definition of the terms of the modification as outlined in Section 3. C. of that agreement. See again Exhibit B.

144.

Even though Ditech included a copy of the HAMP modification agreement with its correspondence, it did not because it could not reference any page, section, subsection or paragraph wherein the term "fixed step rate" was incorporated.

145.

In addition to its false and misleading response, Ditech also provided within the same paragraph, information that I did not ask for.

146.

Ditech makes two more false and misleading statements when it replied that the refund was from United Guaranty and that "The refund of the unused premium

could not be refunded to you prior to Ditech's receipt of refund from the PMI insurer." Again, the refund was from Ditech, not from United Guaranty. See also 12 U.S.C. § 4902(f).

147.

*Ditech made a materially false and deceptive statement of its statutory obligation to perform under a consumer protection statute to a consumer* (emphasis added).

148.

Because Ditech didn't answer accurately, honestly, timely correct errors or provide information that I requested, or provide a statement of my "right to request documents relied upon by the servicer in reaching its determination..." Ditech violated RESPA.

149.

As a result of Ditech statements, the anxiety and frustration I felt was amplified. Attached as Exhibit N is October 20, 2016 and November 9, 2016 Correspondence.

150.

On November 8, 2016, I sent a letter to Ditech that identified five RFIs.

151.

On November 13, 2016, I sent another letter to Ditech.

152.

The November 8, 2016 letter was missing page one, that page mistakenly replaced with page one of my previous letter from October 20, 2016. Therefore I included page one as an attachment to my letter dated November 13, 2016.

153.

The first part of the November 8, 2016 letter described my frustration in trying to reach the Single Point of Contact previously provided to me.

154.

The second part of page one described my anger and exasperation in trying to resolve the ongoing problems that I was experiencing including frustration and loss of sleep.

155.

My November 13, 2016 letter identified six separate NOEs and three RFIs and also describes in detail the toll this battle is taking on me and how at minimum and after everything I'd experienced, I might be deserving of an apology.

156.

Included within my letter was another mention of Rice v. Green Tree

Servicing. In addition, I attached another copy of a signed Remortization Agreement.

157.

Ditech responded in part, to my November 8, 2016 and November 13, 2016, on December 19, 2016.

158.

Ditech sent this letter through the U.S. Mail. This letter was also signed by Shea Anderson.

159.

In response to my request for telephone transcripts and recordings, Ditech responded: "Please be advised, any information requested outside the scope of RESPA, or which is proprietary, confidential, burdensome or immaterial to the servicing of the account, will not be provided."

160.

Ditech declines to provide any other information as to how my request are not applicable requests under 12 C.F.R. §1024.36(f).

161.

Ditech also failed to determine in a timely manner that it didn't have to respond under C.F.R. §1024.36(f)(1)(ii), thereby violating 12 C.F.R. §1024.36(f)(2).

162.

12 C.F.R. §1024.36(f)(2) requires that a servicer "notify the borrower of its determination in writing not later than five days (excluding legal public holidays, Saturdays, and Sundays) after making such determination. The notice to the borrower shall set forth the basis under paragraph (f)(1) of this section upon which the servicer has made such determination."

163.

In addition, Ditech makes the false and misleading statement that is has responded to previous requests when it had not and that my PMI had been canceled appropriately when it had not.

164.

More specifically, Ditech states: "It has been determined that the PMI was correctly cancelled effective June 1, 2016. *There are no corrections needed nor any additional refund due to you.*"(emphasis added).

165.

Ditech then lists many dates that it had responded including dates that I have absolutely no record of. Additionally Ditech didn't explain *how* it responded nor did it provide copies of all the responses to support those claims.

166.

Because I couldn't determine how Ditech had responded based on some of the dates given, the telephone transcripts and recordings were very important to resolving these issues and to reconcile what was happening and why.

167.

Notwithstanding, if Ditech *had responded and corrected errors, there would be no reason for further discourse.* Ditech had not responded or corrected the outstanding errors on my account (emphasis added.)

168.

Ditech did not respond accurately, correct errors or provide with a statement of my right to request documents relied upon by the servicer in reaching its determination or information regarding how I could request such documents.

169.

Clearly, Ditech's attempts to prevent me from using RESPA to resolve the ongoing errors and get information to help me figure out what happened caused me *extreme anxiety, frustration and anger.* Attached as Exhibit O is the November 8, 2016, November 13, 2016, and December 19, 2016 correspondence.

170.

On December 21, 2016 I met with attorney James Hurt to discuss the merits of my case against Ditech.

171.

On December 23, 2016, mentally and emotionally exhausted, I made three phone calls to Ditech to inquire about my loan and why my loan could not be recast.

172.

I spent a combined total of 61 minutes on those calls.

173.

In one of those instances, I spoke to a representative named William who told me among other things, the reason Ditech most likely had never received the Reamortization Agreement was that the return address provided on the cover letter was incorrect.

174.

Also on December 23, 2016, I received four large envelopes from Ditech that contained multiple copies of its previous responses with all the attachments to those responses.

175.

The fact that Ditech kept sending me the same documents over and over but couldn't show me how those documents supported there were no errors was also extremely upsetting to me, not only because it wasted my time, but I was bothered by the unnecessary waste of paper. Moreover, I felt like Ditech was punishing me and harassing me, simply because I chose to stand up for myself against them.

176.

Ditech's misrepresentations and omissions of material facts made me wonder what else could be wrong with my loan. I feared that most likely there were many other errors that I had yet to find and wondered how many other borrowers were unaware of the errors on their own loans because they didn't understand how to apply the federal statutes to their own situation and/or had fallen for Ditech's deceptions.

177.

All of this put a dark cloud over my holiday and it was difficult to explain to anyone what I was going through or how I felt because this was so complicated and anyone unfamiliar with these laws would most likely not understand.

178.

On December 24, 2016, I sent another letter to Ditech.

179.

Enclosed with my letter was a copy of the CFPB's interpretation of the provisions of Regulation X 1024.36 in question, a copy of the Rice v. Green Tree Servicing opinion, and Annual Escrow Account Disclosure Statements dated 5/2/2016 and 10/02/2016.

180.

Ditech responded in part to my December 24, 2016 letter dated January 13, 2017. The response was received in the U.S. Mail. It was signed by Shea Anderson.

181.

Ditech did not respond accurately or honestly, said it had responded when it had not, misrepresented material facts, did not correct errors or provide all the information I requested or mention that I could request documents and therefore did not meet the requirements under RESPA.

182.

In particular Ditech stated that it had previously responded when it did not and listed many dates. It is my belief that this intentional misrepresentation and concealment of material facts is meant to deceive the reader so that at first blush, it appears the servicer has gone above and beyond and it is the borrower abusing the servicer and RESPA.

183.

Ditech's also sent *nine large envelopes replete with multiple copies of my HAMP modification agreement, among other things, that I didn't request* (emphasis added). I could not locate my December 2013 amid all those documents despite looking several times. Attached as Exhibit P is the December 24, 2016 and the January 13, 2017 Correspondence.

184.

Sometime in January 2017, I met with James Hurt again and he agreed to handle my case. *This was a tremendous weight off of me knowing that I had someone in my corner that would help me fight this and bring Ditech to justice* (emphasis added).

185.

My loan was *finally* recast effective February 1, 2017, ten months after I should have received the initial offer. Though I had purchased Dave Ramsey's "Total Money Makeover on March 15, 2016, the ongoing battle with Ditech had dampened my spirits and enthusiasm and I had given up, depressed over the whole idea.

186.

This action was filed on September 5, 2017 and Ditech was served on September 6, 2017.

187.

On December 8, 2017, I sent Ditech another letter.

188.

Ditech did not timely acknowledge receipt of my letter and sent information to my attorney when I had *specifically asked that the response to be sent directly to me.* This action was harassing and disrespectful and I felt like it was an attempt to increase my costs of this action.

189.

Because Ditech didn't honor my request, it resulted in my sending an additional letter on December 23, 2017.

190.

Ditech partially responded to my December 08, 2017 letter on December 22, 2017. This letter was received through the U.S. mail.

191.

In its December 22, 2017 response, Ditech once again provides no explanation as to why some documents are proprietary or confidential; indeed, these account

notes *are part of the servicing file* available to me under RESPA.

192.

Further, Ditech doubles down on its previous false statement that it had previously responded on numerous occasions when it had not, but added the additional date of January 13, 2017, in which it was only partly responsive.

193.

In addition to Ditech's response to my RFI number two, *Ditech explains why my account is not a variable rate when the rate that is listed on the enclosed FNMA MI Cancel Request Review clearly states the loan is being serviced as a variable rate loan* (emphasis added). This constitutes fraud by concealment, omission, and misrepresentation.

194.

*Not only is this a clear attempt to again, avoid answering my question which would uncover the HPA violation, Ditech doesn't bother to acknowledge the glaringly obvious contradictions to its own previous statements* (emphasis added).

195.

In response to NOE number two and RFI number eight, Ditech's statement that it is "unable to determine the exact payment for which I reference the amount of $28.99 being misapplied" shows without a doubt that Ditech didn't even bother

to review the reports I supplied, let alone actually investigate as the reports were very detailed and specifically pointed out that the $28.99 represented the total of *twenty two different times payments that were erroneously applied to a UAF account.*

196.

Further, the requirement to timely credit payments to a loan is a violation of 12 CFR 1026.36(c)(1) and TILA 15 U.S.C. § 1639f(a) and a violation of the Note.

197.

I began to feel like RESPA was not a consumer protection statue that I could even rely on if a servicer could thwart my attempts to use it by turning it around to suit its own agenda. This was very discouraging.

198.

Ditech partially responded to my December 23, 2017 letter on February 26, 2018. This response was signed by Meredith Freeman, In-house counsel for Ditech and was sent by either U.S. mail or by Fedex.

199.

Ditech was not required to send an acknowledgement to my attorney and did so *after I asked it not to*. RESPA *does require* that servicers respond to a *borrower's*

*request.* As James Hurt *is not the borrower*, Ditech *did err* and *did not respond timely under RESPA* (emphasis added)*.*

### 200.

In reply to my RFI number one "how many times my monthly payment has changed…" I have no record of any response by Ditech on June 13, 2016. Further since I had not asked this specific question prior, Ditech couldn't have possibly responded on November 9, 2016 or on January 13, 2017 and a review of those letters confirms that. Thus Ditech did not respond and attempted to conceal and misrepresent materials facts.

### 201.

To avoid responding to further inquiries regarding my PMI, Ditech states that it won't respond because of pending litigation. There is no provision under RESPA that alleviates a servicer's duty to respond because a law suit has been filed against them.

### 202.

*Ditech has done everything in its power, including committing the act of fraud in an effort to keep me from discovering the information that I've been asking for over and over, the date that my loan actually did reach 78% LTV. In addition, the fact that an officer of the court would outright lie in order to cover up the theft of my*

*unearned premiums is beyond reprehensible* (emphasis added).

203.

Ditech's blatant denial that it had never violated RESPA or the HPA, reaffirming all previous false misrepresentations by and through its in-house counsel was not only disdainful but unnerving.

204.

I felt Ditech was trying to force me to press my own counsel for answers, creating further complications. This was extremely upsetting to me. Attached as Exhibit Q is the December 08, 2017, December 23, 2017, December 29, 2017 and February 26, 2018 Correspondence including for reference, the May 6, 2016 and May 19, 2016 letter.

205.

Ditech partially responded to my January 02, 2018 letter on March 13, 2018. This response was also from Ms. Freeman and it arrived via Fedex.

206.

Once again, Ditech tries to circumvent its obligation to respond under RESPA by distorting the statute to suit itself. Indeed Ditech's remark that pursuant to 12 C.F.R. § 1024.35(g) it's not required to respond is a perfect example of that.

207.

With one exception, Ditech's response letter endeavors nothing more than to send me on a "wild goose chase", referring me back to letters that contradict other letters, which contradict other letters, and back again. None of those letters answer my questions and each are separate violations under RESPA.

208.

Ms. Freeman fraudulently misrepresents that Ditech did not fail to respond to my request to provide the date my loan reached 78% LTV by referring me to page 2 of their February 26, 2018 where she declined to provide the date at all stating that it was not relevant under RESPA.

209.

Ditech corrects its October 10, 2016 response however that correction is actually a false representation of material fact. Further, this misrepresentation sought to hide excess money that was disbursed from my escrow and never returned or accounted for. Ditech did not correct any NOE and failed to adequately respond to the majority of inquiries and Ms. Freeman's statement that the final PMI disbursement was on 3/17/16 constitutes fraud by misrepresentation and concealment.

210.

Honesty, accuracy as well as transparency are duties under RESPA otherwise it fails Congress's intent. Ditech again violates RESPA with this letter by not investigating or correcting errors, not providing documents and providing inaccurate information about my loan. As a result, I continued to feel an unhealthy amount of anger, agitation, and stress over Ditech's rash responses. Attached as Exhibit R is the January 02, 2018 and March 13, 2018 Correspondence.

211.

On April 26, 2018 James Hurt's office forwards me a copy of the Magistrate Judge Janet King's Non-Final Report and Recommendation.

212.

Mr. Hurt's response was that he agreed with the Report and that he didn't plan to object to it. In a complete panic and in reply on May 6, 2018 I sent Mr. Hurt a nine page email with all the errors that I found along with supporting case law for my objections.

213.

I found myself even more anxious and worried and started to feel depressed. I stopped tending to my vegetable garden and stopped working in my yard which are things that I really enjoyed doing. I found myself waking up in the middle of the

night to pour over the documents, letters and payment histories Ditech had sent me, looking for clues but uncovering even more issues.

214.

I sent another letter to Ditech on June 4, 2018.

215.

Ditech partially responded to my letter on July 19, 2018. This letter arrived via Fedex and is again signed by Ms. Freeman.

216.

Ditech did not adequately respond to the majority of my requests, made further false statements of material fact, declined to provide the total interest as of the date of the loan modification, refused to provide information regarding extra principle payments that were not timely applied to my account, refused to provide amortization schedules and did not properly investigate my errors.

217.

In particular, Ms. Freeman made a false misrepresentation of material fact when she stated that the total of payments and total interest due on the loan is located on the modification agreement. Ditech declined to provide this information to me because it doesn't want me to discover this information.

218.

Another misrepresentation of fact is Ms. Freeman's statement that Ditech denies that it has failed to apply payments in accordance with the terms of the note when it most definitely has and admits so in this very letter. Further, Ms. Freeman attempts to conceal and omit information on this topic by declining to provide an answer to my question as to why my payments were sent into a UAF/suspense account. This reply also fails to meet the standards required under RESPA.

219.

I started to feel sick to my stomach when I made my mortgage payment. The closer I looked at my loan documents, the more issues I found. I was confounded as I had never before experienced this kind of callousness and to this extent from an organization let alone from another human being. Attached as Exhibit S is the June 6, 2018 and July 19, 2018 Correspondence.

220.

On June 8, 2018 I sent a letter to Ditech outlining in detail almost every contradiction, error and mistake they made in the grossly negligent handling of my HPA claim and their systematic attempt to cover it up almost from the very beginning.

221.

Ditech sends it partial response on July 26, 2018 via Fedex and it was again signed by Ms. Freeman.

222.

Ditech did not provide me with the information I requested to prove Ms. Freeman's statement regarding my PMI termination was accurate but instead points me to two letters as proof of its response that actually defeat its claim. Ms. Freeman's omissions constitute fraud.

223.

Ms. Freeman's denial of each of new and material allegation is in effect, fraud by concealment and the failure to reinvestigate and respond, in particular my claim that the wrong original value was entered into their system which is likely why their system didn't catch the automatic termination date is also a violation of RESPA.

224.

I was shocked and outraged at the stance that Ditech had taken that it had found no errors on my loan that it has responded to my inquiries and questions when it had not and with such obdurate and reckless disregard for my rights as a borrower and my contract. This has affected my sleep, my ability to focus on my business and

my relationship with my husband. Attached as Exhibit T is the June 8, 2018 and July 26, 2018 Correspondence.

225.

Even after repeated request, after repeated request, both before and after the commencement of this action, Ditech has not once supplied me with the actual date that my LTV reached the 78%. In fact, it has blocked every attempt I've made to discover this information, information that they had a duty to provide both under my contract and under RESPA.

226.

Ditech consistently responds to letters under RESPA in detail providing information not requested in a deliberate attempt to confuse and frustrate the issue and to make its responses appear substantive on its face to avoid violations under RESPA but then fails to answer the question asked.

227.

Ditech's business practices and policies and procedures are in place to assist in violating federal and local regulations and to avoid compliance.

228.

To date, I have been unable to reconcile my bank account with the payment histories Ditech has provided to me.

229.

As a result of Ditech's noncompliance with federal and local regulations and as a result of Fannie Mae's obvious negligence and total lack of care in making sure that their servicers comply with the same, I have suffered confusion, anxiety, insomnia, jaw pain from clenching my teeth, paranoia, extreme emotional distress, agitation, heart palpations, stomach pains and extreme anger and have often felt bullied and harassed. This has at times, affected my quality of life, my business and my personal and professional relationships.

## COUNT ONE – DITECH AND FANNIE MAE

## VIOLATIONS OF THE HOMEOWNER'S PROTECTION ACT

230.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

231.

Fannie Mae as agent to Ditech can be held vicariously liable in its negligent supervision of its independent contractors under federal law and for Ditech's HPA violations under 12 U.S.C 4907(c) where it's servicing guides and lack of oversite directly harm the rights of borrowers.

232.

Ditech violated 12 U.S.C § 4902(b) when it did not automatically terminate PMI when my loan reached 78% LTV.

233.

Ditech violated 12 U.S. Code § 4902(f) when it did not refund unearned premiums within 45 days.

234.

Pursuant to 12 U.S.C. § 4907(a)(1), Defendant is liable to Plaintiff for "actual damages sustained by the mortgagor as a result of the violation, including interest (at a rate determined by the court) on the amount of actual damages, accruing from the date on which the violation commences."

235.

Pursuant to 12 U.S.C. § 4907(a)(2)(A), Defendant is liable for statutory damages up to $2,000.00 for its violation of the Act.

236.

Defendant is also liable to Plaintiff for Plaintiff's reasonable costs of this action and attorney's fees to be determined by the Court.  12 U.S.C. § 4907(a)(3) and (4).

## COUNT TWO – DITECH AND FANNIE MAE

## VIOLATIONS OF THE

## REAL ESTATE SETTLEMENT PROCEDURES ACT

237.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

238.

Fannie Mae as agent to Ditech can be held vicariously liable in its negligent supervision of its independent contractors under federal law and for Ditech's RESPA violations where its servicing guides and lack of oversite directly harm the rights of borrowers.

239.

Ditech has failed to comply with 12 U.S.C. § 2605(e), in that it did not properly respond to numerous qualified written requests, did not take timely action to investigate errors or take timely action to correct those errors, or provide me with contact information despite my continued pleas and assertions that the account was in error.

240.

Ditech has failed to comply with 12 C.F.R. § 1024.35(a) in that it did not treat

the BBB as an agent of the borrower and properly respond and investigate my NOE.

241.

Ditech has failed to comply with 12 C.F.R. § 1024.35 in that it failed to timely and properly respond to numerous notices of error, did not take timely action to investigate errors or take timely action to correct those errors, provide me with documents that prove the account was not in error, explain why the account was not in error or provide me with contact information despite my continued pleas and assertions that the account was in error.

242.

Ditech has failed to comply with 12 C.F.R. § 1024.36 in that it failed to timely or properly respond to numerous requests for information and/or documents, and did not timely provide or refused to provide information or documents despite my continued pleas for information and/or documents.

243.

Ditech has failed to comply with 12 C.F.R. § 1024.36(f)(2) on numerous occasions when it did not timely identify that it was not required to respond under 12 C.F.R. § 1024.36(f)(1)(ii).

244.

Ditech has violated all provisions of 12 U.S.C. § 2605(e), 12 C.F.R. § 1024.35 and 12 C.F.R. § 1024.36 whereby the intent of Congress was found to imply that a servicers response to any QWR, NOE, or RFI be accurate, honest and reliable.

245.

Ditech has failed to comply with 12 C.F.R 1026.36(c)(1) on numerous occasions when it did not timely credit a payment to my mortgage loan account as of the date of receipt, thereby directly affecting the interest paid over the life of the loan.

246.

On all occasions, Ditech has failed to provide me with a statement of my right to request documents relied upon by the servicer in reaching its determination or information regarding how the borrower can request such documents. Therefore Ditech violated 12 C.F.R. §1024.35(e)(1)(i)(B) and 12 C.F.R. §1024.36(d)(1)(i).

247.

Ditech failed to maintain account notes in the servicing file in a manner that facilitates compiling such documents and data into a servicing file within five days. Therefore Ditech violated C.F.R. § 1024.38(c)(2).

248.

This complaint clearly reveals Ditech's pattern or practice and willful noncompliance under RESPA 12 U.S.C. § 2605(f)(1)(B).

249.

In addition and as a result of these RESPA violations, I have been financially and emotionally harmed.

250.

Ditech, as a result of the aforementioned violations is liable to me for all actual damages, including but not limited to emotional damages, the costs of this action, together with any attorney's fees incurred in connection with this action as this Court may determine to be reasonable under the circumstances.  12 U.S.C. § 2605(f)(3).

## COUNT THREE – FANNIE MAE

## TRUTH IN LENDING ACT

251.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

252.

Under TILA 15 U.S.C. § 1639f(a) Fannie Mae is responsible for Ditech's failure to timely credit numerous payments to my mortgage loan account as of the

date of receipt, thereby directly affecting the interest paid over the life of the loan.

## COUNT FOUR – DITECH AND FANNIE MAE

## BREACH OF CONTRACT

### 253.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

### 254.

Fannie Mae as agent to Ditech can be held vicariously liable in its negligent supervision of its independent contractors under local law and for Ditech's contract breaches and of the Note where its lack of oversite directly harms the rights of borrowers.

### 255.

Ditech has breached its contract with me for failing to provide the automatic termination date of PMI when my loan reached 78% LTV in accordance with the terms of the Security Deed and Note, specifically the Private Mortgage Insurance Disclosure.

### 256.

Ditech's failure to timely credit payments to my mortgage loan account as of the date of receipt breaches the term of the contract. This breach has occurred on

multiple occasions.

257.

Ditech has breached its contract with me by refusing to waive escrow.

258.

Ditech's breaches have caused me actual damages in the costs of this action interest, and emotional distress.

## COUNT FIVE – DITECH AND FANNIE MAE

## UNJUST ENRICHMENT

259.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

260.

Fannie Mae as agent to Ditech can be held vicariously liable for Ditech's unjust enrichment and for its negligent supervision of its independent contractors under local law.

261.

By its breach of our contract, Ditech has been unjustly enriched and I have been deprived of the financial benefits of my unearned premiums.

262.

By its breach of our contract, Ditech has been unjustly enriched and I have been deprived of the financial benefits of interest from being able to maintain my own escrow account.

263.

By its breach of our contract, Ditech has been unjustly enriched by its failure to timely credit principle curtailment payments and I have been deprived of the financial benefits of lowered interest over the life of the loan.

## COUNT SIX – DITECH AND FANNIE MAE

## NEGLIGENCE

264.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

265.

Fannie Mae as agent to Ditech can be held vicariously liable in its negligent supervision of its independent contractors under local law.

266.

Ditech has a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm.

267.

Ditech's negligence has breached this standard by not performing its contractual, statutory, and regulatory duties and not dealing with me honestly or fairly.

268.

As a result of Ditech's breach, I have suffered financial harm, including the costs of this action and emotional distress.

## COUNT SEVEN – DITECH AND FANNIE MAE
## NEGLIGENT MISREPRESENTATION

269.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

270.

Fannie Mae as agent to Ditech can be held vicariously liable for Ditech's negligence misrepresentations in its negligent supervision of its independent contractors under local law.

271.

Ditech has negligently misrepresented that it did not violate the HPA.

272.

Ditech has negligently misrepresented that my interest rate is not a step-rate or adjustable rate for purposes of determining the automatic termination date at 78% under the HPA.

273.

Ditech has negligently misrepresented the amount of PMI disbursements made from my escrow account.

274.

Ditech has negligently misrepresented and omitted the exact date that my loan did reach 78% LTV on numerous occasions.

275.

Ditech has negligently misrepresented and omitted PMI disbursements from my account in 2016.

276.

Ditech has negligently misrepresented that it did not violate provisions of RESPA.

277.

Ditech has negligently misrepresented that it did comply with Fannie Mae's Servicing Guides.

278.

Ditech has negligently misrepresented that it could not cancel my escrow account due the HAMP modification.

279.

Ditech has negligently misrepresented that it did not misapply any payments and did not violate the terms of my contract that directly relate to the application of payments.

280.

I involuntarily relied upon Ditch's negligent misrepresentations by paying PMI I did not owe, interest on a misrepresented principle balance I did not owe, additional interest over the life of the loan I did not owe, and by paying an escrow cushion amount of approximately two months of escrow payments that I wouldn't have had to pay if escrow would have been waived.

281.

As a result of my reliance upon these negligent misrepresentations, I have suffered financial harm, including the costs of this action and emotional distress.

## COUNT EIGHT – DITECH AND FANNIE MAE

## FRAUDULENT MISREPRESENTATION

### 282.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

### 283.

Fannie Mae as agent to Ditech can be held vicariously liable for Ditech's fraudulent misrepresentations in its negligent supervision of its independent contractors under local law.

### 284.

Ditech has fraudulently and knowingly misrepresented that it did not violate the HPA and attempted to conceal this from me.

### 285.

Ditech has fraudulently, willingly and knowingly omitted the exact date that my loan did reach 78% LTV on numerous occasions.

### 286.

Ditech also has fraudulently, willingly and knowingly misrepresented that my interest rate is not a step-rate or adjustable rate for purposes of determining the automatic termination date at 78% under the HPA.

287.

Ditech has fraudulently, willingly and knowingly misrepresented that I only tried to cancel my PMI to avoid admitting it violated the HPA.

288.

Ditech has fraudulently, willingly and knowingly misrepresented and omitted PMI disbursements from my account in 2016.

289.

Ditech has fraudulently, willingly and knowingly misrepresented that it did not violate provisions of RESPA, in an effort to avoid answering direct questions regarding my loan.

290.

Ditech has fraudulently, willingly and knowingly misrepresented that it did comply with Fannie Mae's Servicing Guides, when it did not and attempted to conceal this from me.

291.

Ditech has fraudulently, willingly and knowingly misrepresented that it could not cancel my escrow account due the HAMP modification and attempted to conceal this from me.

292.

Ditech has fraudulently, willingly and knowingly misrepresented that it did
not misapply any payments and did not violate the terms of my contract that directly
relate to the application of payments.

293.

The intention of Ditech's negligent and fraudulent misrepresentations and
omissions was to induce me to act or refrain from acting, notwithstanding the
commencement of this very action.

294.

I was forced to rely upon Ditch's negligent and fraudulent misrepresentations
by paying PMI I did not owe, interest on a misrepresented principle balance I did
not owe, additional interest over the life of the loan I did not owe, and to pay an
escrow cushion amount of approximately two months of escrow payments that I
didn't have to pay if escrow would have been waived.

295.

As a result of my reliance upon these negligent and fraudulent
misrepresentations and omissions, I have suffered financial harm, including the costs
of this action and emotional distress.

## COUNT NINE – DITECH AND FANIIE MAE

## CONVERSION

### 296.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

### 297.

Fannie Mae as agent to Ditech can be held vicariously liable for Ditech's conversion and for its negligent supervision of its independent contractors under local law.

### 298.

Ditech has committed the tort of conversion by taking and converting my unearned premiums for itself and not returning those funds despite multiple demands.

### 299.

Ditech has committed the tort of conversion by taking and converting my principle curtailment payments for itself and not returning those funds despite multiple inquiries.

### 300.

Ditech's conversion of my monies has caused me financial harm, including

the costs of this action and emotional distress.

## COUNT TEN – DITECH AND FANNIE MAE
## NEGLIEGENT INFLICTION OF EMOTIONAL DISTRESS

301.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

302.

Fannie Mae as agent to Ditech can be held vicariously liable for Ditech's negligent infliction of emotional distress and for its negligent supervision of its independent contractors under local law

303.

Ditech's negligent and repeated violations of federal and local laws have caused me to experience pain in my jaws from clenching my teeth, heart palpations and stomach pains arising from emotional distress.

## COUNT ELEVEN – DITECH AND FANNIE MAE
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

304.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

305.

Fannie Mae as agent to Ditech can be held vicariously liable for Ditech's intentional infliction of emotional distress and for its negligent supervision of its independent contractors under local law

306.

Ditech has committed the tort of intentional infliction of emotional distress under causing me to experience severe anxiety, worry, frustration, agitation and insomnia, which has over all affected my quality of life.

307.

Ditech's actions in its intentional, willful and stubbornly litigious refusal to admit or correct bona fide errors on my account over the course of three years and its constant, repetitive denial of access to information and documents directly related to the servicing of my loan along with its denial that it has ever violated the HPA, RESPA, my contract, or any federal statute, and converted my earned premiums and principle payments after it had been shown to them that it has is atrocious and utterly intolerable in today's civilized society.

308.

Ditech's outrageous and extreme conduct has caused me severe emotional distress which no human being should be made to tolerate.

## COUNT TWELVE – DITECH AND FANIIE MAE

## PUNTIVE DAMAGES

### 309.

Plaintiff re-alleges and avers all prior paragraphs pertaining to this cause of action as if set out here in full.

### 310.

Ditech is liable under O.C.G.A. § 51-12-5.1 for punitive damages for its willful, malicious, wanton and reckless conduct and for its specific intent to cause me harm.

**WHEREFORE**, I pray that I recover the following:

1.)   Actual damages;

2.)   Emotional damages;

3.)   General damages;

4.)   Treble damages;

5.)   Punitive damages

6.)   Expenses of this litigation

7.)   Any such other damages as are deemed appropriate by this honorable court.

Respectfully submitted, this 3rd of October, 2018.

**Traci St. Claire**

By: Traci St. Claire
8390 Emerald Pointe Lane
Gainesville, GA 30506
(404) 606-3021
tracistclaire@gmail.com